Name ___James Hickman Holloman___    Prison Number 229746

RECEIVED

Place of Confinement ___St. Clair Correctional Facility___

United States District Court for the Middle District of Alabama

2006 SEP -1  A II: 09

For the Southern Division

Case Number  1:06CV786-MHT

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

JAMES HICKMAN HOLLOMAN,

PETITIONER

        v.

RICHARD ALLEN, ALABAMA DEPARTMENT OF CORRECTIONS,

RESPONDENT.

## PETITION

1.    Name and location of court which entered the judgment of conviction under attack: __Dothan, AL, Houston County__

2.    Date of conviction:     __June 18, 2003__

3.    Length of sentence:     __Life Without Parole__

4.    Nature of offense involved:    __Capital Murder During a Burglary, Capital Murder During a Kidnapping, Attempted Murder and Attempted Murder__

5.    What was your plea?   (Check one)
   - (a)   Not guilty   ☒
   - (b)   Guilty   ☐
   - (c)   Nolo contendere   ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:   __N/A.__

6.    Kind of trial:   (Check one)
   - (a)   Jury   ☒
   - (b)   Judge only   ☐

1

7.  Did you testify at the trial?  <u>No</u>

8.  Did you appeal from the judgment of conviction?
    Yes  ☒    No  ☐

9.  (a)  If you did appeal, answer the following:
        (1)  Name of court:  <u>Alabama Court of Criminal Appeals</u>
        (2)  Result:  <u>Affirmed by  Memorandum</u>
        (3)  Date of Result:  <u>August 20, 2004</u>
        (4)  Citation:  <u>CR-02-1958</u>

    (b)  If you appealed to any other court, then as to the second court to
         which you appealed, give the following information:
        (1)  Name of Court:  <u>Supreme Court of Alabama</u>
        (2)  Result:  Petition for Writ of Certiorari - denied
        (3)  Date of Result:  <u>December 10, 2004</u>
        (4)  Citation:  <u>1040023</u>

    (c)  If you appealed to any other court, then as to the third to which
         you appealed, give the following information:  N/A
        (1)  Name of Court:
        (2)  Result:
        (3)  Date of Result:
        (4)  Citation:

10.  Other than a direct appeal from the judgment of conviction and
sentence, have you previously filed any petitions, applications, or motions
with respect to this judgment in any court, state or federal?

        Yes ____    No <u>X</u> ____

11.  If your answer to 10 was "yes," give the following information:
        (1)  Name of court:
        (2)  Nature of proceeding:
        (3)  Grounds raised:

12.  (a)  If you did appeal, answer the following:
        (1)  Name of court:
        (2)  Result:
        (3)  Date of Result:

(b)    If you appealed to any other court, then as to the second court to which you appealed, give the following information:
    (1)    Name of Court:
    (2)    Result:
    (3)    Date of Result:

13.    As to any second petition, application or motion give the same information:

14.    State concisely every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

**PLEASE SEE THE STATEMENT OF FACTS AND ISSUES THAT ARE INCLUDED WITHIN THIS PETITION.**

15.    If any of the grounds listed in were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

16.    Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐    No ☒

17.    Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a)    At preliminary hearing

(b)    At arraignment and plea:    Thomas K. Brantley, Clark M. Parker, and Tommy L. Stinson, 401 N. Foster Street, Dothan, AL 36303 (334) 793-9009); and Charles D. Decker, 26 2 W. Main Street, Dothan, AL 36301 (334) 702-2725)

(c)    At trial:    (Same)

(d)    At sentencing:    (Same)

(e)  On appeal:  _Gary A. Hudgins,   P.O. Box 1142, Dothan,  AL 36302_

(f)  Initial post-conviction counsel   _N/A_

(g)  Subsequent post-conviction counsel:   _N/A_

(h)  On appeal from any adverse ruling in a post-conviction proceeding: _N/A_

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes  ☒   No  ☐

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes  ☐   No  ☒

(a)  If so, give name and location of court which imposed sentence to be served in the future:_N/A._

(b)  And give date and length of sentence to be served in the future: N/A

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment, which imposed the sentence to be served in the future?
Yes _     No  _X_

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

STEPHEN A. STRICKLAND

JAFFE, STRICKLAND& DRENNAN, P.C.
2320 Arlington Avenue
Birmingham, AL  35205
(205) 930-9800

## INTRODUCTION

James Holloman appeals to this Court for a writ of Habeas Corpus under 28 U.S.C. § 2254. In 2003, in the Circuit Court of Houston County, Mr. Holloman was convicted of two counts of capital murder and two counts of attempted murder.

The conviction is unreliable.

First, the trial court refused to order John Gallia to appear in court as a witness for Mr. Holloman. John Gallia witnessed the crime. He was one of the victims. His testimony was material and favorable to Mr. Holloman. After refusing to compel Mr. Gallia's attendance, the trial court refused to continue the trial so that Mr. Holloman's counsel could depose Mr. Gallia.

Second, Mr. Holloman received ineffective assistance of trial, and there is a reasonable probability that the outcome of his trial would have been different.

## PROCEDURAL HISTORY

On June 19, 2000, a Houston County grand jury indicted James Holloman for the attempted murder of John Gallia and the attempted murder of Becky Clark. The grand jury also returned a two-count indictment charging Mr. Holloman with the capital murder of Jimmy Clark during the

course of a burglary and a kidnapping. Mr. Holloman pled not guilty and not guilty by reason of mental disease or defect.

The trial began on May 19, 2003. The jury found Mr. Holloman guilty as charged. At the sentencing phase, the jury recommended life. On June 18, 2003 the trial court sentenced Mr. Holloman to sentences of fifty years and seventy-five years for the attempted murders and one sentence of life without parole for the capital murders.

In a memorandum opinion (CR-02-1958) the Alabama Court of Criminal Appeals affirmed the conviction and sentence. The Alabama Supreme Court denied Mr. Holloman's petition for certiorari on December 10, 2004. Then, on September 29, 2005, Mr. Holloman filed a Rule 32 Petition for post-conviction relief in the Circuit Court of Houston County. The circuit court summarily denied the petition. On April 21, 2006, in memorandum opinion CR-05-0245, the Alabama Court of Criminal Appeals affirmed the summary denial. The Alabama Supreme Court denied Mr. Holloman's petition for a writ of certiorari on June 9, 2006.

## FACTS FROM COURT OF CRIMINAL APPEAL'S OPINION

The evidence presented at trial established that Holloman had been married to Sherri Holloman for nine to ten years at the time of the offenses. During their marriage, the Hollomans lived in Prattville. Two children were born as a result of that marriage, 8-year old Jamie and 6-year old Leslie. There was a history of domestic abuse during the course of the marriage; the

most recent incident occurred in April 2000, when Holloman broke Sherri's nose. As a result of this incident, Sherri planned to divorce Holloman. Thereafter, Sherri took the children and moved in with her parents, Jimmy and Becky Clark, in Rehobeth. While living with her parents, Sherri began dating John Gallia.

Holloman's father, who had observed that his son had anger-management problems, suggested that he seek professional help. On April 11, 2000, Holloman checked into Bradford Health Services. He admitted to the professionals there that he had substance abuse problems, marital problems, and that he had been charged with domestic assault. Holloman received in-patient rehabilitation between April 11 and May 1, 2000. His time at Bradford was not without consequence, however. On April 28, 2000, Becky Encizo, a Bradford counselor, was called outside by another patient to find Holloman with his hand bleeding from hitting a post because he was upset about something.

On another occasion, Holloman's father called and told him that a private investigator had stated that Sherri was having an affair. Holloman told Encizo that he had to "take care of business." He then explained that he planned to "lie in wait," kill his wife and her lover, then pen a suicide note and kill himself. Following this statement, Holloman ran into the woods behind the treatment facility. Officials at Bradford notified Sherri of this incident and recommended that she take herself and her children to a safe place. Holloman left Bradford on May 1, 2000.

On May 5, 2000, Holloman, who was in Prattville, had a conversation with his friend, Joey Oats. During the conversation, Holloman stated that his wife was visiting her mother in Dothan; he further stated that he was gong to Dothan to kill his wife. Still in Prattville, Holloman went to another friend's house and borrowed a Mossberg 20-gauge pump-action shotgun. During this time, he was driving a red pick-up truck.

On May 6, 2000, Gallia and Sherri took the two children on a day trip to the beach. That same day, Sherri's father, Jimmy Clark, asked the Sheriff's Department to patrol the neighborhood for the family's protection. That afternoon, Holloman telephoned the Clark residence and asked to speak to his children. Sherri's mother, Becky Clark, told him that they were gone to the beach. Holloman became hostile and told her that no one was going to keep his children away from him. Mrs. Clark told him that no one was trying to keep his children away from him, but that Sherri wanted a divorce. She told him that he could see the children any time he wanted as long as he worked it out with Sherri. Holloman reiterated that anybody who kept him from his children would be sorry. Frightened by the exchange, Mrs. Clark told her husband what had occurred.

Later that day, after Sherri, Gallia, and the children had returned from the beach, Holloman called back and had a telephone conversation with Sherri. The family assumed that Holloman was telephoning from Prattville.

At some point between 8:00 and 8:30 PM, Mrs. Clark looked up and saw Holloman standing a few feet away from her, armed with a shotgun. Jimmy Clark was sitting on one couch, Mrs. Clark was on another couch, and Gallia was sitting on the floor with eight year-old Jamie resting against his leg. Sherri was in another room, and six-year old Leslie was asleep in a bedroom. Holloman moved toward Gallia, who was unarmed, and shot him in the back while he sat on the floor with Jamie. Next, Holloman shot Mr. Clark, and then shot Mrs. Clark in the shoulder and the stomach. Sherri came running from the computer room and begged Holloman to stop shooting. Instead, Holloman shot Gallia a second time. Sherri ran toward the back of the house with Holloman firing the gun and chasing after her. Holloman then dragged a screaming Sherri by her hair through the house. As he dragged Sherri through the house and out the back door, Holloman told one of his daughters that she needed to find herself a new mommy and daddy. Mrs. Clark told her granddaughter to check on Mr. Clark. The child shook him, but he did not move. The child got a towel for Mrs. Clark and helped to telephone 911 for emergency assistance.

Some of the Clark's neighbors had observed a suspicious red truck driving up and down the Clark's street before the shootings. When they heard screams, the neighbors also telephoned for emergency assistance. Two young men ran toward the red truck as Holloman was placing Sherri in it. One of the men, John Daw, punched Holloman, who then put the shotgun on Daw's face. Holloman pulled the trigger, but nothing happened. Sherri pleaded for her husband to stop the killing and struggled to keep him from shooting Daw. Daw ran to this car and chased Holloman's truck, but he lost sight of it at an intersection.

Around 2:00 or 3::00 AM, Holloman telephoned his father in Prattville from Florida. Later that morning, Holloman and Sherri arrived at Holloman's father's house in Prattville. Holloman gave his dad the shotgun and after talking with the family, agreed to turn himself in to local authorities.

Forensic evidence was revealed that showed that the shell casings recovered from the crime scene came from the shotgun fired by Holloman. Additional testimony was offered to show that the cause of death for Jimmy Clark was multiple buckshot injuries to the base of the neck and upper chest, including a severed carotid artery and jugular vein. Becky Clark survived the attack, but lost bone in her shoulder, part of her stomach and a major portion of her intestines. John Gallia had a fractured arm, a collapsed lung, and suffered a life-threatening spinal injury from the shotgun blast that left him permanently paralyzed.

## GROUNDS SUPPORTING THE PETITION FOR RELIEF

A state court decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court precedent, or (2) when faced with materially indistinguishable facts, arrived at a conclusion different from that of the Supreme Court. Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000). A state court's decision amounts to an "unreasonable application" of federal law if it identifies the correct legal rule from Supreme Court case law, but applies that rule in an unreasonable manner to the facts of petitioner's case. Id. This could also occur if the state court unreasonable extends, or declines to extend, a governing legal principle (as established by Supreme Court case law) to a new context. Id. An unreasonable application of federal law does not refer to an incorrect or erroneous application, but rather to one that is objectively unreasonable. Williams v. Taylor, 120 S.Ct. 1495 (2000) (Williams II). When the state habeas court has held an evidentiary hearing, the findings of fact by the state court are generally presumed to be correct unless clearly erroneous. Conklin v. Schofield, 366 F.3d 1191, 1200 (11th Cir. 2004).

When there is a grave doubt about whether the state court applied the correct rule governing federal law when arriving at a challenged decision,

the rule that habeas relief may be granted only if the decision was contrary to or an unreasonable application of, clearly established federal law does not apply and the habeas court decides the issue or issues de novo. <u>Romine v. Head</u>, 253 F.3d 1349, 1365 (11th Cir. 2001).

It is respectfully submitted that the Alabama courts' decisions concerning James Holloman were contrary to clearly established Federal law as determined by the Supreme Court and/or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court. Moreover, the Alabama courts abused their discretion in their factual holdings and failure to properly consider all of the facts in this case.

## I. THE TRIAL COURT VIOLATED JAMES HOLLOMAN'S RIGHT TO COMPULSORY PROCESS WHEN IT REFUSED TO GRANT MR. HOLLOMAN'S MOTION FOR A CONTINUANCE.

## A. THE RIGHT TO COMPULSORY PROCESS.

The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." The right to compulsory process applies to the states, because "This right is a fundamental element of due process of law." <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967). The Supreme Court elaborated:

> **The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to**

> **present a defense, the right to present the defendant's**
> **version of the facts as well as the prosecution's to the jury so**
> **it may decide where the truth lies.** Just as an accused has the
> right to confront the prosecution's witnesses for the purpose of
> challenging their testimony, he has the right to present his own
> witnesses to establish a defense.

Id. Hence, "at a minimum, . . . criminal defendants have the right to the

government's assistance in compelling the attendance of favorable witnesses

at trial and the right to put before a jury evidence that might influence the

determination of guilt." Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987). To

establish a violation of this right, Mr. Holloman must show that the "that the

evidence lost would be both material and favorable to the defense." United

States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982).

## B.    THE EVIDENCE LOST WAS BOTH MATERIAL AND FAVORABLE TO JAMES HOLLOMAN'S DEFENSE.

In order to find James Holloman guilty of capital murder, the jury had

to find that he a particularized intent to kill Jimmy Clark. See Starks v. State,

594 So.2d 187 (Ala.Cr.App. 1992) and Russaw v. State, 572 So.2d 1288,

1292 (Ala.Cr.App. 1990). In addition, an intentional murder, standing alone,

is not a capital crime. Something more must be established to elevate an

intentional murder to a capital offense such as alleging that the murder was

during a burglary or kidnapping. In Mr. Holloman's case, he was convicted

on two counts of the capital murder Jimmy Clark  - (1) during the course of

a burglary and (2) during the course of a kidnapping. Mr. Holloman was also convicted for the attempted murder of John Gallia and the attempted murder of Becky Clark.

No one contested the fact of the killing; the issue at trial was Mr. Holloman's state of mind. The defense argued that Mr. Holloman acted out of a heat of passion. The defense also argued that the killing was not capital because he had a lack of a particularized intent to kill. In addition, it was not committed during the course of a kidnapping because Mr. Holloman never had the intent to harm Sherri Holloman. Nor was it committed during the course of a burglary because Mr. Holloman did not knowingly and unlawfully enter or remain in the house. The defense's theory was that the killing was either manslaughter or murder, but not capital murder.

One of Mr. Holloman's surviving victims, John Gallia, was in the house before, during, and after the shootings. Mr. Gallia had a fractured arm, a collapsed lung, and suffered a life-threatening spinal injury from the shotgun blast that left him permanently paralyzed. Mr. Gallia sent the following statement to the district attorney:

> There is no doubt in my mind Sherri Holloman shot Jimmy Clark and myself. Everything I did, including drive across the U.S. 4 times to try and get Sherri out of Alabama and to help her get away from James Holloman, was in vain because Sherri wanted nothing more than to piss off and cause a confrontation between James and myself. James called the house that night

and talked to Jimmy, then he talked to Sherri. Sherri gave the phone back to Jimmy after she was done, then asked Jimmy where James was calling from. Jimmy said, "I don't have my glasses on," and handed the phone to Sherri. Sherri looked on the caller ID and said nothing. About 5 minutes later, she told the kids to stay where they were and play. The kids were behind the couch. Sherri went into the other room and around 15 minutes later came through the kitchen and unlocked the back door. She then walked through the living room and looked at me with a smile and walked past us, back into the computer room. Jimmy and Becky, at this time, were sleeping on the couch. About 1 minute later, I saw the automatic light in the garage go on and thought it was odd. James Holloman then walked through the door holding a shotgun, and I started to get up. He then shot me. Jimmy said, "James for god sakes what are you doing?" He then shot Jimmy. Then he shot me again and then proceeded to shoot Becky. I heard James say, "I love you, baby," when he walked to the computer room. When we were in AZ 2 days before, I was sick of listening to Sherri and James fighting on Sherri's cell phone. Jimmy always told Sherri to just mash the button and hang up. Sherri never did and always fought James every chance she had. I told Sherri she was to get a plane ticket and go home. Sherri kept crying, "he's going to take my kids." I agreed to drive Sherri all the way back to AL, but I was to be gone the next day after we got there. Sherri said, "we have to take the kids to the beach." I agreed to do that, but the next day I would be gone.

This is just a small part of the story, but I believe when it goes to court, everything will come together, and I seriously doubt you'll get Murder 2 on James Holloman.

In short, Sherri Holloman used her mother, father, kids, myself, and James Holloman to cause what happened. She knew James Holloman was on his way there and said nothing. She unlocked the back door to let James Holloman in. Why do you think there were no signs of a break-in? This and a lot more questions will be answered in court. Did you know I was a certified peace officer for the state of Texas? Did you know my father is a retired Cobb County police officer? Think about my

credibility. On, by the way, while I was in the hospital, Sherri had stated that Wendy Hughes had stolen my cell phone. That was just to detract attention away from herself and make everybody look at Miss Hughes. Sherri's own family wouldn't talk to her that night. I wonder why. They all knew Sherri had caused this shooting. FBI would call that a clue.

This letter just scratches the surface of how far Sherri Holloman went. When the rest is revealed, your case against James Holloman will fall apart right in front of your eyes. I don't condone what James Holloman did, but I can understand why he did it. After you and the jury hears what I've been through for Sherri Holloman and the hell my life is now, everybody will know just what kind of evil person Sherri Holloman and Becky Clark really are.

I'm also surprised how I was never contacted after my initial statement. There's a whole lot more than somebody walking in and shooting 3 innocent unarmed victims, or maybe you do know. But then again, like you said, I was just a guy who got caught fucking someone's wife, right?

I have not made any statements to you out of fear for myself, my family, and my friends, because I know what kind of person Sherri Holloman is and how far she will go to lie and manipulate people. Soon you will know, too. My address is to be kept confidential.

This is my statement. This is the truth.

(C. 346-347). See also C. 343-354, 370-371, 390 and R. 2-17 from April 29, 2003 hearing.

For the burglary charge, the State had to prove that Mr. Holloman entered or remained "unlawfully" in the Clark home with the intent to commit a crime. Ex parte Davis, 737 So.2d 480, 483 (Ala. 1999). Care

must be made to prevent every intentional murder committed indoors into capital murder or to likewise make virtually any crime committed indoors a burglary as well. Ex parte Davis, 737 So.2d at 483-86. Moreover, in the Court of Criminal Appeals opinion, it found that the victims thought Mr. Holloman was telephoning from far away, in Prattville.

However, Mr. Gallia would have proved there was no burglary and, therefore, the murder was not a capital murder committed during a burglary. Mr. Gallia would have testified that, on the night of the incident, Mr. Holloman called Sherri Holloman. Sherri looked at the caller ID and saw the call was being made locally. Sherri picked up the phone, talked with Mr. Holloman, and knew that Mr. Holloman was calling. Mr. Holloman wanted to see his children. Sherri later went to the backdoor and unlocked it to let Mr. Holloman in. Less then three minutes later, Mr. Holloman walked through the unlocked door. From this the jury could infer that Mr. Holloman had been expected and the back door had been unlocked for Holloman because he was an invited guest; evidence that the entry was not an act of burglary. See C. 343-354, 370-371, 390 and R. 2-17 from April 29, 2003 hearing.

On the capital murder/kidnapping charge, at the close of the State's case-in-chief, defense counsel moved for a judgment of acquittal with

respect to each of the individual charges against Holloman. (R. 1059-1077,1567-1584). The trial court expressed concern about the first-degree kidnapping charge, but nonetheless denied the motion at that time. (R. 1077-1087). At the close of all the evidence, the trial court ruled that the evidence was sufficient to support capital murder during the course of a kidnapping or an attempt thereof, but granted Holloman's motion for acquittal with respect to the first-degree kidnapping charge. (R. 1584).

Throughout the trial, as proof of the capital murder/kidnapping charge, the state emphasized Becky Clark's testimony that Mr. Holloman said to his daughter she would need a new mommy and daddy. (R. 1682, 1739). In his closing argument, the prosecutor stated: "as he's going by his daughter, he says, you going to have to get yourself a new daddy and a momma. What does that tell you what his intent was at that time? He intended to carry out his plan . . . his intent was to kill Sherri and kill himself." (R. 1682). The trial court admitted the evidence on the kidnapping was very weak but held that the statement to Mr. Holloman's daughter was why he would not dismiss the "kidnapping capital murder count." (R. 1085-1087).

John Gallia could have rebutted this alleged statement had he testified. Though Mr. Gallia witnessed the entire event, he made no mention of this

statement in his letter to District Attorney Doug Valeska. The only thing Gallia recalled hearing was Mr. Holloman say "I love you baby." (Id.).

On appeal, the Court of Criminal Appeals held that "the fact that Holloman was not convicted of the first-degree kidnapping as originally charged in the indictment, does not prevent him from being convicted of the capital murder of Clark which was committed before he renounced his plan to kidnap Sherri Holloman." (Holloman v. State, page 11). Nevertheless, the trial court's holding confirms that the State already had some problems with its kidnapping charge. Mr. Gallia's testimony would have created further problems for the State and would have negated the capital murder/kidnapping charge.

In addition, Mr. Gallia would have negated the prejudicial statements of Becky Clark that Mr. Holloman was laying on the legs of John Gallia when he was shot. C. 343-354, 370-371, 390 and R. 2-17 from April 29, 2003 hearing.

Finally, Mr. Gallia hinted at several other facts relevant to Mr. Holloman's defense. Mr. Gallia said in the statement to the district attorney, "When the rest is revealed . . . everybody will know just what kind of evil person Sherri Holloman and Becky Clark really are." (C. 346-347).

Recounting Sherri's misdeeds would have added to the heat of passion defense.

Hence, Mr. Gallia's testimony would have offered material evidence favorable to Mr. Holloman's defenses. Mr. Gallia was a crucial eyewitness and the outcome would most likely have been different.

## C. THE TRIAL COURT REFUSED TO GRANT A REASONABLE CONTINUANCE.

John Gallia had moved to California and would not come to Alabama for the trial. (R-345). Mr. Holloman's attorneys diligently pursued Mr. Gallia's testimony. In preparation for the trial, Mr. Holloman's attorneys had secured a rental car for Mr. Gallia. (C. 345). They were ready to help him get to Alabama from California. (C. 345). **When Mr. Gallia refused to come, Mr. Holloman filed a petition with the trial court on April 7, 2003, requesting an order compelling Mr. Gallia's attendance. (C. 343-348). The court denied it. (C. 349).**

After the court refused to compel Mr. Gallia's attendance at the trial, Mr. Holloman's counsel then tried to preserve the testimony via deposition. (C. 370). By an order dated April 29, 2003, a deposition was to be taken telephonically by the parties here in Alabama with a court reporter in California. (C. 354).

19

On May 9, 2003, everyone involved arrived on time and prepared, except Mr. Gallia. (C. 370). Mr. Holloman immediately contacted attorneys in California, so that they could file a petition in a California court compelling Mr. Gallia's attendance at another deposition. (C. 370-371). On May 13, 2003, Mr. Holloman asked the trial court to continue his trial long enough for the order to issue and the deposition to occur. (C. 370-371). The trial court denied the request. (C. 428-430).    However, the court issued a "Certificate of Judge of Requesting State for Attendance of Out-of-State Witness." (C. 390, 9).  The court wrote in the certificate that the testimony of John M. Gallia may be necessary and material in the forthcoming trial. (C. 390).

## D.    THE    TRIAL    COURT'S    ORDER    ON    MOTION    FOR CONTINUANCE UNDER SEAL.

This case is set for trial for May 19, 2003.  It has previously been set for trial twice – for March 2003 and April 2003.  It was continued for defendant in March to complete a psychiatric examination with the understanding that defendant would be ready for trial on April 21, 2003. Prior to April setting, the defendant made known to the Court that he wanted to call the witness, John Gallia, to appear for trial; that Gallia is a paraplegic confined to a wheelchair and lives in California. Gallia was refusing to voluntarily appear to testify and the defendant wanted to take his deposition to be used at trial. The defendant appeared, along with the state, and moved for continuance of the April trial on the contention that he had not been able yet to arrange for the deposition, even though it had been ordered.  The Court later agreed that a deposition could be taken and with a video being made as Gallia testified.

Arrangements were made for Gallia to appear at a court reporter's office in California; that the Court, the defendant, defendant's attorneys and the District Attorney would gather at an appointed time and place in Dothan and the deposition would be taken telephonically. This was all arranged to be done on Friday, May 9, 2003, at 11:30 a.m. (CDT), 9:30 a.m. (PDT). On May 9, 2003, everyone appeared for the arranged deposition, except the witness, John Gallia. Everyone waited an additional 45 minutes hoping that Gallia would appear even though he had told the defense attorneys that he might or might not appear.

The defendant has now moved for another continuance alleging that he is hopeful that if this Court will issue an order for Gallia's appearance in this Court that a state judge in California might also issue an order for Gallia to be arrested and made to return to Alabama to testify. This court has received a statement taken by the Sheriff's Department of Houston County right after the incident in question and also an e-mail statement purportedly sent by the witness Gallia to the District Attorney of Houston County. The latter was sent many months after the original was taken. The statements, assuming the second was truly from Gallia, are inconsistent. **The Court makes no judgment as to which statement is true.** The Court only knows that Gallia has refused to willingly appear for trial in Alabama; that he has refused to appear in California for a deposition; and that he is a paraplegic confined to a wheelchair. The defense attorneys, in an effort to be absolutely candid with the Court, have confided to the Court that the witness Gallia has attempted to extort money from them in exchange for his testimony and that he has told them that he will never be served to appear in Alabama. The Court is not convinced that John Gallia's testimony is necessary or material for the defense of this defendant. As a matter of fact, the Court believes that Gallia's testimony might very well be very detrimental to the defendant.

The Court is, therefore, denying the defendant's motion for continuance and **is issuing this order under seal, to be forwarded to the defendant only, so as not to unduly prejudice the defendant in the event he is able to ultimately depose Gallia or convince him to appear for trial.**

(C. 478-480).

## E. THE ALABAMA COURT OF CRIMINAL APPEALS DECISION CONCERNING THE MOTION FOR CONTINUANCE.

On appeal, Holloman argues that the trial court committed reversible error when it denied a motion for continuance so that he could obtain the testimony of John Gallia. Holloman's case had been continued from two previous trial settings. The first continuance was granted so that Holloman could complete a psychiatric examination. Before the second scheduled trial date, defense counsel advised the court that he wanted to secure the attendance of John Gallia at trial. However, due to Gallia's reluctance to return to Alabama from California where he had moved after the shooting, and the hardship of travel due to his handicap, it was determined that a video deposition would suffice. The second continuance was granted for that purpose. On May 9, 2003, with all parties prepared and the court reporter and videographer present, Gallia did not appear for the deposition. Defense counsel wanted to be granted a third continuance to attempt to obtain an Alabama court order to be forwarded to the proper California court to compel Gallia's appearance for the deposition. During a hearing on the motion for continuance, the trial court learned from defense counsel that Gallia had attempted to extort money from counsel in exchange for his testimony, and had told them that he would never be served to appear in Alabama. The trial court was not convinced that Gallia's testimony was necessary and material for Holloman's defense and would, in fact, be inculpatory. The trial court denied the request for a continuance.

\* \* \*

"It is well settled that a motion for continuance is addressed to the sound discretion of the trial judge, whose exercise of that discretion will not be disturbed on appeal without proof that it was clearly abused. E.g., Arthur v. State, [711 So. 2d 1031] (Ala. Crim. App. 1996); Smith v. State, 698 So. 2d 189 (Ala. Crim. App. 1996); Long v. State, 611 So. 2d 443 (Ala. Crim. App. 1992). Review of a denial of a motion for continuance

requires a review of the circumstances of the case, including the reasons the defendant gave to the trial judge in support of the motion, in order to determine whether there was a clear abuse of discretion. Arthur, supra."

R.D. v. State, 706 So. 2d 770, 783 (Ala. Crim. App. 1997).

In considering the circumstances of this case, it is clear from the record that the trial judge was concerned by the apparent desire to have testimony from one of the victims in the case. Indeed, the proceedings had already been continued once in order to obtain testimony from Gallia. However, the trial court was aware that the witness was hostile, and another continuance would not guarantee that the witness's participation could be obtained. The trial judge did not abuse his discretion by denying Holloman's motion for a third continuance.

## F. THE STATE COURTS ADJUDICATION OF THIS CLAIM RESULTED IN A DECISION THAT WAS CONTRARY TO, AND AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.

"When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process." Hicks v. Wainright, 633 F.2d 1146, 1148 (5th Cir. 1981)(Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1209 [11th Cir. 1981] adopted as precedent Fifth Circuit decisions rendered prior to October 1, 1981).

**"A court may not, however, refuse to grant a reasonable continuance for the purpose of obtaining defense witnesses where it has**

been shown that the desired testimony would be relevant and material
to the defense." Dickerson v. Alabama, 667 F.2d 1364, 1370 (11th Cir.
1982). The Eleventh Circuit went on to say:

> [There are] several factors which are to be considered in
> determining whether an accused was deprived of his right to
> compulsory process by a denial of a motion for continuance:
> The diligence of the defense in interviewing witnesses and
> procuring their presence, the probability of procuring their
> testimony within a reasonable time, the specificity with which
> the defense is able to describe their expected knowledge or
> testimony, the degree to which such testimony is expected to be
> favorable to the accused.

Id. In Dickerson, an Alabama defendant sought to secure the testimony of a
police officer to support his alibi defense. The Eleventh Circuit went on to
hold that each of the factors weighed in favor of the defendant, and stated,
"It is only reasonable to suppose that such testimony by a police officer
would have lent a new aura of credibility to Dickerson's alibi defense."
Id at 1370-71. See also Wilkerson v. Turner, 693 F.3d 121 (11th Cir. 1982)
(failure of Georgia trial court to grant petitioner continuance so he could
appeal previous Alabama court ruling refusing to entertain petition for writ
of habeas corpus ad testificandum so as to allow witness who confessed to
burglary petitioner was charged with to be produced at petitioner's trial
deprived petitioner of due process of law); and Tolbert v. State, 552 So.2d
164 (Ala.Cr.App. 1989).

In Ex parte Murray, 588 So.2d 924 (Ala. 1991), **the defendant took every reasonable step to secure the presence at trial of a potentially exculpatory witness in his murder case, including enlisting the assistance of the trial court.** Id at 927. Pursuant to Alabama case law and the authority vested in trial courts by statute, the Alabama Supreme Court held "that **due to the serious nature of the charge** against Murray and the unusual circumstances of the case, the **trial court erred by failing to either require Effinger to post a bond to ensure his presence at trial, or in the event that Effinger refused or failed to post a bond, to detain him until his testimony was required. That failure allowed a potentially crucial witness to slip from the court's grasp and seriously prejudiced Murray's ability to present a defense.**" Id.

In McTerry v. State, 680 So.2d 953, 956 (Ala.Cr.App. 1996), **the court held that the denial of a defendant's motion for "instanter" subpoena to secure the presence of a sole witness to the shooting of the victim denied the defendant his constitutional right to compulsory process.** The court also observed that trial counsel's reliance on the state's subpoena list to secure the testimony of a witness bordered on ineffective assistance of counsel; "**this is especially true here because Williams was an eyewitness to the shooting.**" Id.

In James Holloman's case, all the <u>Dickerson</u> factors weighed heavily in favor of the continuance. The first factor to consider was the serious nature of the charges against Mr. Holloman. Mr. Holloman was indicted for the attempted murder of John Gallia, the attempted murder of Becky Clark, and a two-count indictment charging Mr. Holloman with the capital murder of Jimmy Clark during the course of a burglary and a kidnapping. The State sought the death penalty for Mr. Holloman, and Mr. Holloman ended up being sentenced to life without a parole, a sentence that many inmates find worse then a death sentence.

In a capital proceeding in Alabama, the state is under a heightened obligation to provide due process. <u>Ex parte Monk</u>, 557 So.2d 832 (Ala. 1989). Defense counsel even reminded the trial court during the hearing that the continuance should be granted because of this heightened obligation. See R. 13-14 from April 29, 2003 hearing.

As explained in the previous section, the testimony would have been very material and favorable. Defense presented to the court a two-page letter from Mr. Gallia, in which he explained many of the specifics of his testimony. (C. 343-348). In addition, defense counsel elaborated further at the hearing on why Mr. Gallia's testimony was material and favorable. (R. 2-17 from April 29, 2003 hearing). More importantly, Mr. Gallia was a

victim and eyewitness so he had specific knowledge of the crime. The jury only heard the Clarks' version (Sherri and her mother's) about what happened. Hence, Mr. Gallia's testimony would have lent a new aura of credibility to Mr. Holloman's defense.

Moreover, both the Court of Criminal Appeals and the trial court recognized that Mr. Gallia's testimony was material and favorable to Mr. Holloman's defense. The Court of Criminal Appeals wrote, "**In considering the circumstances of this case, it is clear from the record that the trial court was concerned by the apparent desire to have testimony from one of the victims in the case.** Indeed, the proceedings had already been continued once in order to obtain the testimony from Gallia." Even after the trial court denied Mr. Holloman's motion for a continuance the court issued a "Certificate of Judge of Requesting State for Attendance of Out-of-State Witness." (C. 390, 9). The court wrote in the certificate that the testimony of John M. Gallia may be necessary and material in the forthcoming trial. (C. 390). Moreover, when the trial court denied the motion for continuance, it did so under seal "so as not to unduly prejudice the defendant in the event he is able to ultimately depose Gallia or convince him for trial." (C. 478-480).

The next factor to consider is the diligence of the defense in interviewing witnesses and procuring their presence. Mr. Holloman took every reasonable step to secure the presence at trial of Mr. Gallia, including enlisting the assistance of the trial court. The court had already continued the trial twice: Once from March to April, then from April to May 19. (C. 428). Changing the date of a trial three times would have been an inconvenience, but not so much that it outweighs the defendant's right to present his defense. Especially when the delay is partly the court's fault. If the trial court had granted the initial petition to compel Mr. Gallia's presence, there would have been no need to delay the April trial date. See McTerry v. State, 680 So.2d 953, 956 (Ala.Cr.App. 1996) (court has duty to issue order to secure witness' presence).

The final factor to consider was the probability of procuring Mr. Gallia's testimony. Mr. Gallia was cooperating by giving statements, sending emails, and talking to counsel. (C. 345-46). However, Mr. Gallia also indicated that he was receiving criticism and threats of loss of support from his family for being willing to tell the truth about what happened during the shooting. (C. 345).

The trial court did not utilize all of the tools that it could have used to secure Mr. Gallia's testimony. The trial court could have either ordered that

Mr. Gallia appear in Alabama to testify, **or** required Mr. Gallia to post a bond to ensure his presence at the deposition, **or** in the event that Mr. Gallia refused or failed to post a bond, to have the California legal system order that Mr. Gallia be detained until his testimony was required. See 12-21-282 and 12-21-283 of the Alabama Code; Rules 16.6, 17.1 – **17.5** of the Alabama Rules of Criminal Procedure; and Ex parte Murray, 588 So.2d 924 (Ala. 1991).

It is a common experience for employees in employment related cases to be unwilling to testify because they are concerned about losing their jobs, but, once they are served with a subpoena, the employees then claim they have no choice but to testify. Once Mr. Gallia was ordered to testify, he could have then told his family that he had no choice but to testify.

In addition, the trial court never completely gave up that Mr. Gallia might testify even without a subpoena. The court ordered that the order denying the continuance be placed under seal so as to not to unduly prejudice the defendant in the event that Mr. Holloman was able to ultimately depose Mr. Gallia or convince him to appear for trial. Hence, the trial court erred in denying Mr. Holloman's reasonable request for a continuance.

Finally, the Court of Criminal Appeals erred in its analysis concerning Mr. Gallia. As the Court of Criminal Appeals' opinion shows, the Court did not bother to analyze the motion for continuance in light of the several factors that are to be considered in determining whether an accused was deprived of his right to compulsory process by a denial of a motion for continuance. See Dickerson v. Alabama, 667 F.2d 1364, 1370 (11th Cir. 1982); Wilkerson v. Turner, 693 F.3d 121 (11th Cir. 1982); and Tolbert v. State, 552 So.2d 164 (Ala.Cr.App. 1989).

The Court of Criminal Appeals did not consider that this was a death penalty case; it recognized that the testimony would be relevant and material; it implicitly recognized due diligence by defense counsel; it did not claim that the request for continuance was unreasonable; instead, the Court of Criminal Appeals focused on the fact that a continuance "would **not guarantee** that the witness's participation could be obtained." More importantly, the Court of Criminal Appeals failed to consider that the trial court did not utilize all of the tools that it could have used to secure Mr. Gallia's testimony. Ex parte Murray, 588 So.2d 924 (Ala. 1991).

In conclusion, the testimony was material and favorable. Mr. Holloman's attorneys pursued it diligently. They described the specifics to the court, and the motion for one more continuance was extremely

reasonable under the circumstances. Any delay would have been minimal and the delay was partially the trial court's own fault when it refused to issue an order compelling Mr. Gallia's attendance. The trial court, therefore, violated Mr. Holloman's right to compulsory process when it refused to continue the trial so that Mr. Holloman could obtain the testimony of John Gallia.  Therefore, the state court adjudication of this claim resulted in a decision that was contrary to, and an unreasonable application of, clearly established United States Supreme Court Precedent.

## II. JAMES HOLLOMAN WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, AND THERE IS A REASONABLE PROBABILITY THAT OUTCOME OF HIS TRIAL WOULD HAVE BEEN DIFFERENT.

### A. JAMES HOLLOMAN WAS NOT PROCEDURALLY BARRED FROM RAISING HIS INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS.

In Ex Parte Jackson, 598 So.2d 895 (Ala. 1992), the Alabama Supreme Court held that the failure of appellate counsel to include a "reasonably ascertainable" issue in a motion to the trial court will bar further argument of the issue on appeal and in post-conviction proceedings.  In Ex Parte Ingram, 675 So.2d 863 (Ala. 1996), the Court overruled Jackson and held that claims of ineffective assistance of counsel must be presented within the 30 day jurisdiction time limit set by Ala. R. Crim. P. Rule 24.1(b) or brought under a Ala. R. Crim. P. Rule 32 petition for post-conviction relief.

On June 18, 2003, James Holloman was sentenced. (C. 11-13,593). On July 8, 2003, trial counsel filed a motion for new trial. (C. 13,594-596). On July 21, 2003, the trial court denied the motion for new trial. (C. 13,597). On August 4, 2003, Mr. Holloman's trial counsel filed a motion to withdraw. (C. 603-04). On August 7, 2003, the trial court granted trial counsel's motion to withdraw and appointed Mr. Holloman appellate counsel. (C. 605). On September 3, 2003, Mr. Holloman's appellate counsel was allowed to withdraw and new appellate counsel was appointed. (C. 605-607). On September 23, 2003, the transcript was completed.

On James Holloman's direct appeal, he tried to raise several issues of ineffective assistance of trial counsel including (1) that counsel failed to develop a defense concerning the effects of medication; (2) that the trial counsel failed to effectively prepare to properly question witnesses at trial; and (3) that trial counsel was ineffective for failing to request certain jury instructions. However, the Alabama Court of Criminal Appeals held that, because Mr. Holloman did not present these claims to the trial court in a motion for new trial, they were not properly raised for the direct appeal.

James Holloman then filed a Rule 32 petition, and he raised the following claims as grounds for post-conviction relief:

1.  The trial court was without jurisdiction to render judgment or to impose sentence because he was deprived of the right to be present during the giving of additional jury instructions;

2.  He received ineffective assistance of trial and appellate counsel for failing to object to the trial court's giving of additional instructions;

3.  The trial court was without jurisdiction because he was deprived of his right to be present and heard during a bench conference;

4.  He received ineffective assistance of counsel because counsel did not consult with him about agreement on consolidation;

5.  The trial court was without jurisdiction because the indictment failed to charge he acted intentionally;

6.  He received ineffective assistance of counsel because counsel did not object to the trial court's instruction concerning an insanity defense and did not call Sherrie Holloman as a witness;

7.  He was deprived of his right to testify and counsel coerced him into not testifying;

8.  Trial counsel failed to develop a defense based upon the medication Holloman was taking; and

9.  The cumulative effect of ineffective assistance of counsel prejudiced his defense.

The trial court granted the State's motion for summary disposition, citing as grounds that the claims raised in the appellant's petition were, or could have been raised on appeal. See Rule 32.2 (a) (4) and (5), Ala. R. Crim. P.   On appeal, the Alabama Court of Criminal Appeals affirmed the trial court's procedural ruling, citing Rule 32.2, Ala. R. Crim. P.

However, James Holloman's ineffective assistance of trial counsel claims were cognizable in his Rule 32 petition because his appellate counsel did not have benefit of a completed record in time to discover ineffective trial counsel claims and include them in a motion for new trial. See Ex parte Ingram, 675 So.2d. 863 (Ala. 1996); Rule 24.1, Ala.R.Crim.P.; and V. R. v. State, 852 So.2d 194 (Ala.Cr.App. 2002).

Moreover, it should be noted that James Holloman's trial counsel filed the motion for new trial that was denied. Where a petitioner had the same attorney at trial and on appeal, an ineffective assistance of counsel allegation cannot be precluded on the grounds that it could have been but was not raised at trial or appeal because counsel could not be expected to allege on appeal his own ineffectiveness. Nelson v. State, 649 So.2d 1299 (Ala.Cr.App. 1994). By the same token, trial counsels could not be expected to allege in the motion for new trial their own ineffectiveness in Mr. Holloman's case. See also Massaro v. United States, 123 S.Ct. 1690 (2003) where the Supreme Court held that ineffective assistance of counsel claims should usually be addressed in post conviction proceedings because the evidence introduced at trial are devoted to guilt or innocence issues, and the resulting record usually will not disclose the facts necessary to decide either

34

prong of the <u>Strickland</u> analysis. Hence, James Holloman's ineffective assistance of counsel claims were not procedurally barred.

## B. JAMES HOLLOMAN'S INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS.

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003)(citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687-688 (1984). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' . . . '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" <u>Wiggins</u>, 539 U.S. at 521(quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 687-688 (1984)). To prove prejudice, the petitioner "must show only a reasonable probability that the outcome would have been different; he 'need not show that counsel's deficient conduct more likely than not altered the outcome in the case.'" <u>Hardwick v. Crosby</u>, 320 F.3d 1127, 1160 (11th Cir. 2003)(quoting <u>Brownlee v. Haley</u>, 306 F.3d 1043, 1059-1060 (11th Cir. 2002)); and <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000).

James Holloman pled not guilty and not guilty by reason of mental disease or defect. Nevertheless, trial counsel failed to request important jury

instructions and failed to investigate and present important evidence showing that Mr. Holloman lacked the ability to form a specific intent.

James Holloman was taking several medications, including Neurontin (R. 1313) and Effexor (R. 1314). (R. 1306). According to the Physician's Desk Reference (PDR), Effexor is prescribed for the treatment of depression – that is, a continuing depression that interferes with daily functioning. The symptoms usually include changes in appetite, sleep habits, and mind/body coordination, decreased sex drive, increased fatigue, **feelings of guilt or worthlessness, difficulty concentrating, slowed thinking, and suicidal thoughts**. According to the PDR, some less common side effects include abnormal taste, **abnormal thinking, agitation**, chest pain, confusion, decreased sex drive, **depression**, dilated pupils, dizziness upon standing up, high blood pressure, itching, **loss of identity**, rapid heartbeat, ringing in the ears, trauma, twitching, urinary problems, weight loss. **A wide variety of very rare symptoms possibly related to Effexor have also been reported.**

Neurontin, for psychiatric problems, was also prescribed to Mr. Holloman while at Bradford. (R. 1314,1320). According to the PDR, Neurontin also produces "thinking abnormal" as a side effect. None of the side effects were explained to Holloman and certainly none were explained to the jury. It would show that Holloman was effectively "intoxicated" or

under the influence of the side effects of prescribed medication which clouded his judgment and thinking. It could also explain why a "cooling off period" in connection with "in the heat of passion" was not available to Mr. Holloman, due to the "abnormal thinking," the agitation, and other side effects of the medication. It was the basis to ask for an intoxication jury charge. This jury charge would have allowed the jury to find that the crimes were committed under a heat of passion without a cooling off period.

These drugs caused abnormal thinking and contributed to outbursts of violence. However, trial counsel, failed to provide any testimony about the effects of these drugs on Mr. Holloman and failed to show how that related to his ability to form the intent required for the crimes.

In addition, Mr. Holloman stopped taking the medications after leaving Bradford, but the jury was not told about this fact as well. The PDR warns, "Do not stop taking the drug [Effexor] without consulting your doctor. If you stop suddenly, you may have withdrawal symptoms, even though this drug does not seem to be habit-forming. Your doctor will have you taper off gradually."

Mr. Holloman was having many of the bad side effects as described in the PDR His withdrawal symptoms were such that they affected Mr. Holloman to the same extent that alcohol or other drug-induced psychosis

37

would have affected him. However, the jury was not told that Mr. Holloman was suffering from these effects.

Trial counsel also failed to request an intoxication charge due to the medications that he was on as well as the withdrawal effects from these medications. The trial court instructed the jury that "a defendant is either sane or he is not. The defendant must either establish his insanity as a complete defense to or excuse for the crime, or he must be held . . . [to] full responsibility for the crime charged." (R. 1816). However, trial counsel did not request that the court modify this charge with the following statement of law:

> While voluntary intoxication can never "excuse or justify a criminal act," it "can be a complete defense in cases where an accused is charged with a crime requiring a specific intent, for the reason that if specific intent is an essential element of a crime, and such specific intent is lacking because of the incapacity of the accused to entertain specific intent, the crime has not been committed.

Coon v. State, 494 So.2d 184, 187 (Ala.Crim.App. 1986).

Those instructions as taken from 13A-3-2(a)-(b) would have told the jury that intoxication of the defendant, whether voluntary or involuntary, may be considered by the jury whenever it is irrelevant to negate an element of the offense charged, such as "intent". (Alabama Pattern Jury Instructions)

In <u>Jerry Hammond v. Sate</u>, 776 So.2d 884, 887 (Ala.Cr.App. 1998),

the Court of Criminal Appeals addressed the question of when an instruction

on intoxication should be given:

> A charge of intoxication should be given if "there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt" on the element of intent. <u>Coon v. State</u>, 494 So.2d 184, 187 (Ala.Cr.App.1986) [quoting other citations which are omitted] intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting. <u>Owen v. State</u>, 611 So.2d 1126, 1128 (Ala.Cr.App. 1992).

While the degree of intoxication necessary to negate specific intent

must rise to the level of insanity, it is clear that where there is evidence of

intoxication, the extent to which the accused is intoxicated is a question to

be decided by the jury. <u>Crosslin v. State</u>, 446 So.2d at 682.

> "In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider the defense, 'we must accept the testimony most favorable to the defendant.' . . . <u>United States v. Lewis</u>, 592 F.2d 1282, 1286 (5th Cir. 1979). The Alabama Supreme Court has indicated that proper written requested instructions must be given 'which are supported by any evidence, however weak, insufficient, or doubtful incredibility.' <u>Chavers v. State</u>, 361 So.2d 1106, 1107 (Ala. 1978)." <u>Coon v. State</u>, 494 So.2d 184, 186 (Ala.Cr.App. 1986).

> "[An intoxication] charge may. . .be warranted if the record contains evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion

was sufficient to affect defendant's ability to form the necessary criminal intent." Fletcher v. State, 621 So.2d at 1020-21.

This statement of law would have applied to both capital murder charges. *See* Ashley v. State, 651 So.2d 1096, 1097-1098 (Ala.Crim.App. 1994)(reversing where court refused to instruct on intoxication in murder/burglary case). The intoxication defense could also have worked against the underlying murder charges. *See* Davis v. State, 740 So.2d 1115, 1120-1121 (Ala.Crim.App. 1998)("The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill."). It would also be a valid defense against the attempted murder charges. McNabb v. State, 887 So.2d 929, 976 (Ala.Crim.App. 2001). The defendant's burden of proof for an intoxication defense is onerous, but where the evidence is presented, the degree of intoxication is matter for the jury, and the court should also instruct them on manslaughter. Ashley, 651 So.2d at 1098. Finally, "The law concerning intoxication resulting from drug use is the same as intoxication resulting from alcohol." Davis v. State, 740 So.2d 1115, 1121 (Ala.Crim.App. 1998)(quoting Hooks v. State, 534 So.2d 329 (Ala.Crim.App. 1987)).

Thus, trial counsel should have presented evidence of intoxication and requested an intoxication instruction. The defense was that Mr. Holloman

could not form the requisite intent. Because the jury did not hear the intoxication instruction, they were left to apply the instructions actually given by the court: That Mr. Holloman was either insane or he was fully guilty. That instruction left no room for Mr. Holloman's defense: That due to intoxication he lacked the ability to form the required intent. The jury therefore, was precluded from considering Mr. Holloman's defense. Had counsel requested an intoxication instruction, the jury could have considered the defense.

This could not have been trial strategy. It makes no sense to base the defense on diminished capacity and then ignore relevant evidence and not even ask for an instruction on the defense. Omitting the evidence and the instruction also prejudiced Mr. Holloman. The jury was not allowed to even consider his defense. Surely it might have come to a different conclusion had it been given all the facts and the appropriate law.

Despite a plea of not guilty by mental disease or defect and strong indications that Mr. Holloman was under the influence of serious medications at the time of the crime, trial counsel did not request an intoxication charge or fully present evidence that Mr. Holloman was intoxicated at the time of the crime. This was ineffective assistance of counsel.

In addition, trial counsel knew that Mr. Holloman went insane due to his wife's infidelity. She was available to testify as a witness for the defense but was not called as a witness for any party. Counsel also prejudiced Mr. Holloman's opportunity to show knowledge of his wife's infidelities and to show that those infidelities were part of his state of mind during the incident. See Ex parte Anthony, 565 So.2d 565 (Ala. 1990) (denying defendant the ability to show knowledge of wife infidelity and to show those infidelities as cause of his state of mind was reversible error once insanity defense had been raised in murder prosecution).

In conclusion, James Holloman was deprived of his right to effective assistance of counsel, and there is a reasonable probability that the outcome of his trial would have been different.

## IV. PRAYER FOR RELIEF

For all the above stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, James Holloman respectfully asks this Honorable Court to grant him the following relief:

Afford petitioner an opportunity to reply to any responsive pleading filed by respondent.

Grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition.

Grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition.

Permit petitioner after further factual development an opportunity to brief and argue the issues presented in this petition.

Issue a writ of habeas corpus granting James Holloman relief from his unconstitutionally obtained conviction and sentence.

Grant such further and other relief as may be appropriate.

STEPHEN A. STRICKLAND

43