IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RECEIVED

2006 OCT 26  P 2: 50

JAMES HICKMAN HOLLOMAN,     )
                                            )

       Petitioner,               )

                                            )

VS.                                    )       1:06-CV-786-MHT

                                            )

                                            )

RICHARD ALLEN, *et al.*,           )

                                            )

Respondents.                 )

## ANSWER

Come now the Respondents in the above-styled cause by the and through the Attorney General of the State of Alabama and in response to this Honorable Courts Order to Show Cause state the following:

## PROCEDURAL HISTORY

1.      On May 27, 2003, Holloman was convicted of two counts of capital murder and two attempted murder charges. Following a jury recommendation of life without the possibility of parole, on June 18, 2003, he was sentenced to life imprisonment without the possibility of parole for the capital-murder conviction, 75 years imprisonment for the attempted murder of Becky Clark and 50 years

imprisonment for the attempted murder of John Gallia. (Exhibit "A", "B", "C" & "D")

      2.     On direct appeal Holloman raised numerous issues including the two raised in the present habeas corpus petition; the continuance issue and ineffective assistance of counsel issue. On August 20, 2004, the Alabama Court of Criminal Appeals affirmed Holloman's conviction in a memorandum opinion addressing the merits of Holloman's continuance issue and finding the ineffective assistance of counsel claim to the procedurally barred. (Exhibit "D") An application for rehearing was overruled on September 17, 2004 and a petition for writ of certiorari was denied on December 10, 2004 with a certificate of judgment entered at that time. (Exhibits "E" & "F")

      3.     On September 29, 2005, Holloman filed a Rule 32 petition attacking his 2003 conviction. Grounds raised included ineffective assistance of counsel. The petition was summarily dismissed on October 18, 2005. (Exhibits "G" & "H") On appeal the Alabama Court of Criminal Appeals held that the grounds were precluded because they were or could have been raised on appeal and thus the Court affirmed the Rule 32 dismissal. (Exhibit "I") An application for rehearing was overruled on May 12, 2006 and a petition for writ of certiorari was denied on June 9, 2006 with a certificate of judgment being entered on that date. (Exhibit "J" & "K")

**ARGUMENT**

4.    The present federal habeas corpus petition raises just two grounds.
The first ground argued at length deals with the trail court's failure to grant a
continuance so that a witness's testimony could have been obtained.  This issue
was adjudicated on the merit in the state trial and appellate court.  The trial court's
findings are contained in the record at clerks record 428-430 in Exhibit "A", while
the appellate courts finding are found in the opinion in Exhibit "D".  Because it
was adjudicated on the record, it is due to be denied pursuant to 28 U.S.C. §
2254(d).

5.    The trial court had granted repeated continuances to allow Holloman
to obtain the witness's testimony, but the witness had made it clear that he would
not testify at this trial.  Under Alabama law a motion for continuance is addressed
to the sound discretion of the trial court.  Huntly v. State, 627 So. 2d 1013 (Ala.
1992).  Holloman has not shown that the trial court's denial of a continuance based
upon the record was unreasonable or an abuse of discretion.

6.    Holloman's next claim of ineffective assistance of counsel was found
to be procedurally barred by the state appellate court.  The state's procedural
default rules bar federal habeas corpus relief.  Harmon v. Barton, 894 F.2d 1268,
1270 (11th Cir. 1990).  Holloman's argument is based upon a claim that although

trial counsel did put on mental health evidence and based a defense on diminished capacity, counsel did not do enough in the regard. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to construct the circumstances of counsel's challenged conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland v. Washington, 466 U.S. 668, 689 (1984).

7.    For the reasons stated herein, the present federal habeas corpus petition is due to be dismissed and denied.

## EXHIBITS

1. Exhibit "A" – Trial Record; CR-02-1958[1];

2. Exhibit "B" – Petitioner's Brief on Direct Appeal; CR-02-1958;

3. Exhibit "C" – State's Brief on Direct Appeal; CR-02-1958;

4. Exhibit "D" – Memorandum Opinion; CR-02-1958;

5. Exhibit "E" – Notice of Overruling Rehearing; CR-02-1958;

6. Exhibit "F" – Certificate of Judgment; CR-02-1958;

7. Exhibit "G" – Petitioner's Brief on Rule 32 Appeal; CR-05-0245;

8. Exhibit "H" – State's Brief on Rule 32 Appeal; CR-05-0245;

9. Exhibit "I" – Memorandum Opinion; CR-05-0245;

10. Exhibit "J" – Notice of Overruling Rehearing; CR-05-0245;

11. Exhibit "K" – Certificate of Judgment; CR-05-0245.

Respectfully submitted,

TROY KING, ASB #KIN047
*Attorney General*
By-

*Assistant Attorney General*
Cecil G. Brendle, Jr.
ID #BRE005

---

[1] Due to the voluminous nature of the exhibit, it will be sent under separate cover.

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of October, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  Stephen A. Strickland, JAFFE, STRICKLAND & DRENNAN, P.C., 2320 Arlington Avenue, Birmingham, Alabama 35205.

Respectfully submitted,

Cecil G. Brendle, Jr. (CGB005)
Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL 36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-Mail: cbrendle@ago.state.al.us

196926/99318-001

DUE TO THE VOLUMINOUS NATURE OF EXHIBIT A, IT WILL BE SENT UNDER SEPARATE COVER.

CASE NO. CR-02-1958

COURT OF CRIMINAL APPEALS

APPEAL FROM THE CIRCUIT COURT OF HOUSTON COUNTY,
CC-2000-755, 757 AND 758

JAMES HICKMAN HOLLOMON
APPELLANT
VS.

STATE OF ALABAMA
APPELLEE

APPEAL FROM STATE CONVICTIONS

-------------------------------------------------------------------------

BRIEF OF APPELLANT
James Hickman Holloman

-------------------------------------------------------------------------

Oral Argument Requested

GARY A. HUDGINS
ATTORNEY FOR APPELLANT
P.O. BOX 1142
DOTHAN, ALABAMA 36302
334 794 8773

EXHIBIT
_B_

Table of Contents

Table of Contents.......................... i

Table of Authorities    ...................iv

Statement of the case...................... 1

Statement of the issues.....................2

Statement of the Facts ....................4

Statement of the Standard of Review .........8

Summary of Argument........................10

Argument................................. 11

I. The Court Erred When It Refused to
allow a Continuance to Obtain the
Testimony of a Crucial Witness............. 11

II. Counsel Was in Effective for
Failing to Develop a Defense concerning
the Effects of the Medication He Was
taking and the Effects of Abruptly
Discontinuing the Medication............... 17

III.  Ineffective Assistance of Counsel
Due to Multiple Deficiencies by Trial
Counsel. ...  .....    ....     ...........21

IV.  Remand because Defendant was
coerced into not testifying and thereby
denying him a right to testify and his
rights under the fifth amendment.......... 27

V. Court committed error when the court
allowed testimony confidential
communications between Becky Enzio and
the Appellant at Bradford's in violation
of the psychotherapist -patient privilege?..31

VI The prejudicial effect of the 911 tape

outweighed the probative value of the
tape when it was played for the jury........ 34

VII The Capital murder convictions
should be overturned on the basis
of double jeopardy......................... 36

VIII.  The court erred in its instructions
on Burglary and the evidence was in
sufficient to convict on capital murder
committed during a burglary............... 42

IX.  There was error in allowing the
charge of capital murder during the
commission of a kidnapping to go to
the jury. ................................  47

X The court erred when it refused to
give charge #17 and charge #18 of the
Defendants requested charges..............  51

XI Counsel should have requested a jury
charge similar to the intoxication charge... 56

XII. Prejudicial error was committed
when the judge went to the jury room.........60

XIII. The District Attorney committed
prejudicial error when he attacked the
veracity of the defense team.................61

XIV Statements by the District Attorney
were improper and the court should have
granted a mistrial. .........................64

XV. Defendant claims prejudicial error
in denying a Motion for New Trial without
a hearing. ................................  69

XVI Whether the evidence was sufficient
to find Holloman guilt of two counts of
attempted murder in CC-00-757 (Supp Rec 44)
and CC-00-758 (Supp.Rec46)...................72

XVII Ineffective Assistance of Counsel
in CC-00-757 and CC-758......................73

XVIII Failure to grant motion for a
    change of venue............................73

XIX Error for not giving other jury
    instructions........................... 75

Conclusion.................................. 76

Certificate of Service..................... 77

Appendix: List of Adverse Rulings

Request for Oral Argument................... viii

## TABLE OF AUTHORITIES

Adams v. State, 280 Ala. 678,
    198 So.2d 255 (1967)----------------------------62

Adams v. State, 776 So.2d 884
    (Ala. Crim App 2003) ----------------------------62

Averette v. State, 469 So.2d 1371,
    1374 (Ala.Cr.App.1985)----------------------------35

Berger v. United States, 295 U.S. 78,
    55 S.Ct. 629, 79 L.Ed. 1314 (1935)------------- 67

Borden v. State, 711 So.2d 498
    (Ala.Crim.App.1997), aff'd,
    711 So.2d 506 (Ala.), cert. denied,
    525 U.S. 845, 119 S.Ct. 113,
    142 L.Ed.2d 91 (1998)-----------------------37, 39

Bynum v. State, 35 Ala.App. 297, 298,
    47 So.2d 245, cert. denied,
    254 Ala. 22, 47 So.2d 247 (1950)----------------63

Campbell v. State, 19 Ala.App. 349, 352,
    97 So. 783 (1923)---------------------------- 63

Campbell vs. State
    718 So.2d 123,128 (Ala. Cr.App 1997)------------35

Chavers v. State,
    361 So.2d 1106, 1107 (Ala.1978)-----------------59

Coon v. State,
    494 So.2d 184, 186 (Ala.Cr.App.1986)---------58, 59

Coral v. State, 628 So.2d 954, 958
    (Ala.Cr.App.1992), aff'd,
    628 So.2d 1004 (Ala.1993)
    cert. denied, 511 U.S. 1012, 114 S.Ct. 1387,
    128 L.Ed.2d 61 (1994)-----------------------38, 39

Crosslin v. State, 446 So.2d at 682-------------- 58

Daniels v. State,
    650 So.2d 544, 552 (Ala.Cr.App.1994)----------27

Darden v. Wainwright,
    477 U.S. 168, 106 S.Ct. 2464,
    91 L.Ed.2d 144 (1986)-----------------------68

Davis vs. State,
    737 So.2d 480 at 484 (Ala. Crim. App 1999)-----42

Ex Parte Belue, 727 So.2d 785 at 787 (Ala. 1998)---70

Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987)---21,22

Ex parte Saranthus, 501 So.2d 1256 (Ala.1986)-------15

Edgar vs. State
    646 So.2d 681 at 683 (Ala. Crim. App 1993)-----60

Fletcher v. State
    621 So.2d at 1020-21--------------------------59

Frazier v. State, 758 So.2d 577 (Ala.Cr.App.), aff'd,
    758 So.2d 611 (Ala.Cr.App.1999)-------------- 22

Free v. State, 455 So.2d 137,
    (Ala.Cr.App.1984))---------------------- 33,73

Gentry vs. State ( 1940471) Supreme Court ----------43

Gentry vs. State,
    689 So.2d 894 (Ala.Crim. App. 1994)------ 43,45,46

Harris vs.State,
    WL 31151417 at page 5 (Ala. Crim.App)---------------------------------36

Hammond vs. State,
    776 So.2d 884 at 887,
    (Ala. Crim. App. 1998) -------------------------------------------------56,58

Hicks v. Wainwright,
    633 F.2d 1146 (5th Cir.1981) --------------------------------------------14

Hill vs. State,
    675 So.2d 484 at 486 (Ala.Crim. App. 1995)----------------------------70

Hunter v. State,
    802 So.2d 265, 270 (Ala.Crim.App.2000) ----------------------------35

Ingram vs. State,
    779 So.2d 1225 (Ala. Crim. App. 1999)----37, 38

Jaffe v. Redmond,
        518 U.S. 1, 1116 S.C. 1923,
        135 LED 2d 337 (1996)--------------------------------------------32

Kuenzel v. State,
        577 So.2d 474 (Ala.Cr.App.1990),
        aff'd, 577 So.2d 531 (Ala.1991) ---------------------------------8

Loggins v. State,
        771 So.2d 1070 (Ala.Crim.App.1999)-------------------------------36

Nichols vs. Butler,
        952 F.2d 1550 (11th Cir. 1992)----------------------------------30

Owen v. State,
        611 So.2d 1126, 1128 (Ala.Cr.App.1992)--------------------------58

Perkins vs. State, 808 So.2d 1041,
        1069 (Ala. Crim.App.1999) --------------------------- 74

Sprinkle v. State,
        368 So.2d 554, 560 (Ala.Cr.App.1978)--------------------------- 63

Strickland v. Washington,
        466 U.S. 668, 104 S.Ct. 2052,
        80 L.Ed.2d 674 (1984) -----------------------------------20,21,27, 73

R.D.H. v. State,
        775 So.2d 248, 254 (Ala.Crim.App.1997) -------------------------35

United States v. Lewis,
        592 F.2d 1282, 1286 (5th Cir.1979) ----------------------------58,59

United States v. Uptain,
        531 F.2d 1281, 1287 (5th Cir.1976) ----------------------------15

Washington v. Texas,
        388 U.S. 14, 87 S.Ct. 1920,
        18 L.Ed.2d 1019 (1967) ----------------------------------------16

Wells v. State, 768 So.2d 412, 414
        (Ala. Crim. App.1999)------------------- 72

**Code Sections**

Code of Al 1975, §§ 13A-1-8(b) ----------------------------------------37,38
Code of AL 1975, §§ 13A-1-9------------------------------------------37,38
Code of Al. §§ 13A-3-2(a)-(b)----------------------------------------57
Code of Al §§ 13A-4-2 ------------------------------------------73
Code of AL 1975, §§ 13A-5-40(a)(1) ---------------------------------37,47
Code of Al 1975 §§ 13A-5-49------------------------------------------48
Code of AL 1975, §§ 13A-6-2.-----------------------------------------37
Code of AL 1975, § 13A-6-44(a) -------------------------------------52
Code of AL 1975, § 13A-7-1(4) ------------------
Code of AL 1975 § 15-23-61 -------------------------------------- 64

## OTHER AUTHORITIES

Alabama Rules of Professional Conduct
        1.2(a)(1991)------------------------------------------------30


Alabama Pattern Jury Instructions ------------------------------------57


Rule   45 A   Alabama Rules of Appellate Procedure-------------8,22
Rule 45B Alabama Rules of Appellate Procedure ------------------9
Rule 403 Alabama Rules of Evidence--------------------------------35
Rule 503 Alabama Rules of Evidence--------------------------------31,32


Alabama Constitution of 1901, Article I, § 6----------
U.S.C.A. Const.Amend. 5.---------------------------------------37
U.S.C.A. Const.Amend. 5; Const. Art. 1, § 9 ----------------------41
U.S.C. A. Const. Amend. 6------------------------------------------65
U.S.C.A. Const.Amend. 14------------------------------------------ 65


C. Gamble, McElroy's, § 20.01-------------------------------------35


W. LaFave and A.Scott,
Handbook on Criminal Law ,
Section 96, p.708 (1972)------------------------------------------------44


R. Perkins an R. Boyce,
Criminal Law, Ch. 3,
Sect 1, p. 250 (3d ed. 1982)-------------------------------------44


2004 PDR (Physicians Desk Reference) --------------------------------

## REQUEST FOR ORAL ARGUMENT

Appellant Request Oral Argument.  The case while not extremely difficult does contain much information that is not in the official court record.  Those items that are in the court record, appellant believes that some light could be shed on the merits of the Appellant's case.

Wherefore, Appellant respectfully requests oral argument.

_Gary A. Hudgins_
Gary A. /Hudgins

## STATEMENT OF THE CASE

This is a capital murder case based upon a two count indictment concerning the death of Jimmy Clark. In Case number CC-2000-755, Count I of the indictment was based upon a murder during the commission of a burglary. Count II of that charge alleged a capital murder of Jimmy Clark during a kidnapping of a Sherri Holloman. (R15) The other two cases were attempted murder of Becky Clark, (CC-2000-758. The attempted murder of John Gallia (CC-2000-757) and kidnapping in the first degree of Sherri Holloman (CC-2000-756). The defendant had several counsel representing him.

The defendant entered pleas of not guilty; not guilty by reason of mental disease or defect; and not guilty by reason of mental disease or defect (R-29).

A Motion For Change of Venue (R243)was denied as was a Motion for a CAT scan was denied. (R325) A Motion for a Continuance to obtain a crucial witness was denied after attempts to have him appear for a deposition in California failed.

At the conclusion of the State's case, an oral motion for directed verdict was requested on all charges. (T1058) The court entered a judgment of acquittal as to first degree kidnapping in CC-02-756. The "victim" had been released unharmed and prior to the Defendant's apprehension. The court later refused to dismiss the count of Capital murder based upon kidnapping.

1

VIII. The court erred in its instructions on Burglary and the evidence was in sufficient to convict on capital murder committed during a burglary.

IX. There was error in allowing the charge of capital murder during the commission of a kidnapping to go to the jury.

X The court erred when it refused to give charge #17 and charge #18 of the Defendants requested charges.

XI Counsel should have requested a jury charge similar to the intoxication charge.

XII. Prejudicial error was committed when the judge went to the jury room.

XIII. The District Attorney committed prejudicial error when he attacked the veracity of the defense team.

XIV. Statements by the District Attorney were improper and the court should have granted a mistrial.

XV. Defendant claims prejudicial error in denying a Motion for New Trial without a hearing.

XVI Whether the evidence was sufficient to find Holloman guilt of two counts of attempted murder in CC-00-757 (Supp Record 44) and CC-00-758 (Supp. Record 46)

XVII Ineffective Assistance of Counsel in CC-00-757 and CC-758.

XVIII Failure to grant motion for a change of venue.

XIX Error for not giving other jury instructions.

At the conclusion of the Guilt or Innocence phase the jury found the Appellant guilty of two counts of capital murder and two counts of attempted murder. During the penalty phase the jury recommended life without parole. At sentencing on June 18, 2002, the court entered an order in the attempted murder case of CC-00-757 of fifty years. In CC-00-758 he was sentenced to 75 years. In CC-00-755 he sentence the defendant to life without parole on both counts. Cases were running consecutively.

A Motion for New Trial was filed and denied by the court without hearing. A timely appeal was filed.

## STATEMENT OF ISSUES PRESENTED

I. The Court Erred When It Refused to allow a Continuance to Obtain the Testimony of a Crucial Witness, John Gallia.

II. Counsel Was in Effective for Failing to Develop a Defense concerning the Effects of the Medication He Was taking and the Effects of Abruptly Discontinuing the Medication.

III. Ineffective Assistance of Counsel Due to Multiple Deficiencies by Trial Counsel.

IV. Remand because Defendant was coerced into not testifying and thereby denying him a right to testify and his rights under the fifth amendment.

V. Court committed error when the court allowed testimony confidential communications between Becky Enzio and the Appellant at Bradford's in violation of the psychotherapist - patient privilege?

VI The prejudicial effect of the 911 tape outweighed the probative value of the tape when it was played for the jury.

VII The Capital murder convictions should be overturned on the basis of double jeopardy.

2

## STATEMENT OF FACTS

Sherri Hollomon and James Hickman Hollomon (Hick) met when they were both in for alcohol treatment. (T1121) They married had two children, Jamie and Leslie and lived in Pratville, Alabama.  Sherri's parents lived in Malvern.

On  April 11, 2000, John Hollomon admitted himself to Bradfords for alcohol treatment until May 1, 2000 (T942) when he check himself out and continued outpatient treatment in Montgomery.

Becky Encizo a counselor at Bradford's (T908) testified as to her conversations with the Defendant and about confidential matters related during counseling sessions.(T921) A treatment plan provided by a psychiatrist included medications such as Effexor and Nureton.(T960) (T945)

At the end of April, Holloman left Bradford's for out patient treatment.  Experts testified that during the time he was in Bradfords, he had de-compensated to the point he was not interpreting things adequately. (T While in Bradford's Holloman found out that his wife was seeing another man (T1088)and a blue a blue car had been seen at

4

Holloman's Pratville residence.(T1093) After his wife left Pratville for Rehoboth with the children, he left Bradford. (The same blue car he saw when he arrived at the residence in Malvern the day of the incident)

Witnesses that Holloman was worse off after coming out of Bradford, he was having a nervous break down,he was shaking, sweating and all he talked about was his children (T1138) even though he was involved in intensive out patient care in Montgomery. (T1140) Holloman was coming off of Neurontin and Effexor and  wanted to see his kids. (T1152) Mary Holloman, his mother, testified that Holloman acted worse than when he went to Bradford, he would not eat, was more depressed and his hands were shaking and sweating and was not himself.  Lynn Dodd, Holloman's sister, had never seen him self-never seen him like that before nervous, depressed, upset, suicidal and wanted to kill self. (T1330) Holloman was not taking his medication for 4 or 5 days (T1423)

On May 5, 2000, he called the home of his mother in law to speak to his wife.  He was told Sherri had gone to the beach; was not seeing anyone; and that no one was at the house with his wife.  After calling the residence of

5

Becky Clark a second time and speaking to Jimmy Clark and Sherri Holloman, Appellant went to the Clark home and entered the residence through the unlocked back door where he always entered. While in the Clark home he shot John Gallia, shot and killed Jimmy Clark and shot Becky Clark. He then left with Sherri Holloman his wife in his red pickup truck.

Becky Clark or the granddaughter, Jamie Holloman, called 911. Admission of the 911 tape into was objected to by the defense. (T904)

After traveling to Bonify, Florida, they traveled to Pratville Alabama to the home of Richard and Mary Holloman. While there, Holloman surrendered the shot gun used in the shooting, released Sherri Holloman unharmed (T1163) and then turned him self in to the Autauga Sheriffs department. (T1165)

Richard Hollomon testified about the head injuries his son received at an early age: (T1114)his stay at Baptist Hospital in Montgomery; his head injury in the service (T1117) and his head injury in 1999 when Holloman was hit in the head with an axe handle. (T1119) Other witnesses also confirmed these injuries.

6

Sherri showed no signs of bleeding, scratches, bruises, or injuries (T1163) even going to sleep while Hick went to the local sheriff's office to turn himself in. (T1165) The Autauga County sheriff's deputies came twice to Richard Holloman's residence, once to get the shotgun. (T1253 & T1352) and the second time to get Sherri. Sherri had told the deputy that her hand prints were on the shotgun because Holloman asked her to shoot him. (T1350)

Dr. Goff a clinical neuropsychologist testified about. The tendency to get real upset easily. Neuropsychological defect or neurologic dysfunction which might have had an impact upon his behavior. (T1390) His IQ showed him at the 17th percentile or the low average range (T1393) Dr. Goff testified that Bradford's psychiatrist found Hick depressed, suffering from sleep disturbances, mental remernations. (T1406) Holloman was suffering from a depressive disorder and major depression. (T1409) There was documented deterioration while at his stay at Bradford. (T1413) to the extent that the psychiatrist had to come in and prescribe antidepressants. The diagnosis of Holloman was (T1420) severely depressed individual with

7

a substantial personality disturbance was experiencing something that  - that we call de-compensation, where he became less and less able to deal with the circumstances surrounding his situation."  Dependent personality disorders tend to be very sensitive to situation where their dependency is not met. (T1425) A personality disorder is a serious mental or emotional disorder (T1431) and he was de-compensated to the pint he was not intrepreting things adequately.

### STANDARD OF REVIEW

When there is a capital case in which the death penalty has been imposed under Rule 45A, Ala.R.App.P., the Appellant Court must search the record for any error, whether or not the error was brought to the attention of the trial court.  Rule 45A, states:

"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

In determining when to apply plain error to a given situation, this court has stated:

Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. The failure to object at trial weighs against any claim of prejudice an appellant may make. <u>Kuenzel v. State</u>, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991).' "

However under Rule 45B Alabama Rules of Appellate Procedure states that in those criminal cases in which the death penalty has not been imposed, the Court of Criminal Appeals shall not be obligated to consider questions or issues not present in briefs on appeal.

While the heightened standard of review is provided in "death imposed" penalty cases does not apply because the accused has been committed to life in prison without the possibility of parol, the appellant argues that the higher standards should be applied and asks the Court of Criminal Appeals to apply the higher standard. Although the ultimate penalty has not been imposed the next highest penalty has been imposed -- the ending of all hope of ever being paroled. We would ask the court to extend that to all capital cases, even those where the ultimate penalty has been eliminated.

9

## Summation of Argument

Appellant makes several arguments for the remanding of the case for a new trial or at least remanding for a Motion for New Trial to properly build the record.

A crucial and necessary witness (John Gallia) was not present or trail.  A continuation should have been granted.  His testimony would have negated crucial elements of the burglary element of the capital murder charge.

Another area deals with the capital murder charges, the failure to give a directed verdict as to the kidnapping capital murder charge, the failure to give requested charges dealing with kidnapping and capital murder and the failure to give one charge which was not requested, but should have been requested - intoxication.

Ineffective assistance of counsel is another area the Appellant alleges that counsel should have requested a hearing on the Motion for New Trial and there were many areas of ineffective assistance of counsel that should

10

have not occurred at trial and items that should have been presented in the Motion for New Trial. These deficiencies amounted to ineffective assistance of counsel. (Counsel is aware that many of these items are outside the record and should be presented in a Rule 32, but counsel is bringing them up at this point.) Areas include, failure to present evidence of the side effects of medication, failure to adequately prepare and cross examine witnesses, failure to use available evidence and witnesses.

Appellant maintains certain actions by the state were improper, highly prejudicial and arise to the pint that the Appeals Court should grant a new trial.

Appellant also maintains he was coerced into not testifying and that he could have provided evidence to substantiate the claim of heat of passion and counter some testimony by other witnesses. For this and the reasons set out below, Appellant asks that his convictions be overturned and he be allowed a new trial on all three cases, CC-00-755, 757, 758.

11

**I. The Court Erred When It Refused to allow a
Continuance to Obtain the Testimony of a Crucial
Witness, John Gallia.**

John Gallia was the victim in CC-2000-757 and a
crucial witness for the Defense to prove there was
no burglary and to counter the prejudcial statements
of Becky Clark such that Jamie Holloman was laying
on the legs of John Gallia when he was shot And to
counter the statement that Holloman told his little
girl, Jamie, "she would have to find a new momma and
daddy". A statement the judge commented on as one of
the reasons why he would not dismiss the "kidnapping
capital murder count".

John Gallia had moved to California and would
not come to Alabama for the trial.(R-345)    The
Defense team asked for a continuance to obtain a
deposition of Mr. John Gallia. His emails and faxes
show that he was a crucial witness. By order dated
April 29, 2003 a deposition was to be taken
telephonically by the parties here in Alabama with a
court reporter in California. (R354) The deposition
failed when Mr. Gallia failed to attend on May 9,
2003 (R320).   The defense immediately asked for a

11

continuance. Counsel had made previous efforts to see that Mr. Gallia would be at court, including renting a car for him to travel to Alabama before setting up the video deposition.

John Galia's testimony would provide evidence that Holloman had been expected and the back door had been unlocked for Holloman. Evidence that the entry was not an act of burglary and therefore the murder was not a capital murder committed during a burglary. John Gallia's fax/email statement was as follows:

..... Sherry wanted nothing more than to miss off and cause a confrontation between James and my self. James called the house that night and talked to Jimmy then he talked to Sherri Sherri gave the phone back to Jimmy after she was done, then asked Jimmy where James was call from. Jimmy said "I don't have my glasses on and handed the phone to Sherrie. Sherrie looked on the Caller ID and said nothing. About 5 minutes later she told the kids to stay where they were and play, the kids were behind the couch, Sherri went into the other room and about 15 minutes later came through the kitchen and unlocked the back door, she then walked through the living room and looked at me with a smile and walked past us back into the computer room. Jimmy and Becky were asleep on the couch. [portions omitted]

... In short, Sherrie Holloman used, her

12

mother, father, kids, myself, and James
Holleman to cause what happened, She knew
James Holloman was on his way there and
said nothing . She unlocked the back door
to let James Holloman in, Why do you think
there were no signs of a break in?
[portions omitted]

... this letter just scratches the surface
of how far Sherrie Holloman went. When the
rest is revealed your case against James
Holloman will fall apart right in front of
your eye's. I don't condone what James
Holloman did, but I can understand why he
did it. .. [portions omitted].

... This is my statement. This it the
truth. [John Gallia's fax/email] (R346-
347)

The court found the statement given to police

immediately after the shooting and the email/fax

sent months afterwards to be inconsistent and denied

the Motion to continue. (R428) The court in made

a ruling denying the continuance and giving reasons

which are found at (R430) The quote from the court's

ruling is omitted here due to space. The court's

ruling determined which witnesses would be

detrimental to the defense. (R428-R430)

According to John Gallia's statement Mr.

Holloman spoke with the Jimmy Clark and Sherri

Holloman shortly before he arrived at the house and

he was not instructed in any way to stay away from the house. Further that Sherri Holloman looked at the caller ID and then unlocked the back door. This was a direct counter to the state's evidence that there was a burglary. It would have raised more than a mere possibility that the jury would have found him guilty of the lesser included offense of murder instead of the capital offense of murder committed during a burglary. It is likely that a different result would have been reached as to the charge of capital murder during a burglary.

A court may not, refuse to grant a reasonable continuance for the purpose of obtaining defense witnesses where it has been shown that the desired testimony would be relevant and material to the defense. Hicks v. Wainwright, 633 F.2d 1146 (5th Cir.1981);

> In Hicks the Court enunciated several factors which are to be considered in determining whether an accused was deprived of his right to compulsory process by a denial of a motion for continuance: "The diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe

14

their expected knowledge or testimony, the
degree to which the testimony is expected
to be favorable to the accused, and the
unique or cumulative nature of the
testimony.   633 F.2d at 1149 (quoting
United States v. Uptain, 531 F.2d 1281,
1287 (5th Cir.1976) (footnotes omitted))."

With a continuance and a court order the defense
would have been able to bring Mr. Gallia to court or
at least compel him to attend a deposition within a
short period of time. Further it is clear from the
record that the defense had been diligent in trying
to procure Mr. Gallia even renting a car for Mr.
Gallia to travel to Alabama.  (Vol II - R345)

That the court was not convinced the testimony
would be helpful should not be the deciding factor.
The court can not make comments to the jury as to
its opinion as to the validity or truthfulness of
the testimony. Yet here the decision of the court
did even more. It prevented the testimony from ever
reaching the jury.      In Ex parte Saranthus, 501
So.2d 1256 (Ala.1986) one of the factors for
consideration in reviewing the denial of a
continuance is whether the anticipated evidence
would have been material and competent. The offer

15

of proof contained in the email/fax shows the
testimony would have been material.

In Washington v. Texas, 388 U.S. 14, 87 S.Ct.
1920, 18 L.Ed.2d 1019 (1967), the United States
Supreme Court explained the innate relationship
between compulsory process and the accused's right
to a fair trial.

> "The right to offer the testimony of
> witnesses, and to compel their attendance,
> if necessary, is in plain terms the right
> to present a defense, the right to present
> the defendant's version of the facts as
> well as the prosecution's to the jury so it
> may decide where the truth lies.   Just as
> an accused has the right to confront the
> prosecution's witnesses for the purpose of
> challenging their testimony, he has the
> right to present his own witnesses to
> establish a defense.   This right is a
> fundamental element of due process law."
> 388 U.S. at 19, 87 S.Ct. at 1923.

Based upon the court's failure to grant the
continuance and thereby the failure of a crucial
witness to be compelled to attend, the defendant
asks for a new trial.

**II. Counsel Was in Ineffective for Failing to
Develop a Defense concerning the Effects of the
Medication He Was taking and the Effects of Abruptly
Discontinuing the Medication.**

It was shown that Hollomon was on several

16

medications while at Bradford Health Services.  But he stoped taking them after he left (T1423) The side effects of these medications were not presented at trial.  They should have been.

Holloman was taking several medications including Neurontin, (T1313) and Effexor (T1314) Neurotin was prescribed for psychiatric problems and the Effexor was an anti-depressant.  (T1314) Two drugs, Effexor and Neurotin, were prescribed while at Bradford. (T1320).

Mr. Holloman was coming off Effexor and Nuerotin a week before the shooting on May 6, 2000 when he left Bradford.  He was having the bad side effects as describe in the PDR (Physicians Desk Reference). See the appendix for more information on these drugs.  Some of the symptoms people have when taking Effexor include nervous, dizziness, memory loss, headaches, confusion, abnormal behavior (including what occurred on May 6, 2000) out breaks of violence.  The medications he was on was confirmed by the Houston County Sheriff's nurse's testimony, Darla Speigner. (T1306)

With the nurse, and a  PDR and/or the three experts that testified at the trial the side effects of

17

these medications counsel should have been presented to the jury.  The following is a discussion of the effects of two of those drugs.(Had there been a Motion for New Trial, this is one of the items which should have been presented at trial and definitely should have been presented at a Motion for New Trial.)

According to the PDR, Effexor is prescribed for the treatment of depression--that is, a continuing depression that interferes with daily functioning. The symptoms usually include changes in appetite, sleep habits, and mind/body coordination, decreased sex drive, increased fatigue, **feelings of guilt or worthlessness, difficulty concentrating, slowed thinking, and suicidal thoughts**. According to the PDR, some less *common side effects include* Abnormal taste, **abnormal thinking, agitation,** chest pain, confusion, decreased sex drive, **depression,** dilated pupils, dizziness upon standing up, high blood pressure, itching, **loss of identity,** rapid heartbeat, ringing in the ears, trauma, twitching, urinary problems, weight loss.  **A wide variety of very rare symptoms possibly related to Effexor have also been reported.**

18

More important than the side effects while you are
on the drugs are the side effects as you abruptly come
off the drugs. [Holloman stopped taking the medications
after leaving Bradford another factor which is not
shown in the record.]

"Do not stop taking the drug [Effexor]
without consulting your doctor. If you stop
suddenly, you may have withdrawal symptoms,
even though this drug does not seem to be
habit-forming. Your doctor will have you taper
off gradually." (Internet PDR see appendix)

Neurontin was also prescribed to Mr. Holloman
while at Bradfords. According the the PDR it also
produces "thinking abnormal" as a side effect.   None
of the side effects were explained to Holloman and
certainly none were explained to the jury.  It would
show that Holloman was effectively "intoxicated" or
under the influence of the side effects of prescribed
medication which clouded his judgment and thinking.   It
could explain why a "cooling off period" in connection
with in the "heat of passion" was not available to Mr.
Holloman, due to the "abnormal thinking", the
agitation, and other side effects of the medication.
It was the basis to ask for an intoxication jury

19

charge. A charge which would have allowed the jury to find that the crimes were committed under a heat of passion without a cooling off period. A cooling off period which was not available because he was de-compensating exacerbated by the side effects and withdrawal symptoms. A cooling off period that was not available because he had been told there was no one else in the house with Sherri and his children. Something he did not find out for sure until he arrived at the Clark residence.

Failure to present this to the jury was not a "strategy" but a missed opportunity to present evidence favorable to the accused. Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) Holloman alleges that counsel's performance was deficient and made this error which was serious enough that counsel's performance fell below an objective standard of reasonableness. Strickland, at 687-88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 (1984). And the failure to provide this evidence to the jury prejudiced the defense, and deprived the appellant of a fair trial. With this additional evidence the

20

Appellant believes and that the probable outcome of the trial would have been different. Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).

## III. Ineffective Assistance of Counsel Due to Multiple Deficiencies by Trial Counsel.

The standard for determining ineffective assistance of counsel was set out by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prove a claim of ineffective assistance of counsel, an appellant must meet a two-pronged test. First, the appellant must show that counsel's performance was deficient, that is, that counsel made errors so serious that counsel was not functioning as "counsel" under the Sixth Amendment and that counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 687-88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 (1984). Second, the appellant must show that this deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the appellant of a fair trial and that the probable outcome of the trial would have been

different but for counsel's ineffective performance.
Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).

Appellant alleges he did not receive effective
assistance of counsel as guaranteed him by the Sixth
and Fourteenth Amendments to the United States
Constitution and  Article I, Section 6 of the Alabama
Constitution of 1901.

Although Holloman did not present the
allegations of ineffective assistance of counsel to the
trial court, he had no opportunity to do so.  There was
no hearing on a Motion for New Trial.  Further the
Trial Court summarily denied the Motion for New Trial.
We ask the Appeals  Court to look at and  review
Appellant's  allegations, pursuant to the plain error
doctrine even though Holloman was given life without
parol.  Rule 45A, Ala.R.App.P., and Frazier v. State,
758 So.2d 577 (Ala.Cr.App.), aff'd,  758 So.2d 611
(Ala.Cr.App.1999).

The appellant has expressed his belief that
counsel did not review case enough with client know
what questions to ask of the witnesses and failed to
object or ask questions to explain evidence that was

22

elicited by the prosecutor. The Defendant has alleged that many "facts" coming out at trial where inaccurate and a proper, better direct and cross examination could have been presented if the Defendant had been more thoroughly consulted as to the questions to ask.

A. *The District Attorney portrayed Holloman as taking psychology for the purpose of "playing crazy".*

The D.A. protrayed Mr. Hollomon as going to college and taking Psychology, thereby implying that Hollomon took psychology courses for the purpose of trying to mislead and faking mental instablility. "District Attorney: "He went to Troy State University , to college, for a year. Which course did he take? Psychology. Remember that? Psychology." (Vol 14 T1734)

The Defense failed to show that this was a two year associate in business paid by the V.A. and was taken as a required course of study along with a host of other courses. The college was attended in 1995 & 1996 and should have been brought out to the jury to prevent the inference that Holloman took the course to be able to fake mental illness.

B.   *The D.A. brought out evidence that Holloman had a pair of binoculars in his truck.*

The prosecutor then used this information to allow or argue that they were for the purpose of spying on the Clarks and Sherri Holloman to carry out his "plan". The Appellant had these for years and they were always in the truck and were not placed in there just for the purpose of "spying" on his wife. This could have been shown with other family members testimony if counsel had been better prepared.   The District Attorney argued, "He's got binoculars where he has been watching." (Vol 14 T1735)

C.   *The Defense failed to properly cross examine Becky Clark as to the statement, "You are going to need to get a new mommy and daddy."*

Although the defense asked Becky Clark about this statement, the defense accepted her answer and went on. This should have been brought up in trial on with an effective cross examination.   Not available to the court of appeals is the taped statement of Jamie Holloman - the daughter heard on the 911 tape.   In her taped statement she said she heard her daddy say, "<u>He said sorry baby that I did this, I love you, all I know</u>

is I want to say goodbye." *None of the other witnesses in their taped statements said anything about, "You are going to need to get a new mommy and daddy."* This statement came from Chief Deputy William Lands recounting of the statement of Jamie Holloman. Again, this police report by Deputy William Land is not in the transcript and is not properly before this court. It should have been brought up in an effective cross examination and/or at a Motion for New Trial. The taped statement of Becky Clark indicated that Holloman did not say anything in the house. The taped statement of Sherri Holloman made no mention of any statement like this. The taped statement of John Gallia made no mention of a "You are going to need a new mommy and daddy." As you can see the problem I have with this argument, is that all of the "taped statements" are not part of the record, but as stated above, they could have been used to effectively cross examine Becky Clark.

A vigorous cross of examination of Becky Clark on this point was necessary to counter the burglary charge and the intent element. *"You are going to need to get a*

new mommy and daddy" carries such a strong impact that it could not help but be one of the emotional and prejudicial  factors that convinced the jury that this should be capital murder rather than just plain murder. And it was one of the factors stated by the Judge as to why he would not throw out the "kidnapping capital murder" Charge.   The assistance of counsel is therefore ineffective under Strickland.

D.   The Jury was told three different stories of the first head injury due to the fact that Defense Counsel did not do enough pretrial interview with client.

The defendant had actually hit his head playing football behind bleachers at age 11 when he ran into a brick wall.  The Defense attorney said he fell off a bike,Holloman's Father said he fell off bleachers. Brantley said he ran into a wall.   Inconsistences in the testimony concerning an easily ascertainable fact undermined the credibility of the defendant's case and allowed jurors to discount the testimony of the defense

witnesses and the credibility of the defense case. [1]

The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances." ' Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065). As argued before, perhaps just one of the errors listed above might not be sufficient, but the multitude of mistakes push this outside the range of professionally competent assistance.

---

[1] Again I am presenting matters which are not in the record and would not be available for the record without a Motion for New Trial and/or a Rule 32 petition. Some of these things not presented or errors at trial include:

Defense Attorneys failed to object to items said by D.A. against the Defendant including he is a sharp shooter and knows how to kill.

Defense Attorneys failed to use other witnesses that were available during the trial and could explained Holloman's behavior as a response to his Ex-wife's actions such as leaving Pratville with the children while Holloman was in Bradford's.

Defense Counsel failed to interview Jim Hayward before the trial as to what his testimony might be at trial. Further this witness was a personal friend of the D.A. having played tennis together. Counsel failed to show the allegations of threats against Jimmy Clark were years before. Failed to call Joey Oates girl friend, Tammy, who would have testified that Holloman never said he would like to kill his wife when Holloman was talking with Joey Oates. As previously mentioned in a separate argument the Defense counsel failed to pursue the effects of the drugs Holloman was taking.

27

**IV.   Remand because Defendant was coerced into not testifying and thereby denying him a right to testify and his rights under the fifth amendment.**

The appellant says he has been denied his opportunity to testify in his own behalf.  This is perhaps more important at the guilt/innocent phase of the trial  than at the penalty phase, as the recommendation was life without parole.  However, the Appellant court can see the pressures not to testify that were place upon him at the sentencing phase. These same pressures were previously placed upon him at the guilt/innocence phase of the trial.  Defendant wanted to testify but was talked out of testifying by his trial counsel.[2]

> MR. DECKER: Yes, Your Honor.  Our client has advised us that he wishes to testify on his own behalf during the penalty phase of this trial.
> It is our advice, the advice of Mr. Brantley, the advice of Mr. Parker, the advice of Ms. Stinson, and advice of myself that Mr. Holloman not take the stand.  He is invoking his Constitutional right to testify on his own behalf.
>
> THE COURT: Okay.  All right.  Your' aware – you are aware that your attorneys, all four of

---

[2] Another issue that could have been presented at a Motion of New Trial.

28

your attorneys, have advise you not to take
the witness stand and not to testify?
MR. HOLLOMAN: (No audible response)

THE COURT: Are you aware of that?
MR. HOLLOMAN: Yes, sir.
THE COURT: Okay. All right. And I understand
that you - I gave your father an opportunity
to go in and talk to you also, and I
understand that he advised you not to testify.
MR. HOLLOMAN: There's a lot of things that I
can prove.
THE COURT: Well, now, I want you to answer my
questions right now.
MR. HOLLOMAN: I've changed my mind. I'm not
going to do it because - because of my family.
They upset. **And I was wanting to get on the
stand last week I was listening to all this
stuff, and nobody wanted me on the stand.** So
I'm just going to just forget it. (emphasis
supplied)
THE COURT: Okay. All right . So you're going
to - you're going to follow your attorneys'
advice?
MR. HOLLOWMAN: Yes, sir.  (T2000)

The same tactics had been used a week before

during the guilt or innocent phase of the trial.

Counsel asked for a 10-15 minute recess to talk with

his client behind closed doors.   (VolXIII -T1563-1564)

After the brief recess, the Defendant and counsel

came back to the court room where upon the following

exchange took place.

MR. BRANTLEY: Let the record reflect that
I myself, and Mr. Decker, Mr. Parker, have

29

> consulted with James Hickman Holloman just a
> few minutes ago with regards to his Fifth
> Amendment rights.  We specifically asked him
> did he want to testify.  He carried on a
> conversation with us. He asked us some
> questions.  We answered those questions.  And
> as a result of that discussion, Mr. Holloman
> has instructed that he will refrain from
> getting on the stand.  **And would the Court
> like to examine Mr. Holloman on that decision?**
> (emphasis supplied)  (Vol XIII - T1565-1566)

You don't usually ask the court to question your

client on whether he really wants to testify or not

unless there is a problem.  Nichols vs. Butler, 952

F.2d 1550 (11th Cir. 1992) (en banc) set out the

importance of allowing the Defendant to testify.  In

Nichols the attorney threatened to withdraw if Nichols

testified.  In our case, Holloman was pressured into

not testifying.  Under the Alabama Rules of

Professional Conduct 1.2(a)(1991) a lawyer shall abide

by the clients decision, after consultation with the

lawyer, as to a plea to be entered, whether to waive

jury trial and whether the client will testify.

Further, we noted that the first prong of the

Strickland test would be met "if defense counsel

refused to accept the defendant's decision to testify

and would not call him to the stand. (Nichols, supra at

30

1553)  Based upon this argument, Defendant should be granted a new trial and an opportunity to testify.

**V. Court committed error when the court allowed testimony confidential communications between Becky Enzio and the Appellant at Bradford's in violation of the psychotherapist -patient privilege?**

The State called Rebecca Hale Encizo to testify for the state. (T908-978) Ms. Encizo was a counselor at the inpatient facility of Bradford located in Warrior, Alabama.  Bradford. Bradford's was an alcohol treatment facility at which all participants were told that it was confidential.

The presence of a third party does not destroy confidentiality if the third person present was (1) present to further the interest of the patient, (2) reasonably necessary for transmission of the communication, or (3) participant in the diagnosis or treatment who was under the direction of the psychotherapist.  Rule 503 indicates the privilege extends beyond the psychotherapist and patient to include any third parties necessary to the communication or delivery of services.  All individual

and group sessions were there to counsel the participants in their treatment.

In Jaffe v. Redmond, 518 U.S. 1, 1116 S.C. 1923, 135 LED 2d 337 (1996) federal law recognizes a privilege protecting confidential communications between patient and psychotherapist.

The Defense objected to the testimony of the counselor under Rule 503 of the Alabama Rules of Evidence claiming a psychotherapist /patient privilege. After discussions the court allowed the testimony of Becky Encizo as to her conversations with the Defendant and things Holloman had said in counseling sessions. (T921)   On cross examination it was shown that John Hollomon had a psychiatric evaluation by a medical licensed psychiatrist and a treatment plan was set up. (The psychiatrist also placed Mr. Holloman on medications (T960) such as Fexxor and Nureton.   There was extensive testimony that patients had an expectation of confidentiality. (T921) and(T945)

> Alabama Rules of Evidence, Rule 503 (b).
> Psychotherapist-Patient Privilege: A patient
> has a privilege to refuse to disclose and to
> prevent any other person from disclosing
> confidential communications, made for the
> purposes of diagnosis or treatment of the

patient's mental or emotional condition, including alcohol or drug addiction, among the patient, the patients's psychotherapist, **and persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including member of the patient's family.**

There is also Counselor-Client Privilege under Rule 503A. While Becky Enzio did not hold a professional license she was a counselor for a "licensed organization" Bradford's.

Even though the rule states there is no privilege under this rule as to an accused in a criminal case who raises the defense of insanity appellant makes the argument that this should apply to the medical records only and not to the communications by the defendant.

There is a difference between the medical records and other communications.  Even though there are cases that state the psychotherapist-patient privilege is unavailable in a criminal trial where the defendant raises the defense of insanity. ( Free v. State, 455 So.2d 137), we would ask the court to make a distinction between the written records and reports and the confidential communications revealed during treatment.

Based upon the court allowing confidential communications to be testified to at trial, we ask for the court to remand the case for a new trial.

## VI The prejudicial effect of the 911 tape outweighed the probative value of the tape when it was played for the jury.

The defense objected to the introduction of the 911 tape from the call made immediately after Holloman left the residence. (T336 and R372)  There is nothing on the tape that was not presented to the jury from some other source.  The most prejudicial part of the tape is the continued moaning, groaning and cry for help. The tape would merely call upon the juries sympathy to the Clark's and to retaliate against the defendant for causing so much pain and agony.   The prejudicial nature of the tape outweighs anything that the jury might have benefitted from hearing it.   The 911 tape did not clear up any disputed testimony. Nothing on the tape was disputed.

One of the criteria in deciding when prejudicial effect of evidence substantially outweighs probative value, is whether there are less prejudicial means of

34

proving the same thing, and if such alternative, less prejudicial evidence exists, then such availability argues in favor of excluding the prejudicial evidence. Rules of Evid., Rule 403. There was a transcript of the tape that was available for the jury. Instead this tape of moaning and crying "help me" was just so chilling as to render its playing for the jury merely a method of inflaming the jury. See R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997), quoting C. Gamble, McElroy's, § 20.01.

In Hunter v. State, 802 So.2d 265, 270 (Ala.Crim.App.2000), The standard for determining whether error is harmless is whether the evidence in error was 'harmless beyond a reasonable doubt.' 802 So.2d at 270, [citing other cases Citations omitted.].

Campbell vs. State   718 So.2d 123, 128 (Ala. Cr.App 1997) quoting Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985)[other citations omitted]

Appellant is filing a motion with the State Court to supplement the record with the mailing of the original 911 tape to the court for its review.

## VII The Capital murder convictions should be overturned on the basis of double jeopardy.

While the Defendant is aware that there are some cases that say that conviction of capital murder on the basis of a burglary and a capital murder on the basis of kidnapping are separate offenses we ask the court to over rule those cases.

Defendant should not be convicted of both capital offense of murder committed during a kidnapping and capital offense of murder committed during a robbery, as the offenses arose out of same conduct and the same murder. Convictions on both charges violated double jeopardy. Loggins v. State, 771 So.2d 1070 (Ala.Crim.App.1999). Based upon Loggins, either the capital murder charge for burglary by Mr. Holloman or the count two kidnapping capital murder charge against Mr. Holoman should have been dismissed or instructions given to the jury

that they could find Mr. Holloman guilty of one or the other but not both.

In Harris vs.State, WL 31151417 at page 5 (Ala. Crim.App 2002)Defendant's convictions for felony murder during a robbery and robbery in the first degree

36

violated Double Jeopardy Clause; the same robbery formed
the basis for the felony-murder conviction and for the
robbery conviction.    U.S.C.A. Const.Amend. 5.

Mr. Holloman is charged with killing James Clark.    He
is charged as a capital murder crime of killing Mr. Clark
based upon the killing happening during a burglary and he
is charged with the capital charge of murder during a
kidnapping.  The same basic elements are involved in each
case.

> Convicting defendant of capital offense of
> murder committed during kidnapping in first
> degree and intentional murder would have
> violated statute, prohibiting conviction for
> more than one offense based upon same conduct
> when one offense is included in other, where
> both offenses were based upon same murder.  Code
> 1975, §§ 13A-1-8(b),  13A-1-9,  13A-5-40(a)(1),
> 13A-6-2.  Ingram vs. State, 779 So.2d 1225 (Ala.
> Crim. App. 1999)

> Moreover, the dismissal of count two was proper
> because the principles of double jeopardy would
> have been violated if Ingram had been convicted
> of intentional murder under count two and also
> convicted of the capital offense of murder
> committed during a kidnapping under count one.
> Double jeopardy is violated by a defendant's
> conviction for intentional murder under one
> count of an indictment and capital murder under
> another count where the same murder was an
> element of both offenses. Borden v. State, 711
> So.2d 498 (Ala.Crim.App.1997), aff'd,  711 So.2d
> 506 (Ala.), cert. denied,  525 U.S. 845, 119
> S.Ct. 113, 142 L.Ed.2d 91 (1998); [Other
> citations omitted]  Furthermore, the failure to

37

dismiss one of the counts would have violated
Code of Ala.1975, § 13A-1-8(b).   Section
13A-1-8(b) provides, in part, as follows:

>"When the same conduct of a
>defendant may establish the commission
>of more than one offense, the defendant
>may be prosecuted for each such
>offense.  He may not, however, be
>convicted of more than one offense if:

>"(1) One offense is included in the
>other as defined in § 13A-1-9...."

Clearly, under § 13A-1-9, murder is included in the

capital offense of murder during a kidnapping.   Coral v.

State, 628 So.2d at 958. As quoted in  Ingram vs. State,

779 So.2d 1225 a t 1241 (Ala. Crim. App. 1999)

| | |
|---|---|
| **Ingram Case: Count I**<br>**Capital Murder:**<br>**committed during Kidnapping**<br><br>Lesser included:Intentional | Ingram Case: Count II<br>Capital Murder:<br>committed during a robbery<br><br>**Lesser included** |

The bold faced item within the text box above shows

what Ingram was convicted of.  The court said this was

double jeopardy.  Yet we have the Holloman case

illustrated below:

38

| Holloman Case: Count I<br>**Capital Murder during<br>Burglary**<br><br>Lesser included offense<br>Intentional Murder | Holloman Case: Count II<br>**Capital Murder during<br>Kidnapping**<br><br>Lesser included offense<br>Intentional Murder |
| --- | --- |

The victim was the same in each of the two capital murder charges.   Although the elements of burglary and kidnapping are different it is hard to understand why in one of the above cases there is double jeopardy because the jury found intentional murder in one and capital in the other.( Ingram case)   Yet when the defendant is charge with two separate theories of killing the same man, one can convict him of killing the same man under two different theories. The court seems to say this in at least one other case:

> Borden, 711 So.2d at 503.  See also  Coral v.
> State, 628 So.2d 954, 958 (Ala.Cr.App.1992),
> aff'd,  628 So.2d 1004 (Ala.1993), cert. denied,
> 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61
> (1994) (holding that the defendant's conviction
> of the lesser-included offense of intentional
> murder under a count alleging the capital
> offense of murder-robbery and **his conviction of
> the capital offense of murder-burglary violated
> the principles of double jeopardy where the same
> murder was an element of both convictions**).
> Accordingly, this cause is remanded for the
> trial court to vacate the appellant's conviction
> for intentional murder, as a lesser-included
> offense of the capital offense of murder during
> a robbery, as charged in Count II of the

indictment.

There is also one other problem with the charges and convictions of two capital murder counts for the murder of one person. The way the jury instructions were given allowed the jury to consider that the crime of kidnapping was the element necessary in the conviction of the capital murder during the commission of a burglary.

Although the count charges the defendant with breaking in or remaining unlawfully with the intent to commit a felony - what was the felony? Was it the assault or the kidnapping? Was it the attempted murder of charges CC-00-757 or CC-00-758. The jury was given no clear distinction on which to base their verdict.

The court had charged the jury about what constitutes a burglary. "A person commits a burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling and he does so with the intent to commit a crime therein,..." (Vol XIV T1754) Since kidnapping is crime, it was never explained to the jury that they could not consider the "kidnapping" aspect as the crime. The judge went on to say, "And then fifthly, that in doing so the defendant acted with the intent to

commit a crime - I think the state has alleged assault - therein." (Vol XIV T1756)

The court talked about burglary again at (Vol XIV T1790) ..."the State must have proven beyond a reasonable doubt each of the following elements of burglary in the first degree. First of all, that this defendant, James Hickman Holloman, knowing and unlawfully entered or remained unlawfully in the dwelling of Jimmy Clark, and that with the intent to commit a crime - I believe the state charged assault therein - "

While the test in determining whether charges run afoul of Double Jeopardy Clause is whether each crime contains statutory element not contained in other under U.S.C.A. Const.Amend. 5; Const. Art. 1, § 9 the jury could have used kidnapping or the attempted murder as the crime "to be committed therein" to satisfy the elements of the charge of burglary. While the judge mentions.. "I believe the state charged assault therein.." The court did not exclude the kidnapping as the burglary element. Even if this was not raised at trial, the question of whether there was double jeopardy is jurisdictional and not procedural and should be reviewed on appeal.

41

Based on these reasons, we believe the case should be reversed.

**VIII. The court erred in its instructions on Burglary and the evidence was in sufficient to convict on capital murder committed during a burglary.**

The court gave jury instructions that allowed the jury to infer that the mere killing of Jimmy Clark was committed in the course of a burglary by being committed after the privilege to remain had been revoked. This privilege to revoke was imputed by the very act that constituted the burglary and is therefore impermissible upon which to find burglary.

In Davis vs. State, 737 So.2d 480 at 484 (Ala. Crim. App 1999) the court stated,

> "We reiterate that the evidence of a commission of a crime, standing alone, is inadequate to support the finding of an unlawful remaining, but evidence of a struggle can supply the necessary evidence of an unlawful remaining. In homicide cases, the mere fact of the victim's death cannot be equated with a struggle. For example, evidence of a privileged entry followed by death from an injury inflicted by surprise or stealth and causing instantaneous death would not constitute circumstantial evidence of an unlawful remaining. Likewise, a privileged entry followed by death from an injury inflicted by a delayed mechanism, such as poison, would be equally deficient.
>
> The appellant also believes that there was

ineffective assistance of counsel for not providing a jury instruction covering the question of whether or when a privilege to enter had been revoked in order to turn a murder into capital murder by remaining after the victim had revoked the defendant's privilege to remain.

Under Gentry vs. State ( 1940471) Supreme Court, the court reiterated that standing alone, an intentional murder is not a capital crime. Something more must be established to elevate an intentional murder to a capital offense. One of those elements to elevate a murder to a capital murder is to allege that the murder was during a burglary as they did with James Hickman Holloman.

A person enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so. Section 13A-7-1(4), Ala. Code 1975.

Care must be made to prevent every intentional murder committed indoors into capital murder or to likewise make virtually any crime committed indoors a burglary as well. (Gentry vs. State)

Burglary was defined by the common law to be the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony. The

offense was [composed] of narrowly defined elements.

> The law was not ready to punish one who had been
> 'invited' in any way to enter the dwelling.  The
> law sought only to keep out intruders, and thus
> anyone given authority to come into the house
> could not be committing a breaking when he so
> entered. W. LaFave and A.Scott, Handbook on
> Criminal Law , Section 96, p.708 (1972)
> (footnotes omitted).

> Because breaking, as an element of common-law
> burglary, requires a breach of the building made
> by trespass, it cannot be established by the act
> of one who had authority to open that very door
> at that particular time.  Thus one who has been
> provided a key with the unrestricted right to
> enter at any time does not commit a braking even
> if he uses it on one occasion to gain entrance
> for the purpose of larceny." R. Perkins an R.
> Boyce, Criminal Law, Ch. 3, Sect 1, p. 250 (3d
> ed. 1982)

In our case there was evidence which was excluded
because the court refused to allow a continuance to obtain
the deposition of the elusive John Gallia.  According to
the email/fax of John Gallia, Sherri Holomon talked with
Hick on the telephone. According to Gallia she looked at
the caller ID and  knew that Hick was not in Pratville
where he lived but close to Rehoboth where Sherri was
staying.  After looking at the caller ID Sherri went to

unlock the back door. [3]    From this the jury could infer that James Hickman Holloman was an invited guest.  (The email/fax is found at Vol II   R346)

This is what made John Gallia such a crucial witness and why the out come would most likely have been different at least as to the capital murder charge based on burglary.

The court had charged the jury that.."the State must have proven to you beyond a reasonable doubt that this defendant here, James Hickman Holloman, knowingly and unlawfully entered or remained -- even if he entered lawfully, that after it became unlawful for him to be in that dwelling that he remained unlawfully in the dwelling of Jimmy Clark. " (T1756)

The court repeated this instruction again: " A person acts knowingly if he is aware of the fact that he has no license or privilege to enter or to remain in a dwelling. A person enters or remains unlawfully in or upon premises when he is not licensed, invited, or privileged to do so. (T1757)

---

[3] There are statements by Holloman out side the record that Holloman told Sherri he would be there in 10 minutes.

Under Gentry vs. State, care must be had to prevent all murders indoors from becoming capital merely because they were committed indoors. In order to establish an "unlawful remaining" when the defendant has a license or privilege to be on the premises, the State must present evidence other than evidence that the defendant committed a crime in a dwelling or a building owned or controlled by the victim. Gentry vs. State, 689 So.2d 894 (Ala.Crim. App. 1994)

To interpret 13A-5-7 to the extent that the state has proposed would violate the constitutional limitations designed to reserve capital punishment for only the most egregious crimes, by expanding the scope of the death penalty to apply to intensional murders distinguishable from other intentional murders only because they occur indoors. Gentry vs. State

The court should have given and definitely the defense should have asked for an instruction that just because a murder or a crime is committed after entry that does not automatically turn a lawful entry into an unlawful remaining. Without such an instruction, the jury is left with little but a forgone conclusion that the

murder was committed during a burglary.

**IX. There was error in allowing the charge of capital murder during the commission of a kidnapping to go to the jury.**

In the case CC-2000- 756, the Defendant was charged with Kidnaping in the First Degree. Before the end of the trial the court granted a directed verdict on Kidnaping in the First Degree of Sherri Holloman in CC-2000-756.

Having found as a matter of law, there was no kidnaping in the first degree, that should prevent a charge of attempted kidnaping in the first degree. Since # CC-2000-756 was dismissed the lesser included offense of attempted kidnapping of Sherri Hollomon is also dismissed. Count 2 of the indictment in CC-2000-755 stated:

> The Grand Jury of said county charge that, before the finding of this indictment, James Hickman Holloman, whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of JIMMY CLARK by shooting him with a gun, and caused said death during James Hickman Holloman's abduction of, or attempt to abduct, Sherri Holloman with intent to inflict physical injury upon her, or to violate her sexually, in violation of Section 13A-5-40(A)(1) of the Code of Alabama, against the peace and dignity of the State of Alabama. (R15)
> ( See also Judges Jury Instruction T1751-1752)

The Code of Alabama Section 13A-5-40(a)(1) sets out

the charge of capital murder for kidnapping:

> (a) The following are capital offenses: (1)
> Murder by the defendant **during a kidnapping in
> the first degree** or an attempt thereof committed
> by the defendant. (emphasis supplied)
> And
> (4) Murder by the defendant during a burglary in
> the first or second degree or an attempt thereof
> committed by the defendant.

We believe the court was in error in not giving a
directed verdict on the  the kidnapping capital murder
charge.  Under Section 13A-5-49, there is no requirement
that the kidnaping be in the first degree, but this
section only deals with aggravating circumstances during
the penalty phase. **Because the trial testimony showed that
the defendant was release without serious harm and before
apprehension in a safe place the court found there was no
kidnapping in the First Degree as to the charge of
kidnapping Sherri Hollomon.** A person does not commit the
crime of kidnapping in the first degree if he voluntarily
releases the victim alive, and not suffering from serious
physical injury, in a safe place prior to apprehension.
The burden of injecting the issue of voluntary safe
release is on the defendant, but this does not shift the
burden of proof. This subsection does not apply to a

prosecution for or preclude a conviction of kidnapping in the second degree or any other crime.

Count Two of CC-2000-755 only alleged abduction of Sherri Holloman with intent to inflict physical injury upon her, or to violate her sexually. While murder by the defendant during a kidnaping in the first degree or an attempt thereof committed by the defendant is a capital crime, you must have a kidnapping in the first degree.

Based upon the above argument, the Appellant requests the court to over turn the conviction and remand for a new trial.

Because the court should have excluded the kidnapping capital murder count, the following charge was also improper.  The court gave the following charge:

> Now, you'll remember that the capital murder indictment contains a second count.  That's where he is charged with a murder committed during a kidnapping in the first degree is capital murder. ...(T1758) .....
> .... And then fourthly, the State of Alabama must have proven to you beyond a reasonable doubt that the defendant, James Hickman Holloman, abducted Sherri Holloman, and that at the time that he did that.  That is, at the time he abducted or attempted to abduct Sherri Holloman, that he intended to inflict physical injury upon Sherri Holloman.  (T1760)

The court continued with:

> .... If you ladies and gentleman find from the
> evidence that the State of Alabama has proved
> beyond a reasonable doubt each of the above
> elements of the offense of intensional murder
> during a **kidnapping in the first degree as
> charged**, then of course you should find him
> guilty of capital murder committed during the
> course of a kidnapping in the first degree.
> (T1762)
>      On the other hand, if you find that the
> State has failed to prove beyond a reasonable
> doubt any of the elements of this offense of
> intentional murder during a kidnapping in the
> first degree, then of course you cannot find him
> guilty of capital murder **committed during the
> course of a kidnapping in the first degree.**
> (T1763)

The court failed to explain to the jury what would
constituted second degree kidnapping. Without this being
explained, then the jury would consider any kidnapping as
kidnapping in the first degree. If kidnapping in the
second degree had been explained the jury could have mad a
distinction rather than believe any degree of kidnapping
to be sufficient for a captial murder charge.

The judge did give instructions on the the lesser
included offenses of burglary but not lesser included
offenses of kidnapping.

Further, we believe that the jury was confused or
unsure of the charges as they requested copies of the

indictments or "descriptions" of the charges.

(Vol XIV -- T1828) The judge recharged the jury on

Capital murder during the course of a kidnapping in the

first degree. (Vol XIV - T1833) As one of the elements he

charged the jury:

> "And that the defendant, this man sitting right
> over here, abjucted Sherry Holloman. That he
> abducted her. And that at the time that he
> abducted her, he intended to inflict physical
> injury upon her. And that this murder, this
> intentional murder took place during that
> kidnapping of Sherry Holloman. (Vol XV- T1834)
> ..... Of course, kidnapping in the first degree
> speaks of, that the defendant must abduct the
> victim and intend to inflict physical injury upon
> the defendant at the time that he abducts her.
> (Vol XV- T1834)

Again the court failed to give any indication of what

a second degree kidnapping was or that the release of the

victim unharmed in a safe place prior to apprehension was

any defense to kidnapping in the first degree.

Based upon the above the court should reverse the

case and send it back for a new trial.

## X The court erred when it refused to give charge #17 and charge #18 of the Defendants requested charges.

The Defendant requested Defendant's Charge #17 to be

given to the jury. It was found at R531 and it gave the

jury information as to what first degree kidnapping and

51

the defense to first degree kidnapping. (R532)

See R531 and T_____ for denial of Charge #17.

The court also refused to give Requested Charge #18.

Refusal is found at R532 and __

### DEFENDANT'S REQUESTED CHARGE #18

With regard to Count II of the Capital Murder
Indictment, wherein the Defendant is charged with
committing murder while in the course of a
Kidnapping in the First Degree, I charge you,
members of the jury, that if you find from the
evidence that the defendant, James Hickman
Holloman, voluntarily released Sherri (Holloman)
McSwain, alive, and not suffering from serious
physical injury, in a safe place prior to his
apprehension, then you cannot find James Hickman
Holloman guilty of Capital Murder under Count II
of the capital Murder Indictment.  (R532)

Defendant's requested Charge #20 standing alone was

confusing in relation to the Capital murder charge under

Count two.

### DEFENDANT'S JURY CHARGE 20

I charge you, members of the jury that if you
find that James Hickman Holloman committed the
crime of murder by causing the death of Jimmy
Clark, but he did not commit a Kidnapping in the
First Degree, then you must find him not guilty
of Capital Murder under Count Two, but may find
him guilty of Murder.

However, that charge alone without explanations of

52

lesser degrees of kidnapping and in particular the Alabama
Code Section, 13A-6-44(a) which reduces the charge of
First Degree kidnapping to a lesser included offense, the
jury does not have any instruction on what is a lesser
included offense and the case should be reversed on the
kidnapping charge.   In fact the court refused to charge
anything along these lines.  After the instructions the
jury went out and the following occurred.

    MR. BRANTLEY: Let's see. I've just got one,
and that's - I believe we need to instruct the
jury that the State must prove beyond a
reasonable doubt as an element -(T1817) as an
element of kidnapping first degree that the
defendant did not voluntary release the victim
alive. In other words, the State must prove this
as an element of the crime.
THE COURT: Okay. Well, that's denied.  That's
denied right off. I mean, is that -
. . . .

    MR.. BRANTLEY:   It says that we can inject
the issue, but then the burden of proof doesn't
shift. And so, what I'm saying is, is that when
we inject the affirmative defense under that
section, the burden of proof shifts to the State
to prove that those things didn't happen.
So, therefore, it becomes an element of the
offense, and they have to prove it beyond a
reasonable doubt that we didn't release her
unharmed, and et cetera.
THE COURT: I just respectfully disagree with you.
(T1818)

MR. DECKER: well, Judge, I have two, and mine are
- the first one is similar in that I did not hear

53

any statement in your charge concerning capital
murder as it relates to the mitigating - the
aggravating circumstance of kidnapping where
there was the affirmative defense laid out. I
think -
THE COURT: Of releasing her -
MR. DECKER: Releasing her.
THE COURT: There wasn't any, because I don't
intend to charge them to that.
MR. DECKER: Okay. Well, we - (T1819)

    MR. DECKER: Well, just for the record,
    we object.
THE COURT: okay. (T1820)


    The court had granted the directed verdict on the

kidnapping first degree charge in Case # CC-2000-

756.(T1570)


    Having given the Defendant's #20 charge without

giving instructions to the jury on what would reduce a

First Degree Kidnapping charge, the jury was without

directions or instructions on how to determine what was a

kidnapping in the second degree. So the charge given is

less than complete unless instructions are given that

allow the jury to consider what would reduce the

kidnapping from first degree or what constitutes

kidnapping in the second degree. Such instructions are

therefore misleading and would not allow the jury to

consider something other than capital murder unless they

just thought it was not first degree because they were not properly instructed. A person commits the crime of kidnapping in the second degree if he abducts another person 13A-6-44(a). The commentary following 13A-6-44 states even if he releases the victim in a safe place    he may be convicted of kidnapping in the second degree.

Further had the jury been instructed on kidnapping in the second degree then the jury would have been able to consider whether Holloman was guilty of an attempt at kidnapping in the second degree - a non capital offense. Unless the jury was appraised of the elements of kidnapping in the second degree the jury would then believe any kidnapping was a first degree kidnapping. Therefore any attempt at a kidnapping would be an attempt at kidnapping in the first degree. By the charges given, the court impliedly instructed the jury that any attempt at kidnapping whether first or second degree was sufficient to fulfil that portion of the elements of a capital murder.

Based upon the court failing to give the requested instructions #17 and #18 and based upon the court giving what we believe are incomplete instructions on kidnapping

55

as it pertains to a capital murder case, the case should
be remanded to the circuit court for a new trial.

## XI Counsel should have requested a jury charge similar to the intoxication charge.

On the theory that the Defendant was under the
influence of medication or under the withdrawal symptoms
of prescribed medications the defense counsel should have
asked for an instruction similar to the instruction on
intoxication.  In Hamond vs State the defendant obtained a
reversal of his conviction based upon a failure to
instruct on intoxication.  Hamond vs. State, 776 So. 2d
884,

We do not intend to continued that the court should
reverse on the basis that the court refused to give a
charge on intoxication because one was not requested and
the line of questioning to support such a charge was not
pursued.  The defense team did not ask for a special jury
instruction, but it should have.  Based on the information
given in a preceding issue on the effects of withdrawal
from Effexor, defense counsel should have presented a jury
instruction to cover the effect of withdraw from the drug.

We allege that the withdrawal symptoms were such that they affected Hollomon to the same extent that alcohol or other drug induced psychosis would have effected him. The drugs which caused abnormal thinking and contributed to out burst of violence was such that the jury should have been informed and allowed to consider an intoxication charge.

The medications he took were by prescription and the side effects were unknown to him. He did what his doctor told him. These medications or should I say the withdrawal from these medications influenced his actions as much as the drinking of alcohol or the taking of illegal drugs would have influenced his actions. Therefore, charges as to intoxication could have been allowed.

Those instructions as taken from 13A-3-2(a)-(b) would have told the jury that intoxication of the defendant, whether voluntary or involuntary, may be considered by the jury whenever it irrelevant to negate an element of the offense charged, such as "intent". (Alabama Pattern Jury Instructions)

The court would have been asked to go on and explain to the jury the Pattern jury instructions on the defense

of involuntary intoxication. The State would have had to prove beyond a reasonable doubt that at the time of the commission of the alleged crime the defendant did not, as a result of being involuntarily intoxicated lacked the capacity to appreciate the criminality of his alleged conduct or conform his alleged conduct to the requirements of the law.

In Jerry Hammond vs. State, 776 So.2d 884 at 887, (Ala. Crim. App. 1998) the Court of Criminal Appeals has previously addressed the question of when an instruction on intoxication should be given:

A charge on intoxication should be given if ' "there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt" ' on the element of intent.   Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App.1986) [quoting other citations which are omitted] intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis').   An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting,   Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App.1992);

While the degree of intoxication necessary to negate specific intent must rise to the level of insanity, it is clear that where there is evidence of intoxication, the

58

extent to which the accused is intoxicated is a question to be decided by the jury.    Crosslin v. State, 446 So.2d at 682.

> "In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider the defense, 'we must accept the testimony most favorable to the defendant.' ...    United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir.1979).    The Alabama Supreme Court has indicated that proper written requested instructions must be given 'which are supported by any evidence, however weak, insufficient, or doubtful in credibility.' Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978)."    Coon v. State, 494 So.2d 184, 186 (Ala.Cr.App.1986).

> " '[An intoxication] charge may ... be warranted if the record contains evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect defendant's ability to form the necessary criminal intent.' " Fletcher v. State, 621 So.2d at 1020-21 (emphasis omitted).

The problem with our case at bar, is that this line of defense was never developed by trial counsel.    It should have been and the failure to develop amounts to ineffective assistance of counsel.

## XII. Prejudicial error was committed when the judge went to the jury room.

Although the lawyers agreed for the judge to go back to the jury room, the Appellant would raise at this time that such permission from his attorneys was ineffective assistance of counsel and such action by the court should mandate a retrial. The court stated purpose of going back was to explain that the verdict must be unanimous. See the granting of permission by counsel at page T1826.

Once back in the jury room the judge said they must agree on the jury verdicts, but he did not tell them they must be unanimous. See the transcript at (T1828) The fact that he went back to the jury room should not be encouraged. In fact the judge told the attorneys he was only going to the tell the jury about reaching a unanimous verdict and then went about suggesting to choose the foreman and some other matters. Since this was put on the record out of the presence of the attorneys, they had no way to object to what was said or done. The court went beyond what it said is was going to do.

In Edgar vs. State 646 So.2d 681 at 683 (Ala. Crim. App 1993) the court stated that:

" When considering an issue concerning the
effect of an outside influence on a jury, the
issue is not whether the exposure improperly
influenced any member of the jury, "but whether
it might have unduly affected any juror to act
outside the evidence in arriving at a verdict."
[Citing other cases: Citations Omitted.]

Our issue here is that the court should not have gone

back and counsel should not have agreed to let this

happen, as the court went beyond what it said it was

originally going to communicate to the jury.

## XIII. The District Attorney committed prejudicial
## error when he attacked the veracity of the defense team.

The prosecution (without objection from the defense)

couched his argument in terms that were highly

prejudicial to the defense and the defendant.    Instead of

stating that the defense is wrong in their argument, the

district attorney states: "Mr. Decker did not tell you the

truth in relationship to burglary in the first degree and

kidnapping in the first degree." (T1725)    The difference

is that the prosecutor tells the jury that defense council

is lying and there by giving unfair prejudicial weight to

the district attorney's argument and evidence while trying

to under mind any arguments or evidence the defense team

61

might have.

On the very next page of the transcript the District Attorney again attacks the defense team rather than argue the evidence. "Evidently they can't listen, Mr. Holloman can't listen, Decker can't listen, Brantley and all of them." (T1726) This is a prejudicial attack on the defense team which went unanswered by the defense team'.

"The primary duties of the office of the District Attorney are to see that justice is done, Adams v. State, 280 Ala. 678, 198 So.2d 255 (1967), and to see that the state's case [is] properly presented to the court and jury as made by the evidence. [Other Citations Omitted]

Both the comments above are not comments on the evidence but direct attacks on the defense. The courts have often recognized the importance of the integrity of the trial system and the integrity of the participants:

> " 'The office of solicitor is of the highest importance; he is the representative of the state, and as a result of the important functions devolving upon him as such officer necessarily holds and wields great power and influence, and as a consequence erroneous insistences and prejudical conduct upon his part tend to unduly prejudice and bias the jury against the defendant; this, without reference to the instructions of the court. The test in matters of this kind is not

necessarily that the conduct of the solicitor complained of did have such effect upon the jury, but might it have done so?' Bynum v. State, 35 Ala.App. 297, 298, 47 So.2d 245, cert. denied,  254 Ala. 22, 47 So.2d 247 (1950). [Other Citations Omitted]

In Sprinkle v. State, 368 So.2d 554, 560 (Ala.Cr.App.1978) the court stated,."In the performance of his duties the District Attorney should treat the defendant fairly and the witnesses courteously, both in examination and in argument.   Campbell v. State, 19 Ala.App. 349, 352, 97 So. 783 (1923).

In judging a prosecutor's closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.  U.S.C.A. Const.Amend. 14. Adams v. State, 776 So.2d 884 (Ala. Crim App 2003) While Adams does not indicate whether the intent of the prosecutor should be taken into account or whether it is just the heat of the moment, there is a pattern that developed in Holloman's trial.

There were other items and maneuvers by the District Attorney to which trial counsel did promptly object.   The prosecutor attempted to put Mr. Mike Clark the designated represntative of Jimmy Clark in

violation of Section 15-23-61.(Vol VIII- T455)

When the prosecutor attempted to show graphic pictures of Jimmy Clark in the morgue to his wife, Becky Clark for the first time while she was on the stand, Defense Counsel Decker objected. (See Transcript at T459) An experience prosecutor knows that if a witness is not prepared for that type of evidence and if the witness had never seen those pictures before there would most likely be such an emotional outbreak that it could not help but influence or evoke sympathy from the jury to the prejudice of the Defendant. (Look at the Prosecutors response at T460. (He was aware of the response he might get springing such graphic pictures from the morgue on the witness for the first time while on the witness stand. T460)

Based upon this allegations and the other comments by the District Attorney when taken as a whole, the arguments made infected the trial with such unfairness that led to a deny of due process and the case should be reversed because of this argument and the series of arguments made to the jury.

**XIV. Statements by the District Attorney were improper**

64

**and the court should have granted a mistrial.**

Hollomon  argues that the prosecutor's misconduct during the guilt phase of the proceedings denied him a fair trial and a reliable verdict due to several statements made by the prosecutor during closing.  The cumulative effect of the errors mandates that his conviction be reversed. The Defendant herein sets out several of the items he believes were improperly argued to the jury which deprived appellant of a fundamentally fair hearing and due process in violation of petitioner's Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Constitution of Alabama.

The District Attorney exceeded what would be considered proper argument.  The District Attorney makes the following comments during closing:(T1727)

> MR. VALESKA:   ...."He's not sick.  He's got a personality disorder.  He's had that from the day he was born.  He will have that till the day he dies.  You can't cure that. You know how Mr. Decker wants you to cure it?  Find him guilty of manslaughter and put him back in the community.  Decker –
> MR. DECKER: Objection, Your Honor.
> MR. VALESKA: that is what he want you to do.
> MR. DECKER: That is not exact – that is not the law to put him back in the community.  The jury knows, and Mr. Valeska knows, that if he

65

is found guilty of manslaughter that this
Court will incarcerate him for a period of
time (T1727) according to the State statute.
Mr. Valeska knows that he will not be released
into the community and that is an improper
argument.  We move for a mistrial at this
time.

THE COURT: And I overrule the motion for a
mistrial, but ladies and gentlemen, that would
not be a correct statement of the law and you
are not to consider that when you come to
weigh and consider the evidence and make up
your verdict in this case.  Go ahead, Mr.
Valeska. (T1728).

If you find him guilty of only manslaughter he
would be placed back on the streets where he could do
it again.  The instruction the judge gave to the jury
failed to tell the jury they could not consider that
statement by the District Attorney.   The judges
limiting instruction failed to help quoted above did
not fully explain to the jury (T1728)  What was not a
correct statement of the law?  What Decker said about
confinement after a conviction of manslaughter?   The
Defense counsel was the only one that said anything
about what the law says. The jury could easily infer
that what Decker said was wrong and that if they did
give him manslaughter he would be placed back on the
street like the district attorney said.

The District Attorney again goes back and in
closing refers to the following, "If I am wrong, find
him not guilty and put him in the community, free."
(T1730) Another onslaught against the Defense
immediately follows:

> "... If I am wrong there was one shred of
> evidence, on time Decker argued it where
> Sherri had met this man on the Internet. There
> was nobody that testified to that. **Decker
> just argued that. *You think about that*.** I
> didn't miss it. Not one of his witnesses said
> that. He just argued it to you. Decker is
> wrong. Decker is wrong again." (Vol XIV
> T1730) Emphasis supplied.

There is no reason to make a statement in this
fashion but to case doubt on the integrity of the
Defense and their case.     Another time the District
Attorney attacks Decker:

> MR. VALESKA: "..You're wrong Mr. Decker."
> MR. DECKER: No, sir, I'm not.
> MR. VALESKA: Now he wants to argue. Listen to
> him.
> THE COURT: Okay, gentlemen.
> MR. VALESKA: What was the testimony? The
> testimony was this: That Saturday, the day of
> the killing, Holloman was not in Bradford.
> Was he? No. He got out when? May the 1st. When
> were the children taken to the beach? Remember
> he testimony, what it was, what Becky said. It
> was that day. He was not in Bradford like M.r
> Decker argued to you.
> MR. DECKER: I didn't say that.
> MR. VALESKA: Did you miss the point? That's
> what he said. Now he said, I didn't say that.
> That's exactly what he said. .... (T1731)

In <u>Berger v. United States</u>, 295 U.S. 78, 55 S.Ct.

629, 79 L.Ed. 1314 (1935), the United States Supreme

Court stated the following concerning a prosecutor's

responsibility:

> "The United States Attorney is the
> representative not of an ordinary party to a
> controversy, but of a sovereignty whose
> obligation to govern impartially is as
> compelling as its obligation to govern at all;
> and whose interest, therefore, in a criminal
> prosecution is not that it shall win a case,
> but that justice shall be done. As such, he
> is in a peculiar and very definite sense the
> servant of the law, the twofold aim of which
> is that guilt shall not escape or innocence
> suffer. He may prosecute with earnestness and
> vigor--indeed, he should do so. But, while he
> may strike hard blows, he is not at liberty to
> strike foul ones. It is as much his duty to
> refrain from improper methods calculated to
> produce a wrongful conviction as it is to use
> every legitimate means to bring about a just
> one.

> "It is fair to say that the average jury,
> in a greater or less degree, has confidence
> that these obligations, which so plainly rest
> upon the prosecuting attorney, will be
> faithfully observed. Consequently, improper
> suggestions, insinuations and, especially,
> assertions of personal knowledge are apt to
> carry much weight against the accused when
> they should properly carry none." 295 U.S. at
> 88, 55 S.Ct. 629. "

The standard for evaluating the propriety of a

prosecutor's argument is whether the argument "so infected

the trial with unfairness as to make the resulting
conviction a denial of due process." Darden v.
Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144
(1986).

Holloman makes the argument that the District
Attorney wanted to scare the jury into a conviction.
Unless the jury put him away, then he would just get out
and do it again is the unstated portion of the District
Attorney's argument. A prosecutor should not be allowed
to prejudice or scare a jury into a decision. Such
comments would have the effect of depriving the defendant
of rights guaranteed by the Fifth, Sixth, Eight, and
Fourteenth Amendments to the United States Constitution
and by the Alabama Constitution. For the above reasons,
the court should have granted a mistrial when requested by
the Defense. Based on this the Appellant asks for the
case to be remanded for a new trial.

## XV. Defendant claims prejudicial error in denying a Motion for New Trial without a hearing.

Defendant's counsel filed a Motion for A New Trial on
July 8, 2003. (Vol III - R594-595). The matter was
summarily denied on July 21, 2003 without a hearing. (Vol

III - R597)

Had the court set a court date, there would have been
further opportunity to present information, amend the
Motion for New Tria and present evidence or research to
the court.   Instead of a court date being set for which
the attorneys would have prepared, the Motion was just
denied.

Cases have been overturned and remanded back for
Motions for New Trial hearings because the defendant was
not present.   See Ex Parte Belue, 727 So.2d 785 at 787
(Ala. 1998):

   We granted Belue's petition for certiorari
   review in order to determine whether the denial
   of his right to be present at the hearing on his
   motion for a new trial was indeed merely
   harmless error.

      There is no dispute that Belue had a right
   to be present at the hearing on his motion for a
   new trial.   Article I, § 6, Ala. Constitution
   of 1901, provides:"[I]n all criminal
   prosecutions, the accused has a right to be
   heard by himself and counsel, or either ...
   [and] to be confronted by the witnesses against
   him...."

Defendant was denied a valuable right when the court
failed to hold a hearing on the motion for new trial and
by Defense counsel failing to Include all the grounds they

70

should have included in the Motion for New Trial.

Hill vs. State, 675 So.2d 484 at 486  (Ala.Crim. App. 1995), held that where that the appellant  was entitled to a hearing on his motion for a new trial so that his allegation of ineffective assistance of trial counsel could be addressed.

While the trial court in Holloman did give a reason for denial of the Motion for New Trial, the rendering of the court without a hearing cut out many avenues for protecting and preserving the record leaving the Appellant without redress of many of the issues which he has set out in this brief.

71

There are several other issues that the Appellant
would like to raise on appeal, but because of the length
of the brief, only short arguments are made here.

**XVI  Whether the evidence was sufficient to find Holloman
guilt of two counts of attempted murder in CC-00-757 (Supp
Record 44) and CC-00-758 (Supp. Record 46)**

Holloman maintains the evidence was insufficient for
a conviction on the two charges of attempted murder.  In
cc-00-757 (Supp R44) Holloman was charged with attempted
murder of John Gallia.  John Gallia failed to show for the
trial and the case was tried with out the victim being
present or testifying.

Appellant alleges the State failed to prove the
element of intent and the life threatening nature of any
injuries sustained by Becky Clark or John Gallia. The
issue was raised at the conclusion of the States case and
again upon the conclusion of the Defendant's case.

In Wells v. State, 768 So.2d 412, 414 (Ala. Crim.
App.1999) the court quoted several cases:

> 'In Alabama a person commits the crime of
> attempt to murder if he intends to cause the
> death of another person and does any overt act
> towards the commission of that intent.   Alabama
> Code 1975, Sections 13A-4-2 (the attempt
> statute), and 13A-6-2 (murder).' [Citations

72

ommitted]. 'Attempted murder is a specific
intent crime.... An attempt to commit murder
requires the perpetrator to act with the
specific intent to commit murder.... A general
felonious intent is not sufficient.'  Free v.
State, 455 So.2d 137, 147 (Ala.Cr.App.1984)."

For the failure of the evidence as described above,
Appellant prays that the court remain the case and a new
trial be granted.

## XVII Ineffective Assistance of Counsel in CC-00-757 and CC-758.

Appellant maintains that the same issues of
ineffective assistance of counsel raised as to CC-00-755
applies to the attempted murder cases.  (Strickland,
supra)

## XVIII Failure to grant motion for a change of venue.

Counsel had requested a change of venue due to the
extensive pretrial publicity. (R317)  The court withheld
ruling on that issue until voir dire and denied any change
of venue. See the record at $688-735 for approximately 150
pages of transcripts of news stories appearing on TV,
Radio and the paper.  There were prejudicial comments by
the Sheriff giving his opinion as to the motive and
comments such as "slipping in the back door" (See pages

73

32-36 of the April 12, 2003 hearing. The entire record is
not sequentially numbered. The hearing on Change of Venue
is found in Vol V of the Record) Other comments were made
that prejudiced the Appellant. "Investigators have
determned Holloman has a history of violence" (R625) and
"Victime never kew what hit them". He had two counts of
assault and all he got was "a slp on the wrist." (R625)
Other media comments attributed to law enforcement were
"Ambushing" (R654) and "Sneaking" (R726)

Appellant maintains that media attention to the
capital murder case inflamed or saturated the community so
that there was an emotional tide against "domestic
violence" and defendant. Pretrial publicity brought the
case to the for front of the community and created a
situation that warranted a presumption of prejudice, ie.
discussions on the papers of a series of domestic violence
cases of which this was one. Several articles were
published on the case in a weekly newspaper, case was
mentioned over the air waves, both television and news
reports to the point that once facts of the case were
reviewed, jurors remembered the case.

The rash of domestic violence cases during a three to

four month period before and after May 5, 2000 created an
atmosphere of built in prejudice.  The fact that this case
was labeled

Failure to move the trial out of the county meant the
venire would be tainted.  The tying in of this case with
other "domestic violence" case added a sensationalism
which Appellant maintains inflamed and saturated the
community and entitled the defendant to a change of venue.
Standards for change of venue are set out in Perkins vs.
State, 808 So.2d 1041, 1069 (Ala. Crim.App.1999)

**XVIX Error for not giving other jury instructions.**

Appellant believes the denial of charges 13 and 19
were also in error as Appellant maintains both were
correct statements of the law.

## Conclusion

Based upon the foregoing arguments and the issues presented the Appellant asks for the overturning of this two capital murder convictions and his two attempted murder convictions. He requests a remand and a new trial.

If the court does not see fit to overturn for a new trial at this point, the Appellant would ask the court to remand for a full hearing on a Motion for New Trial and allow the Appellant to amend and include issues presented here and other issues as the case may warrant.

Gary A. Hudgins (HUD014)
Attorney for Appellant
P.O. Box 1142
Dothan, AL 36302
(334) 794-8773

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the
foregoing pleading on Richard Allen, Actin Attorney General
for the State of Alabama, 11 S. Union St. Montgomery, AL
36103 on this the ___ th day of April, 2004.

_____
Gary A. Hudgins

There are several other issues that the Appellant
would like to raise on appeal, but because of the length
of the brief, only short arguments are made here.

**XVI  Whether the evidence was sufficient to find Holloman
guilt of two counts of attempted murder in CC-00-757 (Supp
Record 44) and CC-00-758 (Supp. Record 46)**

Holloman maintains the evidence was insufficient for
a conviction on the two charges of attempted murder.  In
cc-00-757 (Supp R44) Holloman was charged with attempted
murder of John Gallia.  John Gallia failed to show for the
trial and the case was tried with out the victim being
present or testifying.

Appellant alleges the State failed to prove the
element of intent and the life threatening nature of any
injuries sustained by Becky Clark or John Gallia. The
issue was raised at the conclusion of the States case and
again upon the conclusion of the Defendant's case.

In Wells v. State, 768 So.2d 412, 414 (Ala. Crim.
App.1999) the court quoted several cases:

> 'In Alabama a person commits the crime of
> attempt to murder if he intends to cause the
> death of another person and does any overt act
> towards the commission of that intent.   Alabama
> Code 1975, Sections 13A-4-2 (the attempt
> statute), and 13A-6-2 (murder).' [Citations

72

omitted]. 'Attempted murder is a specific
intent crime.... An attempt to commit murder
requires the perpetrator to act with the
specific intent to commit murder.... A general
felonious intent is not sufficient.' Free v.
State, 455 So.2d 137, 147 (Ala.Cr.App.1984)."

For the failure of the evidence as described above,
Appellant prays that the court remain the case and a new
trial be granted.

## XVII Ineffective Assistance of Counsel in CC-00-757 and CC-758.

Appellant maintains that the same issues of
ineffective assistance of counsel raised as to CC-00-755
applies to the attempted murder cases. (Strickland,
supra)

## XVIII Failure to grant motion for a change of venue.

Counsel had requested a change of venue due to the
extensive pretrial publicity. (R317)   The court withheld
ruling on that issue until voir dire and denied any change
of venue. See the record at $688-735 for approximately 150
pages of transcripts of news stories appearing on TV,
Radio and the paper.   There were prejudicial comments by
the Sheriff giving his opinion as to the motive and
comments such as "slipping in the back door" (See pages

73

32-36 of the April 12, 2003 hearing. The entire record is not sequentially numbered. The hearing on Change of Venue is found in Vol V of the Record) Other comments were made that prejudiced the Appellant. "Investigators have determined Holloman has a history of violence" (R625) and "Victim never knew what hit them". He had two counts of assault and all he got was "a slap on the wrist." (R625) Other media comments attributed to law enforcement were "Ambushing" (R654) and "Sneaking" (R726)

Appellant maintains that media attention to the capital murder case inflamed or saturated the community so that there was an emotional tide against "domestic violence" and defendant. Pretrial publicity brought the case to the for front of the community and created a situation that warranted a presumption of prejudice, ie. discussions on the papers of a series of domestic violence cases of which this was one. Several articles were published on the case in a weekly newspaper, case was mentioned over the air waves, both television and news reports to the point that once facts of the case were reviewed, jurors remembered the case.

The rash of domestic violence cases during a three to

74

four month period before and after May 5, 2000 created an atmosphere of built in prejudice. The fact that this case was labeled

Failure to move the trial out of the county meant the venire would be tainted. The tying in of this case with other "domestic violence" case added a sensationalism which Appellant maintains inflamed and saturated the community and entitled the defendant to a change of venue. Standards for change of venue are set out in Perkins vs. State, 808 So.2d 1041, 1069 (Ala. Crim.App.1999)

**XIX Error for not giving other jury instructions.**

Appellant believes the denial of charges 13 and 19 were also in error as Appellant maintains both were correct statements of the law.

## Conclusion

Based upon the foregoing arguments and the issues presented the Appellant asks for the overturning of this two capital murder convictions and his two attempted murder convictions.  He requests a remand and a new trial.

If the court does not see fit to overturn for a new trial at this point, the Appellant would ask the court to remand for a full hearing on a Motion for New Trial and allow the Appellant to amend and include issues presented here and other issues as the case may warrant.

Gary A. Hudgins (HUD014)
Attorney for Appellant
P.O. Box 1142
Dothan, AL 36302
(334) 794-8773

76

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the
foregoing pleading on Richard Allen, Acting Attorney
General for the State of Alabama, 11 S. Union St.
Montgomery, AL 36103 on this the $\underline{6}$ th day of April, 2004.

_____
Gary A. Hudgins





**PDR for Herbal Medicines**
Prescribing Information
on over **600 herbs!**





disease overviews    health and wellness    drug information    clinical trials    herbal

search

*Brand name:*

# Effexor

*Pronounced: ef-ECKS-or*
*Generic name: Venlafaxine hydrochloride*
*Other brand name: Effexor XR*

## Why is this drug prescribed?

Return to top

Effexor is prescribed for the treatment of depression--that is, a continuing depression that interferes with daily functioning. The symptoms usually include changes in appetite, sleep habits, and mind/body coordination, decreased sex drive, increased fatigue, feelings of guilt or worthlessness, difficulty concentrating, slowed thinking, and suicidal thoughts.

Effexor XR is also prescribed to relieve abnormal anxiety (generalized anxiety disorder). This problem is marked by persistent anxiety for a period of at least 6 months, accompanied by at least 3 of these 6 symptoms: restlessness, fatigue, poor concentration, irritability, muscle tension, and sleep disturbances.

Effexor must be taken 2 or 3 times daily. The extended-release form, Effexor XR, permits once-a-day dosing.

## Most important fact about this drug

Return to top

Serious, sometimes fatal reactions have occurred when Effexor is used in combination with other drugs known as MAO inhibitors, including the antidepressants Nardil and Parnate. Never take Effexor with one of these drugs; and do not begin therapy with Effexor within 14 days of discontinuing treatment with one of them. Also, allow at least 7 days between the last dose of Effexor and the first dose of an MAO inhibitor.

## How should you take this medication?

Return to top

Take Effexor with food, exactly as prescribed. It may take several weeks before you begin to feel better. Your doctor should check your progress periodically.

Take Effexor XR once at the same time each day. Swallow the capsule whole with water. Do not divide, crush, or chew it.

*--If you miss a dose...*

It is not necessary to make it up. Skip the missed dose and continue with your next scheduled dose. Do not take 2 doses at once

*--Storage instructions...*

Store in a tightly closed container at room temperature. Protect from excessive heat and moisture.

## What side effects may occur?

Return to top

Side effects cannot be anticipated. If any develop or change in intensity, tell your doctor as soon as possible. Only your doctor can determine if it is safe for you to continue taking Effexor.

- *More common side effects may include:*
  Abnormal dreams, abnormal ejaculation or orgasm, anxiety, appetite loss, blurred vision, chills, constipation, diarrhea, dizziness, dry mouth, frequent urination, flushing, gas, headache, impotence, infection, insomnia, muscle tension, nausea, nervousness, rash, sleepiness, sweating, tingling feeling, tremor, upset stomach, vomiting, weakness, yawning

- *Less common side effects may include:*
  Abnormal taste, abnormal thinking, agitation, chest pain, confusion, decreased sex drive, depression, dilated pupils, dizziness upon standing up, high blood pressure, itching, loss of identity, rapid heartbeat, ringing in the ears, trauma, twitching, urinary problems, weight loss

A wide variety of very rare symptoms possibly related to Effexor have also been reported. If you develop any new or unusual problems, let your doctor know about it.

## Why should this drug not be prescribed?

Return to top

Never take Effexor while taking other drugs known as MAO inhibitors. (See "Most important fact about this drug.") Also avoid this drug if it has ever given you an allergic reaction.

## Special warnings about this medication

Return to top

Your doctor will prescribe Effexor with caution if you have high blood pressure, heart, liver, or kidney disease or a history of seizures or mania (extreme agitation or excitability). You should discuss all of your medical problems with your doctor before taking Effexor.

Effexor sometimes causes an increase in blood pressure. If this happens, your doctor may need to reduce your dose or discontinue the drug.

Effexor also tends to increase the heart rate, especially at higher doses. Use Effexor with caution if you've recently had a heart attack, suffer from heart failure, or have an overactive thyroid gland.

Antidepressants such as Effexor may cause fluid retention, especially if you are an older adult.

Effexor may cause you to feel drowsy or less alert and may affect your judgment. Therefore, avoid driving or operating dangerous machinery or participating in any hazardous activity that requires full mental alertness until you know how this drug affects you.

Your doctor will check you regularly if you have glaucoma (high pressure in the eye), or you are at risk of developing it.

If you have ever been addicted to drugs, tell your doctor before you start taking Effexor.

If you develop a skin rash or hives while taking Effexor, notify your doctor. Effexor may also cause bleeding or bruising of the skin.

Do not stop taking the drug without consulting your doctor. If you stop suddenly, you may have withdrawal symptoms, even though this drug does not seem to be habit-forming. Your doctor will have you taper off gradually.

The safety and effectiveness of Effexor have not been established in children under 18 years of age.

## Possible food and drug interactions
## when taking this medication

Return to top

Combining Effexor with MAO inhibitors could cause a fatal reaction. (See "Most important fact about this drug.")

Although Effexor does not interact with alcohol, the manufacturer recommends avoiding alcohol while taking this medication.

If you have high blood pressure or liver disease, or are elderly, check with your doctor before combining Effexor with cimetidine (Tagamet).

Effexor does not interact with Lithium or Valium. However, you should consult your doctor before combining Effexor with other drugs that affect the central nervous system, including narcotic painkillers, sleep aids, tranquilizers, antipsychotic medicines such as Haldol, and other antidepressants such as Tofranil.

Effexor has been found to reduce blood levels of the HIV drug Crixivan. It's best to check with your doctor before combining Effexor with any other drug or herbal product.

## Special information
## if you are pregnant or breastfeeding

Return to top

The effects of Effexor during pregnancy have not been adequately studied. If you are pregnant or are planning to become pregnant, tell your doctor immediately. Effexor should be used during pregnancy only if clearly needed.

If Effexor is taken shortly before delivery, the baby may suffer withdrawal symptoms. It's also known that Effexor appears in breast milk and could cause serious side effects in a nursing infant. You'll need to choose between nursing your baby or continuing your treatment with Effexor.

## Recommended dosage

Return to top

EFFEXOR

The usual starting dose is 75 milligrams a day, divided into 2 or 3 smaller doses, and taken with food. If needed, your doctor may gradually increase your daily dose in steps of no more than 75 milligrams at a time up to a maximum of 375 milligrams per day.

If you have kidney or liver disease or are taking other medications, your doctor will adjust your dosage accordingly.

EFFEXOR XR

For both depression and anxiety the usual starting dose is 75 milligrams once daily, although some people begin with a dose of 37.5 milligrams for the first 4 to 7 days. Your doctor may gradually increase the dose, in steps of no more than 75 milligrams, up to a maximum of 225 milligrams daily. As with regular Effexor, the doctor will make adjustments in your dosage if you have kidney or liver disease.

## Overdosage

Return to top

An overdose of Effexor, combined with other drugs or alcohol, can be fatal. If you suspect an overdose, seek medical attention immediately.

- *Symptoms of Effexor overdose include:*
  Sleepiness, vertigo, rapid or slow heartbeat, low blood pressure, seizures, coma

Return to top





age, and 186 (36%) were 75 years of age or older than older that the sufficient data for a statement regarding the distribution of adverse events by race.
was a larger treatment effect in patients 75 years of age and older compared with younger patients who received the same dosage. Since gabapentin is almost exclusively eliminated by renal excretion, the larger treatment effect observed in patients ≥ 75 years may be a consequence of increased gabapentin exposure for a given dose that results from an age-related decrease in renal function. However, other factors cannot be excluded. The types and incidence of adverse events were similar across age groups except for peripheral edema and ataxia, which tended to increase in incidence with age.

Clinical studies of Neurontin® in epilepsy did not include sufficient numbers of subjects aged 65 and over to determine whether they responded differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function, and of concomitant disease or other drug therapy.

This drug is known to be substantially excreted by the kidney, and the risk of toxic reactions to this drug may be greater in patients with impaired renal function. Because elderly patients are more likely to have decreased renal function, care should be taken in dose selection, and dose should be adjusted based on creatinine clearance values in these patients (see CLINICAL PHARMACOLOGY, ADVERSE REACTIONS, and DOSAGE and ADMINISTRATION sections).

## ADVERSE REACTIONS

### Postherpetic Neuralgia

The most commonly observed adverse events associated with the use of Neurontin® in adults, not seen at an equivalent frequency among placebo-treated patients, were dizziness, somnolence, and peripheral edema.

In the 2 controlled studies in postherpetic neuralgia, 16% of the 336 patients who received Neurontin® and 9% of the 227 patients who received placebo discontinued treatment because of an adverse event. The adverse events that most frequently led to withdrawal in Neurontin®-treated patients were dizziness, somnolence, and nausea.

### Incidence in Controlled Clinical Trials

Table 2 lists treatment-emergent signs and symptoms that occurred in at least 1% of Neurontin®-treated patients in placebo-controlled postherpetic neuralgia participating in placebo-controlled trials and that were numerically more frequent in the Neurontin® group than in the placebo group. Adverse events were usually mild-to-moderate in intensity.

| Table 2.    Treatment-Emergent Adverse Event Incidence in Controlled Trials in Postherpetic Neuralgia (Events in at least 1% of Neurontin®-Treated Patients and Numerically More Frequent Than in the Placebo Group) | | |
|---|---|---|
| Body System/ Preferred Term | Neurontin® N=336 % | Placebo N=227 % |
| **Body As A Whole** | | |
| Asthenia | 5.7 | 4.8 |
| Infection | 5.1 | 3.5 |
| Headache | 3.3 | 3.1 |
| Accidental injury | 3.3 | 1.3 |
| Abdominal pain | 2.7 | 2.6 |
| **Digestive System** | | |
| Diarrhea | 5.7 | 3.1 |
| Dry mouth | 4.8 | 1.3 |
| Constipation | 3.9 | 1.8 |
| Nausea | 3.9 | 3.1 |
| Vomiting | 3.3 | 1.8 |
| Flatulence | 2.1 | 1.8 |
| **Metabolic and Nutritional Disorders** | | |
| Peripheral edema | 8.3 | 2.2 |
| Weight gain | 1.8 | 0.0 |
| Hyperglycemia | 1.2 | 0.4 |
| **Nervous System** | | |
| Dizziness | 28.0 | 7.5 |
| Somnolence | 21.4 | 5.3 |
| Ataxia | 3.3 | 0.0 |
| Thinking abnormal | 2.7 | 0.0 |
| Abnormal gait | 1.5 | 0.0 |
| Incoordination | 1.5 | 0.0 |
| Amnesia | 1.2 | 0.9 |
| Hypesthesia | 1.2 | 0.9 |
| **Respiratory System** | | |
| Pharyngitis | 1.2 | 0.4 |
| **Skin and Appendages** | | |
| Rash | 1.2 | 0.9 |
| **Special Senses** | | |
| Amblyopia* | 2.7 | 0.9 |
| Conjunctivitis | 1.2 | 0.0 |
| Diplopia | 1.2 | 0.0 |
| Otitis media | 1.2 | 0.0 |

*Reported as blurred vision

Other events in more than 1% of patients but equally or more frequent in the placebo group included pain, tremor, neuralgia, back pain, dyspepsia, dyspnea, and flu syndrome.

### Epilepsy

The most commonly observed adverse events associated with the use of Neurontin® in combination with other antiepileptic drugs in patients >12 years of age, not seen at an equivalent frequency among placebo-treated patients, were somnolence, dizziness, ataxia, fatigue, and nystagmus. The most commonly observed adverse events reported with the use of Neurontin® in combination with other antiepileptic drugs in pediatric patients 3 to 12 years of age, not seen at an equal frequency among placebo-treated patients, were viral infection, fever, nausea and/or vomiting, somnolence, and hostility (see WARNINGS, Neuropsychiatric Adverse Events).

Approximately 7% of the 2074 patients >12 years of age and approximately 7% of the 449 pediatric patients 3 to 12 years of age who received Neurontin® in premarketing clinical trials discontinued treatment because of an adverse event. The adverse events most commonly associated with withdrawal in patients >12 years of age were somnolence (1.2%), ataxia (0.8%), fatigue (0.6%), nausea and/or vomiting (0.6%), and dizziness (0.6%). The adverse events most commonly associated with withdrawal in pediatric patients were emotional lability (1.6%), hostility (1.3%), and hyperkinesia (1.1%).

### Incidence in Controlled Clinical Trials

Table 3 lists treatment-emergent signs and symptoms that occurred in at least 1% of Neurontin®-treated patients >12 years of age with epilepsy participating in placebo-controlled trials and were numerically more common in the Neurontin® group. In these studies, either Neurontin® or placebo was added to the patient's current antiepileptic drug therapy. Adverse events were usually mild to moderate in intensity.

The prescriber should be aware that these figures, obtained when Neurontin® was added to concurrent antiepileptic drug therapy, cannot be used to predict the frequency of adverse events in the course of usual medical practice where patient characteristics and other factors may differ from those prevailing during clinical studies. Similarly, the cited frequencies cannot be directly compared with figures obtained from other clinical investigations involving different treatments, uses, or investigators. An inspection of these frequencies, however, does provide the prescribing physician with one basis to estimate the relative contribution of drug and nondrug factors to the adverse event incidences in the population studied.

| TABLE 3.    Treatment-Emergent Adverse Event Incidence in Controlled Add-On Trials In Patients >12 years of Age (Events in at least 1% of Neurontin® patients and numerically more frequent than in the placebo group) | | |
|---|---|---|
| Body System/ Adverse Event | Neurontin®* N=543 % | Placebo* N=378 % |
| **Body As A Whole** | | |
| Fatigue | 11.0 | 5.0 |
| Weight Increase | 2.9 | 1.6 |
| Back Pain | 1.8 | 0.5 |
| Peripheral Edema | 1.7 | 0.5 |
| **Cardiovascular** | | |
| Vasodilatation | 1.1 | 0.3 |
| **Digestive System** | | |
| Dyspepsia | 2.2 | 0.5 |
| Mouth or Throat Dry | 1.7 | 0.5 |
| Constipation | 1.5 | 0.8 |
| Dental Abnormalities | 1.6 | 0.3 |
| Increased Appetite | 1.1 | 0.8 |
| **Hematological and Lymphatic Systems** | | |
| Leukopenia | 1.1 | 0.5 |
| **Musculoskeletal System** | | |
| Myalgia | 2.0 | 1.9 |
| Fracture | 1.1 | 0.8 |
| **Nervous System** | | |
| Somnolence | 19.3 | 8.7 |
| Dizziness | 17.1 | 6.9 |
| Ataxia | 12.5 | 5.6 |
| Nystagmus | 8.3 | 4.0 |
| Tremor | 6.8 | 3.2 |
| Nervousness | 2.4 | 1.9 |
| Dysarthria | 2.4 | 0.5 |
| Amnesia | 2.2 | 0.0 |
| Depression | 1.8 | 1.1 |
| Thinking Abnormal | 1.7 | 1.3 |
| Twitching | 1.3 | 0.5 |
| Coordination Abnormal | 1.1 | 0.3 |
| **Respiratory System** | | |
| Rhinitis | 4.1 | 3.7 |
| Pharyngitis | 2.8 | 1.6 |
| Coughing | 1.8 | 1.3 |
| **Skin and Appendages** | | |
| Abrasion | 1.3 | 0.0 |
| Pruritus | 1.3 | 0.5 |
| **Urogenital System** | | |
| Impotence | 1.5 | 1.1 |

* Plus background antiepileptic drug therapy

Other events in more than 2% of pediatric patients >12 years of age but not more frequent in the placebo group included: pharyngitis, upper respiratory infection, headache, rhinitis, convulsions, diarrhea, vomiting, and otitis media.

### Other Adverse Events Observed During All Clinical Trials in Adults and Adolescents

Neurontin® has been administered to 2074 patients >12 years of age during all adjunctive therapy studies in epilepsy, only some of which were placebo-controlled. During these trials, all adverse events were recorded by the clinical investigators using terminology of their choosing. To provide a meaningful estimate of the proportion of individuals having adverse events, similar types of events were grouped into a smaller number of standardized categories using modified COSTART dictionary terminology. These categories are used in the listing below. The frequencies represent the proportion of the 2074 patients >12 years of age exposed to Neurontin® who had an event of the type cited on at least one occasion while receiving Neurontin®. All reported events are included, except those already listed in Table 3, those too general to be informative, and those not reasonably associated with the drug.

Events are further classified within body system categories and enumerated in order of decreasing frequency using the following definitions: frequent adverse events are defined as those occurring in at least 1/100 patients; infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

**Body As A Whole:** Frequent: asthenia, malaise, edema; Infrequent: allergy, generalized edema, weight decrease, chill; Rare: strange feelings, lassitude, alcohol intolerance, hangover effect.

**Cardiovascular System:** Frequent: hypertension; Infrequent: hypotension, angina pectoris, peripheral vascular disorder, palpitation, tachycardia, migraine, murmur, atrial fibrillation, heart failure, thrombophlebitis, deep thrombophlebitis, myocardial infarction, pulmonary thrombosis, ventricular ...accident, pulmonary thrombosis, ventricular...

*Plus background antiepileptic drug therapy
*Amblyopia was often described as blurred vision

Other events in more than 1% of patients >12 years of age but equally or more frequent in the placebo group included headache, viral infection, fever, nausea and/or vomiting, abdominal pain, diarrhea, convulsions, confusion, insomnia, emotional lability, rash, acne.

Among the treatment-emergent adverse events occurring at an incidence of at least 10% of Neurontin-treated patients, somnolence and ataxia appeared to exhibit a positive dose-response relationship.

The overall incidence of adverse events and the types of adverse events were similar among men and women treated with Neurontin®. The incidence of adverse events increased slightly with increasing age in patients treated with either Neurontin® or placebo. Because only 3% of patients (28/921) in placebo-controlled studies were identified as nonwhite (black or other), there are insufficient data to support a statement regarding the distribution of adverse events by race.

Table 4 lists treatment-emergent signs and symptoms that occurred in at least 2% of Neurontin-treated patients 3 to 12 years of age with epilepsy participating in placebo-controlled trials and were numerically more common in the Neurontin group. Adverse events were usually mild to moderate in intensity.

| TABLE 4.    Treatment-Emergent Adverse Event Incidence in Pediatric Patients Age 3 to 12 Years in a Controlled Add-On Trial (Events in at least 2% of Neurontin® patients and numerically more frequent than in the placebo group) | |
|---|---|
| Body System/ Adverse Event | Neurontin® N=119 % |
| **Body As A Whole** | |
| Viral Infection | 10.9 |
| Fever | 10.1 |
| Weight Increase | 3.4 |
| Fatigue | 3.4 |
| **Digestive System** | |
| Nausea and/or Vomiting | 8.4 |
| **Nervous System** | |
| Somnolence | 8.4 |
| Hostility | 7.6 |
| Emotional Lability | 4.2 |
| Dizziness | 2.5 |
| Hyperkinesia | 2.5 |
| **Respiratory System** | |
| Bronchitis | 3.4 |
| Respiratory Infection | 2.5 |

* Plus background antiepileptic drug therapy

Other events in more than 2% of pediatric patients 3 to 12 years of age but not more frequent in the placebo group included: pharyngitis, upper respiratory infection, headache, rhinitis, convulsions, diarrhea, vomiting, and otitis media.

(right column, bottom)
WBC Decreased

tachycardia, including Torsades, QTc, 2.75 pg/mL and the maximum plasma peak concentration
Stevens-Johnson Syndrome, erythema multiforme; ex-
tremidal symptoms (including dyskinesia and tardive
dinesia); hemorrhage (including eye and gastrointesti-
nal bleeding), hepatic events (including GGT elevation; ab-
normalities of unspecified liver function tests; liver damage;
oais, or failure; and fatty liver); involuntary move-
ts; LDH increased, neuroleptic malignant syndrome
events (including a case of a 10-year-old who may have
been taking methylphenidate, was treated and recovered),
neutropenia, night-sweats, pancreatitis, pancytopenia,
prolactin increased, pulmonary eosinophilia, renal
re, rhabdomyolysis, serotonin syndrome, shock-like
rical sensations (in some cases, subsequent to the dis-
tinuation of venlafaxine or tapering of dose), and syn-
drome of inappropriate antidiuretic hormone secretion usu-
ally in the elderly).

e have been reports of elevated clozapine levels that
temporally associated with adverse events, including
ures, following the addition of venlafaxine. There have
been reports of increases in prothrombin time, partial
thromboplastin time, or INR when venlafaxine was given to
ints receiving warfarin therapy.

## G ABUSE AND DEPENDENCE
C rolled Substance Class
Effexor (venlafaxine hydrochloride) is not a controlled
substance.

ical and Psychological Dependence
tro studies revealed that venlafaxine has virtually no
ty for opiate, benzodiazepine, phencyclidine (PCP), or
N-methyl-D-aspartic acid (NMDA) receptors.
venlafaxine was not found to have any significant CNS
nulant activity in rodents. In primate drug discrimina-
studies, venlafaxine showed no significant stimulant or
essant abuse liability.
continuation effects have been reported in patients re-
ceiving venlafaxine (see DOSAGE AND ADMINISTRA-
TION).

e Effexor has not been systematically studied in clinical
for its potential for abuse, there was no indication of
seeking behavior in the clinical trials. However, it is
possible to predict on the basis of premarketing experi-
the extent to which a CNS active drug will be misused,
ted, and/or abused once marketed. Consequently, phy-
s should carefully evaluate patients for history of drug
and follow such patients closely, observing them for
of misuse or abuse of Effexor (eg, development of tol-
rance, incrementation of dose, drug-seeking behavior).

## RDOSAGE
an Experience
e were 14 reports of acute overdose with Effexor
enlafaxine hydrochloride), either alone or in combination
ith other drugs and/or alcohol, among the patients in-
uded in the premarketing evaluation. The majority of the
ts involved ingestions in which the total dose of Effexor
was estimated to be no more than several-fold higher

levels of venlafaxine for the latter 2 patients were 6.24 and
2.35 pg/mL, respectively, and the peak plasma levels of O-
desmethylvenlafaxine were 3.37 and 1.30 pg/mL, respec-
tively. Plasma venlafaxine levels were not obtained for the
patient who ingested 6.75 g of venlafaxine. All 14 patients
recovered without sequelae. Most patients reported no
symptoms. Among the remaining patients, somnolence was
the most commonly reported symptom. The patient who in-
gested 2.75 g of venlafaxine was observed to have 2 gener-
alized convulsions and a prolongation of QTc to 500 msec,
compared with 405 msec at baseline. Mild sinus tachycardia
was reported in 2 of the other patients.

In postmarketing experience, overdose with venlafaxine has
occurred predominantly in combination with alcohol and/or
other drugs. Electrocardiogram changes (eg, prolongation of
QT interval, bundle branch block, QRS prolongation), sinus
and ventricular tachycardia, bradycardia, hypotension, al-
tered level of consciousness (ranging from somnolence to
coma), seizures, vertigo, and death have been reported.

## Management of Overdose
Treatment should consist of those general measures em-
ployed in the management of overdose with any antide-
pressant.
Ensure an adequate airway, oxygenation, and ventilation.
Monitor cardiac rhythm and vital signs. General supportive
and symptomatic measures are also recommended. Induc-
tion of emesis is not recommended. Gastric lavage with a
large-bore orogastric tube with appropriate airway protec-
tion, if needed, may be indicated if performed soon after in-
gestion or in symptomatic patients. Activated charcoal
should be administered. Due to the large volume of distri-
bution of this drug, forced diuresis, dialysis, hemoperfusion
and exchange transfusion are unlikely to be of benefit. No
specific antidotes for venlafaxine are known.
In managing overdose, consider the possibility of multiple
drug involvement. The physician should consider contacting
a poison control center for additional information on the
treatment of any overdose. Telephone numbers for certified
poison control centers are listed in the Physicians' Desk Ref-
erence (PDR).

## DOSAGE AND ADMINISTRATION
Initial Treatment
The recommended starting dose for Effexor is 75 mg/day,
administered in two or three divided doses, taken with food.
Depending on tolerability and the need for further clinical
effect, the dose may be increased to 150 mg/day. If needed,
the dose should be further increased up to 225 mg/day.
When increasing the dose, increments of up to 75 mg/day
should be made at intervals of no less than 4 days. In out-
patient settings there was no evidence of usefulness of doses
greater than 225 mg/day for moderately depressed patients,
but more severely depressed inpatients responded to a
mean dose of 350 mg/day. Certain patients, including more
severely depressed patients, may therefore respond more to
higher doses, up to a maximum of 375 mg/day, generally in
three divided doses (see PRECAUTIONS, General; Use in
Patients with Concomitant Illness).

rate for both venlafaxine and ODV that is observed in
patients with hepatic cirrhosis compared to normal subjects
(see CLINICAL PHARMACOLOGY), it is recommended
that the total daily dose be reduced by 50% in patients with
moderate hepatic impairment. Since there was much indi-
vidual variability in clearance between patients with cirrho-
sis, it may be necessary to reduce the dose even more than
50%, and individualization of dosing may be desirable in
some patients.

## Dosage for Patients with Renal Impairment
Given the decrease in clearance for venlafaxine and the in-
crease in elimination half-life for both venlafaxine and ODV
that is observed in patients with renal impairment (GFR =
10 to 70 mL/min) compared to normals (see CLINICAL
PHARMACOLOGY), it is recommended that the total
daily dose be reduced by 25% in patients with mild to mod-
erate renal impairment. It is recommended that the total
daily dose be reduced by 50% and the dose be withheld until
the dialysis treatment is completed (4 hrs) in patients un-
dergoing hemodialysis. Since there was much individual
variability in clearance between patients with renal impair-
ment, individualization of dosing may be desirable in some
patients.

## Dosage for Elderly Patients
No dose adjustment is recommended for elderly patients on
the basis of age. As with any antidepressant, however, cau-
tion should be exercised in treating the elderly. When indi-
vidualizing the dosage, extra care should be taken when in-
creasing the dose.

## Maintenance Treatment
It is generally agreed that acute episodes of depression re-
quire several months or longer of sustained pharmacologi-
cal therapy beyond response to the acute episode. In one
study, in which patients responding during 8 weeks of acute
treatment with Effexor XR were assigned randomly to pla-
cebo or to the same dose of Effexor XR (75, 150, or 225 mg/
day; qAM) during 26 weeks of maintenance treatment as
they had received during the acute stabilization phase,
longer-term efficacy was demonstrated. A second longer-
term study has demonstrated the efficacy of Effexor in
maintaining an antidepressant response in patients with
recurrent depression who had responded and continued to
be improved during an initial 26 weeks of treatment and
were then randomly assigned to placebo or Effexor for peri-
ods of up to 52 weeks on the same dose (100 to 200 mg/day,
on a b.i.d. schedule) (see CLINICAL TRIALS). Based on
these limited data, it is not known whether or not the dose
of Effexor/Effexor XR needed for maintenance treatment is
identical to the dose needed to achieve an initial response.
Patients should be periodically reassessed to determine the
need for maintenance treatment and the appropriate dose
for such treatment.

## Discontinuing Effexor (venlafaxine hydrochloride)
When discontinuing Effexor after more than 1 week of ther-
apy, it is generally recommended that the dose be tapered to
minimize the risk of discontinuation symptoms. Patients
who have received Effexor for 6 weeks or more should have
their dose tapered gradually over at least a 2-week period.
Discontinuation symptoms have been systematically evalu-
ated in patients taking venlafaxine, to include prospective
analyses of clinical trials in Generalized Anxiety Disorder
and retrospective surveys of trials in depression. Abrupt dis-
continuation or dose reduction of venlafaxine at various
doses has been found to be associated with the appearance
of new symptoms, the frequency of which increased with in-
creased dose level and with longer duration of treatment.
Reported symptoms include agitation, anorexia, anxiety,
confusion, coordination impaired, diarrhea, dizziness, dry
mouth, dysphoric mood, fasciculation, fatigue, headaches,
hypomania, insomnia, nausea, nervousness, nightmares,
seizures, sensory disturbances (including shock-like electri-
cal sensations), somnolence, sweating, tremor, vertigo, and
vomiting. It is therefore recommended that the dosage of Ef-
fexor be tapered gradually and the patient monitored. The
period required for tapering may depend on the dose, dura-
tion of therapy and the individual patient. Discontinuation
effects are well known to occur with antidepressants.

## SWITCHING PATIENTS TO OR FROM A MONOAMINE OXI-
DASE INHIBITOR
At least 14 days should elapse between discontinuation of
an MAOI and initiation of therapy with Effexor. In addition,
at least 7 days should be allowed after stopping Effexor be-
fore starting an MAOI (see CONTRAINDICATIONS and
WARNINGS).

## HOW SUPPLIED
Effexor® (venlafaxine hydrochloride) Tablets are available
as follows:
25 mg, peach, shield-shaped tablet with "25" and a "w" on
one side and "701" on scored reverse side.
  NDC 0008-0701-01, bottle of 100 tablets.
  NDC 0008-0701-02, carton of 10 Redipak® blister strips of
  10 tablets each.
37.5 mg, peach, shield-shaped tablet with "37.5" and a "w"
on one side and "781" on scored reverse side.
  NDC 0008-0781-01, bottle of 100 tablets
  NDC 0008-0781-02, carton of 10 Redipak® blister strips of
  10 tablets each.
50 mg, peach, shield-shaped tablet with "50" and a "w" on
one side and "703" on scored reverse side.

Continued on next column

## TABLE 2
### Treatment-Emergent Adverse Experience Incidence in 6 Month
### Dose Comparison Trial

| Body System/ | Placebo | Effexor (mg/day) | | |
| Preferred Term | (n=92) | 75 (n=89) | 225 (n=89) | 375 (n=88) |
|---|---|---|---|---|
| **dy as a Whole** | | | | |
| Abdominal Pain | 3.3% | 3.4% | 2.2% | 8.0% |
| Asthenia | 3.3% | 16.9% | 14.6% | 14.8% |
| Chills | 1.1% | 2.2% | 5.6% | 6.8% |
| ection | 2.2% | 2.2% | 5.6% | 2.3% |
| **ovascular System** | | | | |
| Hypertension | 1.1% | 1.1% | 2.2% | 4.5% |
| Vasodilatation | 0.0% | 4.5% | 5.6% | 2.3% |
| **gestive System** | | | | |
| orexia | 2.2% | 14.6% | 13.5% | 17.0% |
| spepsia | 2.2% | 6.7% | 6.7% | 4.5% |
| usea | 14.1% | 32.6% | 38.2% | 58.0% |
| Vomiting | 1.1% | 7.9% | 3.4% | 6.8% |
| **rvous System** | | | | |
| itation | 0.0% | 2.2% | 2.2% | 4.5% |
| xiety | 4.3% | 11.2% | 4.5% | 2.3% |
| zziness | 4.3% | 19.1% | 22.5% | 25.0% |
| Insomnia | 9.8% | 22.5% | 20.2% | 13.6% |
| Libido decreased | 1.1% | 2.2% | 1.1% | 5.7% |
| Nervousness | 4.3% | 21.3% | 13.5% | 12.5% |
| nnolence | 4.3% | 16.9% | 18.0% | 26.1% |
| mor | 0.0% | 1.1% | 2.2% | 10.2% |
| **piratory System** | | | | |
| Yawn | 0.0% | 3.4% | 5.6% | 8.0% |
| in and Appendages | | | | |
| eating | 5.4% | 6.7% | 12.4% | 19.3% |
| ial Senses | | | | |
| normality of | 0.0% | 9.1% | 7.9% | 6.8% |
| accommodation | | | | |
| **cogenital System** | | | | |
| normal | 0.0% | 4.5% | 2.2% | 12.5% |
| aculation/orgasm | | | | |
| potence | 0.0% | 5.8% | 2.1% | 3.6% |
| (Number of men) | (n=63) | (n=52) | (n=48) | (n=56) |

## Effexor—Cont.

mean decreases ranging from 0.9 to 3.8 mm Hg for placebo. However, there is a dose dependency for blood pressure increase (see WARNINGS).

*Laboratory Changes*

Of the serum chemistry and hematology parameters monitored during clinical trials with Effexor, a statistically significant difference with placebo was seen only for serum cholesterol. In premarketing trials, treatment with Effexor tablets was associated with a mean final on-therapy increase in total cholesterol of 3 mg/dL.

Patients treated with Effexor tablets for at least 3 months in placebo-controlled 12-month extension trials had a mean final on-therapy increase in total cholesterol of 9.1 mg/dL compared with a decrease of 7.1 mg/dL among placebo-treated patients. This increase was duration dependent over the study period and tended to be greater with higher doses. Clinically relevant increases in serum cholesterol, defined as 1) a final on-therapy increase in serum cholesterol ≥50 mg/dL from baseline and to a value ≥261 mg/dL or 2) an average on-therapy increase in serum cholesterol ≥50 mg/dL from baseline and to a value ≥261 mg/dL, were recorded in 5.3% of venlafaxine-treated patients and 0.0% of placebo-treated patients (see PRECAUTIONS-General-*Serum Cholesterol Elevation*).

*ECG Changes*

In an analysis of ECGs obtained in 769 patients treated with Effexor and 450 patients treated with placebo in controlled clinical trials, the only statistically significant difference observed was for heart rate, ie, a mean increase from baseline of 4 beats per minute for Effexor. In a flexible-dose study, with doses in the range of 200 to 375 mg/day and mean dose greater than 300 mg/day, the mean change in heart rate was 8.5 beats per minute compared with 1.7 beats per minute for placebo (see PRECAUTIONS, General, *Use in Patients with Concomitant Illness*).

**Other Events Observed During the Premarketing Evaluation of Venlafaxine**

During its premarketing assessment, multiple doses of Effexor were administered to 2897 patients in Phase 2 and Phase 3 studies. In addition, in premarketing assessment of Effexor XR (the extended release form of venlafaxine), multiple doses were administered to 705 patients in Phase 3 depression studies and Effexor was administered to 96 patients. During its premarketing assessment for Generalized Anxiety Disorder, multiple doses of Effexor XR were administered to 476 patients in Phase 3 studies. The conditions and duration of exposure to venlafaxine in both development programs varied greatly, and included (in overlapping categories) open and double-blind studies, uncontrolled and controlled studies, inpatient (Effexor only) and outpatient studies, fixed-dose and titration studies. Untoward events associated with this exposure were recorded by clinical investigators using terminology of their own choosing. Consequently, it is not possible to provide a meaningful estimate of the proportion of individuals experiencing adverse events without first grouping similar types of untoward events into a smaller number of standardized event categories.

In the tabulations that follow, reported adverse events were classified using a standard COSTART-based Dictionary terminology. The frequencies presented, therefore, represent the proportion of the 4174 patients exposed to multiple doses of either formulation of venlafaxine who experienced an event of the type cited on at least one occasion while receiving venlafaxine. All reported events are included except those already listed in Table 1 and those events for which a drug cause was remote. If the COSTART term for an event was so general as to be uninformative, it was replaced with a more informative term. It is important to emphasize that, although the events reported occurred during treatment with venlafaxine, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency using the following definitions: *frequent* adverse events are defined as those occurring on one or more occasions in at least 1/100 patients; *infrequent* adverse events are those occurring in 1/100 to 1/1000 patients; *rare* events are those occurring in fewer than 1/1000 patients.

**Body as a whole**—Frequent: chest pain substernal, neck pain; Infrequent: face edema, intentional injury, malaise, moniliasis, neck rigidity, pelvic pain, photosensitivity reaction, suicide attempt; Rare: appendicitis, bacteremia, carcinoma, cellulitis, withdrawal syndrome.

**Cardiovascular system**—Frequent: migraine; Infrequent: angina pectoris, arrhythmia, extrasystoles, hypotension, peripheral vascular disorder (mainly cold feet and/or cold hands), syncope, thrombophlebitis; Rare: aortic aneurysm, arteritis, first-degree atrioventricular block, bigeminy, bradycardia, bundle branch block, capillary fragility, cerebral ischemia, coronary artery disease, congestive heart failure, heart arrest, mitral valve disorder, mucocutaneous hemorrhage, myocardial infarct, pallor.

**Digestive system**—Frequent: eructation; Infrequent: bruxism, colitis, dysphagia, tongue edema, esophagitis, gastritis,

**TABLE 1**
Treatment-Emergent Adverse Experience Incidence in
4- to 8-Week Placebo-Controlled Clinical Trials[1]

| Body System | Preferred Term | Effexor (n=1033) | Placebo (n=609) |
|---|---|---|---|
| Body as a Whole | Headache | 25% | 24% |
| | Asthenia | 12% | 6% |
| | Infection | 6% | 5% |
| | Chills | 3% | — |
| | Chest pain | 2% | 1% |
| | Trauma | 2% | 1% |
| Cardiovascular | Vasodilatation | 4% | 3% |
| | Increased blood pressure/hypertension | 2% | — |
| | Tachycardia | 2% | — |
| | Postural hypotension | 1% | — |
| Dermatological | Sweating | 12% | 3% |
| | Rash | 3% | 2% |
| | Pruritus | 1% | — |
| Gastrointestinal | Nausea | 37% | 11% |
| | Constipation | 15% | 7% |
| | Anorexia | 11% | 2% |
| | Diarrhea | 8% | 7% |
| | Vomiting | 6% | 2% |
| | Dyspepsia | 5% | 4% |
| | Flatulence | 3% | 2% |
| Metabolic | Weight loss | 1% | — |
| Nervous System | Somnolence | 23% | 9% |
| | Dry mouth | 22% | 11% |
| | Dizziness | 19% | 7% |
| | Insomnia | 18% | 10% |
| | Nervousness | 13% | 6% |
| | Anxiety | 6% | 3% |
| | Tremor | 5% | 1% |
| | Abnormal dreams | 4% | 3% |
| | Hypertonia | 3% | 2% |
| | Paresthesia | 3% | 2% |
| | Libido decreased | 2% | — |
| | Agitation | 2% | — |
| | Confusion | 2% | 1% |
| | Thinking abnormal | 2% | 1% |
| | Depersonalization | 1% | — |
| | Depression | 1% | — |
| | Urinary retention | 1% | — |
| | Twitching | 1% | — |
| Respiration | Yawn | 3% | — |
| Special Senses | Blurred vision | 6% | 2% |
| | Taste perversion | 2% | — |
| | Tinnitus | 2% | — |
| | Mydriasis | 2% | — |
| Urogenital System | Abnormal ejaculation/orgasm | 12%[2] | —[2] |
| | Impotence | 6%[2] | —[2] |
| | Urinary frequency | 3% | 2% |
| | Urination impaired | 2% | — |
| | Orgasm disturbance | 2%[3] | —[3] |

[1] Events reported by at least 1% of patients treated with Effexor (venlafaxine hydrochloride) are included, and are rounded to the nearest %. Events for which the Effexor incidence was equal to or less than placebo are not listed in the table, but included the following: abdominal pain, pain, back pain, flu syndrome, fever, palpitation, increased appetite, myalgia, arthralgia, amnesia, hypesthesia, rhinitis, pharyngitis, sinusitis, cough increased, and dysmenorrhea[3]—Incidence less than 1%.

[2] Incidence based on number of male patients.

[3] Incidence based on number of female patients.

**Endocrine system**—Rare: goiter, hyperthyroidism, hypothyroidism, thyroid nodule, thyroiditis.

**Hemic and lymphatic system**—Frequent: ecchymosis; Infrequent: anemia, leukocytosis, leukopenia, lymphadenopathy, thrombocythemia, thrombocytopenia; Rare: basophilia, bleeding time increased, cyanosis, eosinophilia, lymphocytosis, multiple myeloma, purpura.

**Metabolic and nutritional**—Frequent: edema, weight gain; Infrequent: alkaline phosphatase increased, glycosuria, hypercholesteremia, hyperglycemia, hyperuricemia, hypoglycemia, hypokalemia, SGOT increased, thirst; Rare: alcohol intolerance, bilirubinemia, BUN increased, creatinine increased, diabetes mellitus, dehydration, gout, healing abnormal, hemochromatosis, hypercalcinuria, hyperkalemia, hyperlipemia, hyperphosphatemia, hyponatremia, hypophosphatemia, hypoproteinemia, SGPT increased, uremia.

**Musculoskeletal system**—Infrequent: arthritis, arthrosis, bone pain, bone spurs, bursitis, leg cramps, myasthenia, tenosynovitis; Rare: pathological fracture, myopathy, osteoporosis, osteosclerosis, rheumatoid arthritis, tendon rupture.

**Nervous system**—Frequent: emotional lability, trismus, vertigo; Infrequent: apathy, ataxia, circumoral paresthesia, CNS stimulation, euphoria, hallucinations, hostility, hyperesthesia, hyperkinesia, hypotonia, incoordination, libido increased, manic reaction, myoclonus, neuralgia, neuropathy, paranoid reaction, psychosis, seizure, abnormal speech, stupor; Rare: akathisia, akinesia, alcohol abuse, aphasia, bradykinesia, buccoglossal syndrome, cerebrovascular accident, loss of consciousness, delusions, dementia, dystonia, facial paralysis, abnormal gait, Guillain-Barre Syndrome, hypokinesia, neuritis, nystagmus, paresis, psychotic depression,

**Skin and appendages**—Infrequent: acne, alopecia, brittle nails, contact dermatitis, dry skin, eczema, skin hypertrophy, maculopapular rash, psoriasis, urticaria; Rare: erythema nodosum, exfoliative dermatitis, lichenoid dermatitis, hair discoloration, skin discoloration, furunculosis, hirsutism, leukoderma, pustular rash, vesiculobullous rash, seborrhea, skin atrophy, skin striae.

**Special senses**—Frequent: abnormality of accommodation, abnormal vision; Infrequent: cataract, conjunctivitis, corneal lesion, diplopia, dry eyes, exophthalmos, eye pain, hyperacusis, otitis media, parosmia, photophobia, taste loss, visual field defect; Rare: blepharitis, chromatopsia, conjunctival edema, deafness, glaucoma, retinal hemorrhage, subconjunctival hemorrhage, keratitis, labyrinthitis, miosis, papilledema, decreased pupillary reflex, otitis externa, scleritis, uveitis.

**Urogenital system**—Frequent: metrorrhagia*, prostatitis*, vaginitis*; Infrequent: albuminuria, amenorrhea*, cystitis, dysuria, hematuria, female lactation*, leukorrhea*, menorrhagia*, nocturia, bladder pain, breast pain, polyuria, pyuria, urinary incontinence, urinary urgency, vaginal hemorrhage*; Rare: abortion*, anuria, breast discharge, breast engorgement, breast enlargement, endometriosis*, fibrocystic breast, calcium crystalluria, cervicitis*, ovarian cyst*, prolonged erection*, gynecomastia (male)*, hypomenorrhea*, kidney calculus, kidney pain, kidney function abnormal, mastitis, menopause*, pyelonephritis, oliguria, salpingitis*, urolithiasis, uterine hemorrhage*, uterine spasm.*

\* Based on the number of men and women as appropriate.

**Postmarketing Reports**

Voluntary reports of other adverse events temporally asso-

No. CR-02-1958

In the COURT of CRIMINAL APPEALS

of ALABAMA

◆

JAMES HICKMAN HOLLOMAN,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

◆

On Appeal From the Circuit Court
of Houston County (CC-00-755; 00-757; 00-758)

## BRIEF OF APPELLANT

Troy King
*Attorney General*

Andy S. Poole
*Assistant Attorney General*

Cecil G. Brendle Jr.
*Assistant Attorney General*
Counsel of Record*


State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
(334) 242-7401, 242-7300*

May 27, 2004

EXHIBIT

*C*

PENGAD 800-631-6989

## STATEMENT REGARDING ORAL ARGUMENT

The issues raised in the present appeal are adequately addressed in the State's brief and therefore oral argument is not necessary or requested.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.......................... i

TABLE OF CONTENTS......................................... ii

TABLE OF AUTHORITIES..................................... iv

STATEMENT OF THE CASE..................................... 1

ISSUES PRESENTED FOR REVIEW............................... 3

STATEMENT OF THE FACTS.................................... 4

STANDARD OF REVIEW....................................... 10

SUMMARY OF THE ARGUMENT.................................. 12

ARGUMENT................................................. 15

I.    The Trial Court Committed No Reversible Error
In Denying Holloman A Continuance To Obtain The
Testimony Of John Gallia. ............................. 15

II., III.,XI., XVII.  Holloman's Claims Of
Ineffective Assistance Of Counsel Are Raised For
The First Time On Appeal; Thus, They Were Not
Properly Preserved For Appellate Review. ............... 18

IV.  Holloman's Claim That He Was Coerced Into
Not Testifying Is Raised For The First Time On Appeal
And, Thus, Is Not Properly Preserved For Appellate
Review. ............................................... 19

V.    The Trial Court Committed No Error In Allowing
Testimony Concerning Statements Holloman Made To An
Employee Of Bradford Health Services In The Presence
Of A Third Party. ..................................... 20

VI.  The Trial Court Properly Admitted An Audiotape
Of A Victim's 911 Call As Part Of The Res Gestae. ...... 23

VII.   Holloman's Two Capital Murder Convictions
Do Not Violate Double Jeopardy. ....................... 24

VIII.   The Trial Court's Instruction On Burglary
Was Not Objected To And Provides No Grounds For
Reversal. ............................................ 25

IX.  There Was No Error In Allowing The Charge Of
Capital Murder During The Course Of A Kidnapping
To Go To The Jury. .................................. 27

X.   The Trial Court Properly Refused To Give
Holloman's Written Requested Charges #17 And #18. ...... 31

XII.  No Reversible Error Was Committed By The
Trial Judge Going Into The Jury Room. ................. 34

XIII.   Holloman Failed To Preserve For Appellate
Review His Claim That The Prosecutor Made Prejudicial
Attacks On The Veracity Of The Defense Team. ........... 36

XIV.   Statement By The Prosecutor During Closing
Arguments Was Not Improper Or Grounds For A Mistrial. .. 38

XV.  The Trial Court Committed No Error In
Summarily Denying Holloman's Motion For New Trial
Without A Hearing. .................................. 42

XVI.   There Was Sufficient Evidence To Find
Holloman Guilty Of Attempted Murder In CC-00-757
And CC-00-758. ..................................... 44

XVIII.  The Trial Court Properly Denied Holloman's
Motion For Change Of Venue. .......................... 46

XIX.   The trial court properly refused to give
Holloman's written requested jury instruction #13
and #19. ............................................ 48

CONCLUSION............................................ 51

CERTIFICATE OF SERVICE................................ 52

## TABLE OF AUTHORITIES

**Cases**

Bankhead v. State, 585 So. 2d 97 (Ala. Crim.
  App. 1989) .......................................... 42

Blockburger v. United States, 284 U.S. 299 (1932) ........ 24

Bogan v. State, 529 So. 2d 1029 (Ala. Crim. App. 1988) ... 34

Brown v. State, 701 So. 2d 314 (Ala. Crim.
  App. 1997) ...................................... 19, 26

Chaney v. State, 417 So. 2d 625 (Ala. Crim. App. 1982) ... 45

Dawson v. State, 675 So. 2d 897 (Ala. Crim. App. 1995) ... 23

Ex parte Brooks, 695 So. 2d 184 (Ala. 1997) ............. 40

Ex parte City of Fairhope, 739 So. 2d 35 (Ala. 1999) ..... 24

Ex parte Coulliette, 857 So. 2d 793 (Ala. 2003) .. 20, 24, 35

Ex parte Fowler, 574 So. 2d 745 (Ala. 1990) ............. 47

Ex parte Frith, 526 So. 2d 880 (Ala. 1987) .............. 35

Ex parte Ingram, 675 So. 2d 863 (Ala. 1996) ............. 19

Ex parte Lawrence, 776 So. 2d 50 (Ala. 2000) ............ 39

Ex parte Neal, 731 So. 2d 621 (Ala. 1999) ............... 48

Ex parte Saranthus, 501 So. 2d 1256 (Ala. 1986) ......... 17

Ex parte Siebert, 555 So. 2d 780 (Ala. 1989) ............ 37

Ex parte Taylor, 666 So. 2d 73 (Ala. 1995) .............. 39

Ex parte Wilhite, 485 So. 2d 787 (Ala. 1986) ........... 50

Huntley v. State, 627 So. 2d 1013 (Ala. 1992) ........... 17

Hurst v. State, 397 So. 2d 203 (Ala. Crim. App. 1981).... 42

Jackson v. State, 836 So. 2d 915 (Ala. Crim.
  App. 1999)....................................... 18

Long v. State, 668 So. 2d 56 (Ala. Crim. App. 1995)...... 45

McCollum v. State, 678 So. 2d 1210 (Ala. Cr.
  App. 1995)..................................... 31, 34

McCullough v. State, 357 So. 2d 397 (Ala. Crim.
  App. 1978)....................................... 42

Miller v. State, 431 So. 2d 586 (Ala. Crim. App. 1983)... 42

Mims v. State, 816 So. 2d 509 (Ala. Crim. App. 2001)..... 43

Minor v. State, 780 So. 2d 707 (Ala. Crim. App. 1999).... 42

Murphy v. State, 421 U.S. 794 (1975).................... 47

Nelson v. State, 440 So. 2d 1130 (Ala. Crim. App. 1983).. 47

Oryang v. State, 642 So. 2d 979 (Ala. Crim. App. 1993)... 47

Pate v. State, 601 So. 2d 210 (Ala. Crim. App. 1992)..... 36

Peraita v. State, CR-01-0289, 2003 WL 21246440 (Ala.
  Crim. App. May 30, 2003)............................. 25

Shelton v. State, 851 So. 2d 83 (Ala. Crim. App. 1998)... 26

Sockwell v. State, 675 So. 2d 4 (Ala. Crim. App. 1993)... 47

Wells v. State, 768 So. 2d 412 (Ala. Crim. App. 1999).... 45

Whitlew v. State, 509 So. 2d 252 (Ala. Crim.
  App. 1987)....................................... 41

**Other Authorities**

Code of Alabama (1975),

   Sections 13A-4-2 and 13A-6-2 .......................... 45

   Section 13A-5-40(a)(1) ................................ 29

   Section 13A-6-43 ..................................... 29

   Section 13A-6-43(b) .................................. 28

**Rules**

Alabama Rules of Criminal Procedure,

   Rule 21.3 ........................................... 34

Alabama Rules of Evidence,

   Rule 503 ............................................ 21

   Rule 503(a)(3) ...................................... 22

   Rule 503(b) ......................................... 21

## STATEMENT OF THE CASE

This is an appeal from convictions of Appellant, James Hickman Holloman, in the Circuit Court of Houston County for two counts of capital murder and two counts of attempted murder.

On June 19, 2000, the Houston County Grand Jury in CC-00-755 returned a two-count indictment against Holloman charging him with the capital murder of Jimmy Clark during the course of a burglary or attempt thereof, in violation of §13A-5-40(a)(4), Code of Alabama (1975), and the capital murder of Jimmy Clark during a kidnapping or attempt thereof, in violation of Section 13A-5-40(a)(1), Code of Alabama (1975). (C. 15-16) Also that day, the Houston County Grand Jury returned additional indictments against Holloman charging him with the attempted murder of John Gallia in CC-00-757 and the attempted murder of Becky Clark in CC-00-758 in violation of Sections 13A-4-2 and 13A-6-2, Code of Alabama (1975).[1] (Supp. R. 44-47)

Holloman entered pleas of not guilty and not guilty by reason of mental disease or defect to all charges. (C. 29) Following pretrial hearings, the trial court denied motions

---

[1] An additional indictment for kidnapping in the first degree in CC-00-756 was dismissed at trial. (R. 1584)

for change of venue and continuance to obtain a missing witness. (C. 243) (Vol. V, April 2, 2003 hearing) (C. 9, 428-430, 491)

Trial commenced on May 19, 2003, and continued day to day resulting in verdicts of guilty to the two counts of capital murder and the two attempted murder charges. (C. 11-12; 546-547; Supp. R. 41-42) During the penalty phase, the jury recommended a sentence of life without parole for the capital murder convictions. (R. 2079) On June 18, 2003, Holloman was sentenced to fifty years in the penitentiary in CC-00-757, seventy-five years in the penitentiary in CC-00-758, and life without parole in CC-00-755. (Vol. XVI R. 17-21)

A motion for new trial was filed June 8, 2003, and denied on July 21, 2003. (C. 594-597)

2

## ISSUES PRESENTED FOR REVIEW

1. Did the trial court commit reversible error in denying Holloman a continuance to obtain the testimony of John Gallia?

2., 3., 11., 17. Were Holloman's claims of ineffective assistance of counsel properly preserved for appellate review as they are raised for the first time on appeal?

4. Did Holloman preserve his claim that he was coerced into not testifying?

5. Did the trial court commit error in allowing testimony concerning statements Holloman made to an employee of Bradford Health Services in the presence of a third party?

6. Did the trial court properly admit an audiotape of a victim's 911 call as part of the res gestae?

7. Did Holloman's two capital murder convictions violate double jeopardy?

8. Did Holloman preserve a claim concerning the trial court's instruction on burglary?

9. Was there error in allowing the charge of capital murder during the course of a kidnapping to go to the jury?

10.  Did the trial court properly refuse to give Holloman's written requested charges #17 and #18?

12.  Was reversible error committed by the trial judge going into the jury room?

13.  Did Holloman fail to preserve for appellate review his claim that the prosecutor made prejudicial attacks on the veracity of the defense team?

14.  Was a statement by the prosecutor during closing arguments improper or grounds for a mistrial?

15.  Did the trial court commit error in summarily denying Holloman's motion for new trial without a hearing?

16.  Was there sufficient evidence to find Holloman guilty of attempted murder in CC-00-757 and CC-00-758?

18.  Did the trial court properly deny Holloman's motion for change of venue?

19.  Did the trial court properly refuse to give Holloman's written requested jury instruction #13 and #19?

## STATEMENT OF THE FACTS

At the time of the murder and attempted murders, Holloman had been married to Sherri Holloman for nine to ten years and they had two young children, eight-year-old

4

Jamie and six-year-old Leslie. (R. 463-464) There were numerous incidents of domestic abuse over the course of the marriage. (R. 474-476; 779-783) The last incident occurred in April 2000 when Holloman broke Sherri's nose. Sherri left Holloman and was going to divorce him. She took her children to her parents, Becky and Jimmy Clark. (R. 484-487) During this transition period, Sherri started seeing another man, John Gallia. (R. 489)

On April 11, 2000, Holloman checked into Bradford Health Services. He had some substance abuse problems, and reported that he was having marital problems and had been charged with domestic assault. His father had talked him into getting help before he seriously hurt someone. He was in Bradford between April 11, 2000 and May 1, 2000. (R. 910-911, 935) On April 28, 2000, Becky Encizo, a "counselor" at Bradford, was called outside by another patient when Holloman's hand was bleeding from hitting a post because he was upset. Holloman said he had to leave treatment. He said his father had called and told him Sherri was having an affair. Holloman said he had to "take care of business." (R. 929) Holloman said he was going to kill his wife and her boyfriend. He then ran to the woods.

5

Encizo and the other patient followed and when Holloman stopped, he repeated his plan to "shoot" both his wife, her lover, and then himself. (R. 930-932) Bradford notified Sherri and recommended she take herself and her children to a safe place. (R. 933-934) Holloman left Bradford on May 1, 2000. (R. 934)

Sherri and John Gallia arrived at the Clark's house on Malvern Road in Rehobeth in Houston County on May 5, 2000. (R. 494, 461) On May 5, 2000, Holloman was in Prattville, Alabama, where he had a one-hour conversation with a friend, Joey Oates, and told him "he would like to kill his wife." Holloman told Oates his wife was in Dothan with her mother. Holloman said he was going to Dothan and kill her. (R. 648-649) That same day Holloman went to another friend (Duke Ennis) in Prattville and borrowed a Mossberg 20 gauge pump action shotgun that was identified as State's exhibit 2. (R. 415-428) Holloman was driving a red truck. (R. 414, 504)

On May 6, 2000, Gallia and Sherri took the two daughters to Panama City. (R. 496) That same day Jimmy Clark had asked the Sheriff's Department to patrol the home for the family's protection. (R. 497) That afternoon

Holloman called and asked to speak to his children.  Becky Clark told him they had gone to the beach.  Holloman said, "Nobody is going to keep my kids from me."  Becky said, "James, nobody is trying to keep your kids from you. Sherri just wants a divorce.  She wants you to leave her alone.  You can see the kids anytime you want to.  You and Sherri can work that out together."  Holloman said, "You're not going to keep my kids from me, you'll be sorry."  Becky was afraid and told her husband, Jimmy.  (R. 498-99) Holloman called back after Sherri and Gallia had returned with the children to the Clarks' home, and Sherri talked to him.  (R. 500)

The front door of the Clarks' house was locked.  At the time of the crime, Jimmy Clark was on one couch, Becky was on the other, and John Gallia was on the floor watching television with eight-year-old Jamie lying with her head on his leg.  Sherri was in another room on the computer and six-year-old Leslie was asleep in a bedroom.  (R. 507-508) Between 8:00 and 8:30 p.m., Becky looked up and saw Holloman in the house with a shotgun.  She first saw him as he came into the room a few feet away.  (R. 510-511) Holloman went toward Gallia, who was unarmed and lying on

7

the floor with Jamie Holloman on his leg, and shot Gallia in the back. (R. 512-513) Becky heard the shotgun "pump" and then Holloman fired at her husband, Jimmy Clark. Becky saw Jimmy fall over, and, as she turned, Holloman shot her in the shoulder. (R. 516-517) Becky heard Holloman "rack" the gun again and then Holloman shot Becky in her stomach. (R. 520) Becky heard "racking" again and saw Sherri run out of the office area to the den. She was screaming, "What are you doing, you've got to stop." Holloman then shot Gallia a second time. (R. 521-522) Becky heard one more shot as Sherri ran toward the back of the house and Holloman ran after her. (R. 524) Becky next saw Holloman dragging Sherri by her hair through the house. Sherri was screaming. As Holloman was dragging Sherri, he told his daughter Jamie she needed to find herself a new mommy and daddy. (R. 530-531) Holloman dragged Sherri out the back door. (R. 527, 531) Becky heard Sherri screaming outside. (R. 532) Eight-year-old Jamie came to her grandmother Becky. Becky told her to check on Papa. Jamie shook Jimmy Clark who did not move. Jamie got Becky a towel and helped call 911. (R. 527, 530)

8

Some of Clark's neighbors had observed a suspicious red truck that day going up and down the street before the shootings. When they heard a woman screaming, they called 911. (R. 662-670, 791-793) A couple of younger men and boys in their late teens ran toward where Holloman was forcibly putting Sherri in the truck. (R. 671-672, 793-794) One, John Daw, punched Holloman, who then put the shotgun in Daw's face and pulled the trigger. Nothing happened and Sherry started screaming, "No more killing." Sherri jumped on Holloman to keep him from shooting Daw and yelled for Daw to get out of there. Daw ran and got his car and chased Holloman's red truck. He lost them at a five-way stop. (R. 795-800)

Holloman later called his dad in Prattville around 2:00 or 3:00 a.m. the next morning from Florida. (R. 1153-1155) Holloman and Sherri showed up at his dad's house around 6:30 or 7:00 later that same morning. (R. 1155) Holloman gave his dad the shotgun. (R. 1158) After talking with his family, Holloman agreed to turn himself in to the police. Sherri told him, "We know you're sick, we are going to get you help." (R. 1162)

9

Dr. Alfredos A. Paredes did an autopsy on Jimmy Clark, and testified the cause of death was multiple buckshot injuries to the base of the neck and the upper chest that, among other injuries, had severed the carotid artery and the jugular vein. (R. 722, 764) Clark, however, did not die immediately. (R. 762) Becky Clark lived, but lost bone in her shoulder, part of her stomach, and a good part of her intestines. (R. 537) She wore an ileostomy bag for months and will have to be on a special diet the rest of her life. (R. 538, 541) John Gallia had a fractured arm, collapsed lung, and a spinal injury from the shotgun blast that left him permanently paralyzed. (R. 878, 894) The injuries were life threatening. (R. 887)

Forensics revealed that shells recovered at the scene of the crime were fired from the shotgun used by Holloman. (R. 994, 1001-1015, 823-853)

### STANDARD OF REVIEW

1.   The standard of review of a trial court's ruling on a motion for a continuance is abuse of discretion. Price v. State, 725 So. 2d 1003, 1060 (Ala. Crim. App. 1997).

10

2.   Issues not objected to or raised at trial in Arguments II, III, IV, VII, VIII, X, XI, XII, XIII, XVII and XIX, are reviewed under a preserved-error standard of review.  Ex parte Travis, 776 So. 2d 874, 876 (Ala. 2000).

3.   The standard of review on the admissibility of evidence in Arguments V and VI is abuse of discretion. Finley v. State, 606 So. 2d 198, 202 (Ala. Crim. App. 1992).

4.   The standard of review on a double jeopardy claim, if preserved, is de novo as a ruling on a question of law. Moss v. Williams, 822 So. 2d 392, 394 (Ala. 2001).

5.   The standard of review of the trial court's instructions to the jury in Arguments VII, X, and XIX is abuse of discretion.  Williams v. State, 611 So. 2d 1119, 1123 (Ala. Crim. App. 1992).

6.   The standard of review in determining the sufficiency of the evidence in Arguments IX and XVI is whether the evidence was legally sufficient to allow submission of an issue to the jury.  Woodall v. State, 730 So. 2d 652, 658 (Ala. 1998).

7.   The standard of review concerning the propriety of argument of counsel in Arguments XIII and XIV, where it is

11

preserved, is abuse of discretion. <u>Smith v. State</u>, 698 So. 2d 189, 202 (Ala. Crim. App. 1996).

8.   The standard of review in Argument XV of a trial court's decision to deny a motion for new trial is a clear showing of abuse of discretion. <u>Mims v. State</u>, 591 So. 2d 120, 127 (Ala. Crim. App. 1991).

9.   The standard of review of the trial court's ruling on a motion for a charge of venue in Argument XVIII is abuse of discretion. <u>Ex parte Travis</u>, 776 So. 2d 874, 877 (Ala. 2000).

## SUMMARY OF THE ARGUMENT

Holloman failed in his burden of proof with respect to Argument I.   There was no showing to the trial court of any probability that, if another continuance was granted to secure the testimony or attendance of John Gallia, he could be located or persuaded to give testimony.

Holloman's claims of ineffective assistance of counsel in Arguments II, III, IV, XI, and XVII were not properly preserved for appellate review.

Holloman's claim that he was coerced into not testifying in Argument IV was not preserved for appellate review.

Holloman's statement made to an employee of Bradford Health Services in the presence of a third party was not confidential and its admission violated no privilege.

The audiotape of the 911 call was properly admitted as part of the res gestae and as a spontaneous declaration.

Holloman's two capital murder convictions for killing one victim do not violate double jeopardy; also, this claim was not properly preserved for appellate review.

In Argument VIII, Holloman's claim attacking the trial court's instruction was not preserved for appellate review.

The charge of capital murder during a kidnapping in the first degree was supported by the evidence despite Holloman's subsequent release of the kidnapping victim the day after the murder occurred.

The trial court properly refused to give instructions that were not applicable to the facts of the case. An additional claim on appeal about a separate charge was not objected to at trial and thus was waived.

13

The trial court committed no error in going into the jury room with defense counsel's approval. This issue and an additional claim on appeal of ineffective assistance of counsel were not preserved for appellate review.

In Argument XIII, Holloman failed to preserve for appellate review a claim that the prosecutor made prejudicial attacks of the defense counsel's veracity. An additional claim alleging prosecutorial misconduct in the presenting of autopsy photographs is without merit.

In Argument XIV, statements by the prosecutor during closing argument were proper rebuttal comments on statements made by defense counsel during closing argument.

The trial court did not abuse its discretion in denying a motion for new trial without a hearing.

In Argument XVI, the State asserts there was sufficient evidence to find Holloman guilty of two attempted murders.

The State avers in Argument XVIII that the trial court did not abuse its discretion in denying Holloman's motion for change of venue.

Finally the State asserts in Argument XIX that Holloman failed to preserve a claim regarding the refusal to give certain written requested jury charges. Also, the charges

14

in question were confusing, substantially covered, and not applicable to the facts of the case.


### ARGUMENT

I.  **The Trial Court Committed No Reversible Error In Denying Holloman A Continuance To Obtain The Testimony Of John Gallia.**


In its order on the motion for continuance under seal, the trial court made the following findings:

> This case is set for trial for May 19, 2003.  It has previously been set for trial twice – for March, 2003 and April, 2003.  It was continued for defendant in March to complete a psychiatric examination with the understanding that defendant would be ready for trial on April 21, 2003.  Prior to April setting, the defendant made known to the Court that he wanted to call the witness John Gallia to appear for trial; that Gallia is a paraplegic confined to a wheelchair and lives in California.  Gallia was refusing to voluntarily appear to testify and the defendant wanted to take his deposition to be used at trial.  The defendant appeared, along with the state, and moved for continuance of the April trial on the contention that he had not been able yet to arrange for the deposition, even though it had been ordered.  The Court later agreed that a deposition could be taken and with a video being made as Gallia testified.  Arrangements were made for Gallia to appear at a court reporter's office in California; that the Court, the defendant, defendant's attorneys and the District Attorney would gather at an appointed time and place in Dothan and the deposition would be taken telephonically.  This

15

was all arranged to be done on Friday, May 9,
2003, at 11:30 a.m. (CDT), 9:30 a.m. (PDT).  On
May 9, 2003, everyone appeared for the arranged
deposition, except the witness John Gallia.
Everyone waited an additional 45 minutes hoping
that Gallia would appear even though he had told
the defense attorneys that he might or might not
appear.
The defendant has now moved for another
continuance alleging that he is hopeful that if
this Court will issue an order for Gallia's
appearance in this Court that a state judge in
California might also issue an order for Gallia to
be arrested and made to return to Alabama to
testify.  This Court has received a statement
taken by the Sheriff's Department of Houston
County right after the incident in question and
also an e-mail statement purportedly sent by the
witness Gallia to the District Attorney of Houston
County.  The latter was sent many months after the
original was taken.  The statements, assuming the
second was truly from Gallia, are inconsistent.
The Court makes no judgment as to which statement
is true.  The Court only knows that Gallia has
refused to willingly appear for trial in Alabama;
that he has refused to appear in California for a
deposition; and that he is a paraplegic confined
to a wheelchair.  The defense attorneys, in an
effort to be absolutely candid with the Court,
have confided to the Court that the witness Gallia
has attempted to extort money from them in
exchange for his testimony and that he has told
them that he will never be served to appear in
Alabama.  The Court is not convinced that John
Gallia's testimony is necessary or material for
the defense of this defendant.  As a matter of
fact, the Court believes that Gallia's testimony
might very well be very detrimental to the
defendant.

The Court is, therefore, denying the defendant's
motion for continuance and is issuing this order
under seal, to be forwarded to the defendant only,
so as not to unduly prejudice the defendant in the

event he is able to ultimately depose Gallia or
convince him to appear for trial.

(C. 428-430)

A motion for a continuance in a criminal case is
addressed to the sound discretion of the trial court, the
exercise of which will not be disturbed unless clearly
abused. Huntley v. State, 627 So. 2d 1013 (Ala. 1992).  To
warrant a continuance on the grounds that a witness is
absent, 1) it must be shown that the expected testimony of
the witness is material and competent, 2) that there is a
probability that the evidence will be forthcoming if the
case is continued, and 3) that the moving party has
exercised due diligence to secure the evidence.  Ex parte
Saranthus, 501 So. 2d 1256 (Ala. 1986).

As to the first requirement, the record of findings
indicate that the evidence they hoped to present was
contradicted by the witness's statement to police at the
time of the offense; moreover, some of the alleged evidence
was speculation on defense's part, unsupported by the
record, or else hearsay.  (Vol. V, April 29, 2003 hearing)
(R. 8-10)  It is therefore questionable whether the
expected evidence was material or competent.

Furthermore, it is clear from the trial court's findings that there was no probability that Mr. Gallia could be made to give testimony either by deposition or by returning to Alabama to testify at trial. Holloman presented no evidence that, even if a continuance was granted by the trial court, Mr. Gallia could be located and persuaded to testify. Thus, he has not satisfied the second prong of the Saranthus test. Jackson v. State, 836 So. 2d 915, 941 (Ala. Crim. App. 1999).

Based upon the above, the trial court did not abuse its discretion in denying a continuance in this case.

**II., III.,XI., XVII.    Holloman's Claims Of Ineffective Assistance Of Counsel Are Raised For The First Time On Appeal; Thus, They Were Not Properly Preserved For Appellate Review.**

Holloman alleges that trial counsel's performance was ineffective. Among the deficiencies alleged are counsel failed to develop a defense concerning the effects of medication, counsel failed to prepare sufficiently for trial to properly question witnesses, and counsel failed to request certain jury charges. Despite the many allegations of ineffective assistance of counsel presented by Holloman

in brief, none of these were presented to the trial court,
a fact that is admitted in Appellant's brief on appeal.

A claim of ineffective assistance of counsel may not be
considered on appeal if it was not first presented to the
trial court. Brown v. State, 701 So. 2d 314, 319-320 (Ala.
Crim. App. 1997). This Court cannot therefore review
Holloman's claims of ineffective assistance of counsel
because the claims were not presented to the trial court in
a motion for new trial. Ex parte Ingram, 675 So. 2d 863,
865 (Ala. 1996).

IV. **Holloman's Claim That He Was Coerced Into Not
Testifying Is Raised For The First Time On Appeal And,
Thus, Is Not Properly Preserved For Appellate Review.**

Holloman alleges on appeal that his trial counsel
pressured him not to testify at trial. Holloman admits in
his brief that this claim was not presented to the court
below. (Holloman's brief, pg. 28 footnote 2)

Review on appeal is restricted to questions and issues
properly and timely raised at trial. To preserve an issue
for appellate review, it must first be presented to the
trial court by a timely and specific motion setting out the
specific grounds in support thereof. An issue raised for

19

the first time on appeal is not subject to appellate review

because it has not been properly preserved and presented.

Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003).

To the extent that this claim is actually a claim of

ineffective assistance of counsel rather than a claim that

he was denied his right to testify, the claim is also not

properly before this Court for the reasons stated in the

previous argument. The ineffective assistance of counsel

claims were not preserved for appellate review.

**V.  The Trial Court Committed No Error In Allowing Testimony Concerning Statements Holloman Made To An Employee Of Bradford Health Services In The Presence Of A Third Party.**

At trial, the State called Rebecca Hale Encizo, a

social work counselor at Bradford's Warrior facility, to

testify about Holloman's voluntary admission to the

facility between April 11, and May 1, 2000.  (R. 909-978)

Encizo was not a licensed professional counselor.  (R. 917)

When the defense made an objection based on "patient

privilege", there was a voir dire of the witness, plus

discussion, before the trial court overruled the objection

and permitted Encizo to testify about a conversation she

20

had with Holloman outside the building and later in the woods. (R. 912-927) What occurred was that, on the morning of April 28, 2000 at approximately 8:00 a.m., another patient summoned Encizo to the back deck of the facility where Holloman's hand was bleeding from hitting a post. Hollomon was visibly upset and when Encizo asked why, Holloman told her his father had called and informed him that Holloman's wife, Sherri, was having an affair. He told Encizo that he had to leave so that he could kill his wife and her boyfriend. (R. 929-930) The other patient was present during the entire exchange between Hollomon and Encizo. (R. 920) Holloman then ran into the woods. Encizo and the patient followed. Holloman stopped and repeated that he was going to kill his wife and her lover. (R. 930-932)

Holloman alleges on appeal that the trial court's admission of this statement to Encizo was a violation of the "psychotherapist-patient privilege" under Rule 503, Alabama Rules of Evidence.

Rule 503(b) provides a patient a privilege to refuse to disclose "confidential" communications made for the purposes of diagnosis or treatment.

21

Rule 503(a)(3) states a communication is confidential if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation.

Here, Holloman was not in a therapy session, either alone or in a group, but was having a conversation with another patient when he became agitated. Encizo was summoned and Holloman continued to talk with the other patient present and related his intent to kill his wife and her boyfriend. The statements by Holloman were knowingly made in the presence of a third party who was not necessary to the delivery of counseling services; thus, the statement was not privileged. See Rule 503, Ala.R.Evid, Advisory Committee's Notes, subsection (a)(3): Definition of "confidential".

Because the statements were made in the presence of a third party and were not a part of Holloman's treatment, the trial court properly overruled Holloman's privileged communication objection.

22

VI.  **The Trial Court Properly Admitted An Audiotape Of A Victim's 911 Call As Part Of The Res Gestae.**

Before trial, Holloman filed a motion to suppress the 911 tape that originated from the scene of the crime.  (C. 372)  The defense alleged at trial and in the motion that the inflammatory effect of the 911 tape outweighed its probative value.  Following a pretrial hearing, the trial court held that the tape was part of the res gestae and would be admitted.  (R. 336-352)

This Court has previously addressed this very issue in the case of Dawson v. State, 675 So. 2d 897 (Ala. Crim. App. 1995), holding that a 911 call made shortly after a crime occurred was properly admitted as part of the res gestae.  In the case at hand, Holloman was still in the vicinity when one of the gunshot victims, with the help of her eight-year-old granddaughter, called 911.  Thus, the trial court properly admitted the 911 tape.

Furthermore, in Dawson, even the dissent, while not agreeing that the 911 call was always part of the res gestae, held that such a call was still admissible as a spontaneous exclamation and excited utterance.  Therefore, even if this Honorable Court finds that this particular

23

call was not part of the res gestae, it was still
admissible as a spontaneous declaration by the victim as
the events of the crime were unfolding.  A trial court's
judgment should be affirmed if it is correct for any
reason.  Ex parte City of Fairhope, 739 So. 2d 35, 39 (Ala.
1999).

## VII.   Holloman's Two Capital Murder Convictions Do Not Violate Double Jeopardy.

Holloman makes the present double jeopardy argument for
the first time on appeal, and thus did not preserve it for
appellate review.  Review on appeal is restricted to issues
properly and timely raised at trial.  Holloman's failure to
preserve this issue at trial waives appellate review.  Ex
parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003).

Even if he had raised this issue below, however, it
would still be due to be denied as without merit.  In this
case, Holloman was charged with the capital murder of Jimmy
Clark during a burglary and the capital murder of Jimmy
Clark during a kidnapping.  In each instance, each capital
murder charge required proof of an element that the other
did not, thus under Blockburger v. United States, 284 U.S.
299 (1932), Holloman's convictions for both capital

offenses did not violate the Double Jeopardy Clause.

Peraita v. State, CR-01-0289, 2003 WL 21246440, at *48

(Ala. Crim. App. May 30, 2003).

## VIII.   The Trial Court's Instruction On Burglary Was Not Objected To And Provides No Grounds For Reversal.

On appeal, Holloman alleges that the trial "court gave

instructions that allowed the jury to infer that the mere

killing of Jimmy Clark was committed in the course of a

burglary by being committed after the privilege had been

revoked."

The instructions challenged by Holloman are as follows:

> Even if he entered lawfully, that after it became
> unlawful for him to be in that dwelling that he
> remained unlawfully in the dwelling of Jimmy
> Clark.

(R. 1756)

> A person enters or remains unlawfully in or upon
> premises when he is not licensed, invited, or
> privileged to do so.

(R. 1757)

The State would assert that this issue was not

preserved for appellate review.  No objection to this

25

charge was made at trial; thus, this issue is waived. Shelton v. State, 851 So. 2d 83, 95 (Ala. Crim. App. 1998). Holloman tries to assert that trial counsel was ineffective "for not providing a jury instruction covering the question of whether or when a privilege to enter had been revoked in order to turn a murder into capital murder by remaining after the victim had revoked the defendant's privilege to remain."  As stated in Argument II, a claim of ineffective assistance of counsel may not be considered for the first time on appeal.  Brown v. State, 701 So. 2d 314, 319-20 (Ala. Crim. App. 1997).

The State further argues, however, that Holloman's claims on appeal are without merit because trial counsel requested, and the court gave, instruction concerning the fact that the jury could not infer an entry was unlawful because a crime was committed after the entry.  (C. 531, 1796-97)

Based upon Holloman's lack of objection at trial and the trial court's giving of instructions that covered the now complained of points of law, no reversible error has been shown with respect to this issue.

**IX.  There Was No Error In Allowing The Charge Of Capital Murder During The Course Of A Kidnapping To Go To The Jury.**

In an indictment not made a part of this record, in case number CC-00-756, Holloman was charged with kidnapping in the first degree.  At the close of the State's case-in-chief, the defense moved for a judgment of acquittal with respect to the individual charges against Holloman.  (R. 1059-1086)  The court expressed its concern about the kidnapping charge, but denied the motion at that time.  (R. 1086-1087)

At the close of the defense's case, the trial judge informed the defense that he thought there was sufficient evidence of the capital murder during the course of kidnapping charge, but he was going to dismiss the kidnapping in the first degree indictment.  (R. 1567-1584)

Holloman argues that, in the dismissal of the kidnapping in the first degree charge because the victim, Sherri Holloman, was released without harm, before apprehension, and in a safe place, the court erred in not dismissing the charge of capital murder during the course of kidnapping Sherri Holloman.

27

The State avers that this is not the law. While Section 13A-6-43(b), Code of Alabama (1975) does state that, "A person does not commit the crime of kidnapping in the first degree if he voluntarily releases the victim alive, and not suffering from serious physical injury, in a safe place prior to apprehension," it does not prevent Holloman from being convicted of the capital murder he committed before his renunciation of his kidnapping plans. It is clear that, at the time Holloman went to his in-law's house to abduct and kill his wife and her boyfriend, he intentionally killed his father-in-law.

A capital murder was committed during the course of the kidnapping or attempt thereof. Holloman's subsequent change of heart in not killing his wife, but releasing her after being talked into turning himself in so he could get help, does not change the fact that, at the time of the murder, he was committing a kidnapping or attempted kidnapping.

> To sustain a conviction under §13A-5-40(a)(1), Ala. Code 1975, for the capital offense of murder during a kidnapping, the State must prove beyond a reasonable doubt: (1) a kidnapping in the first degree, as defined by §13A-6-43(a), or an attempt thereof; (2) an intentional murder, as defined by §13A-6-2(a)(1); and (3) that the murder was

28

committed "during" the course of the "kidnapping or attempted kidnapping."

Section 13A-6-43, Code of Alabama (1975) defines kidnapping in the first degree as follows:

"(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to. . . (3) Accomplish or aid in the commission of any felony or flight therefrom; or (4) Inflict physical injury upon him, or to violate or abuse him sexually; or (5) Terrorize him or a third person; . . ."

The judge's finding that the kidnapping in the first degree charge was to be dismissed was based upon the defense afforded a defendant under Section 13A-6-43(b) to that specific charge. It was not a finding that the kidnapping was not committed, just that there could not be first degree kidnapping after the renunciation by the defendant.

Section 13A-6-43(b) also states that this defense to a kidnapping in the first degree charge "does not apply to a prosecution for or preclude a conviction of kidnapping in the second degree or any other crime." (emphasis added)

The capital murder statute Section 13A-5-40(a)(1), Code of Alabama (1975), does not require a completed kidnapping, just an attempt. Based upon the above, the dismissal of

the kidnapping in the first degree charge based upon the defense of subsequent release did not require the dismissal of the capital murder charge for a murder committed during the course of the kidnapping or attempt to abduct Sherri Holloman.

Holloman continues this argument on appeal by alleging the trial court erred in giving certain jury instructions concerning capital murder and first degree kidnapping (R. 1758, 1760, 1762, 1763, 1828, 1833-34), but not giving instructions concerning kidnapping in the second degree.[2] The State points out that the defense never requested second degree kidnapping charges after the judge's jury instructions. (C. 527-541; R. 1817-1825) The defense also made no objection when the judge recharged the jury. (R. 1841)

No party may assign as error the court's giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.

---

[2] When the State tried to amend the charge to kidnapping in the second degree, the defense objected. (R. 1530)

Rule 21.3, Ala.R.Crim.P.; see also <u>McCollum v. State</u>, 678

So. 2d 1210 (Ala. Cr. App. 1995).

## X.   The Trial Court Properly Refused To Give Holloman's Written Requested Charges #17 And #18.

Holloman filed written requested charges #17 and #18 to

be given to the jury and was refused by the trial court.

(C. 531-532; R. 1662)  The charges read as follows:

> 17.  I charge you, members of the jury that a person does not commit the crime of kidnapping in the first degree if he voluntarily releases the victim alive, and not suffering from serious physical injury, in a safe place prior to his apprehension.
>
> To convict the Defendant, James Holloman of capital murder in this case, the State must prove beyond a reasonable doubt each of the following elements of kidnapping in the first degree:
>
> First, that the defendant, James Holloman, abducted Sherri (Holloman) McSwain in Houston County, Alabama and;
>
> Second, that the Defendant did so with intent to:
>
> (1)  Hold her for ransom or reward; or
>
> (2)  Use her as a shield or hostage; or
>
> (3)  Accomplish or aid the commission of any felony or flight therefrom; or
>
> (4)  Inflict physical injury upon her, or to violate or abuse her sexually; or
>
> (5)  Terrorize her or a third person; or

31

(6)    Interfere with the performance of any
governmental or political function.

Further, in order to convict James Hickman
Holloman of capital murder under this count of the
indictment, you must find from the evidence that
the State has proved beyond a reasonable doubt the
following elements:

(1)    That James Hickman Holloman DID NOT
voluntarily release Sherri (Holloman) McSwain ali;
AND,

(2)    That she WAS suffering from serious physical
injury; AND;

(3)    That she WAS NOT released in a safe place;
AND

(4)    That said release WAS NOT prior to his
apprehension.

If you find from the evidence that the State has
failed to prove beyond a reasonable doubt each of
the above elements of the offense of kidnapping in
the first degree as charged, then you cannot find
James Hickman Holloman guilty of capital murder
under this count of the indictment.

(C. 531-32)

18.    With regard to Count II of the capital murder
indictment, wherein the Defendant is charged with
committing murder while in the course of a
kidnapping in the first degree, I charge you,
members of he jury, that if you find from the
evidence that the Defendant, James Hickman
Holloman, voluntarily released Sherri (Holloman)
McSwain, alive, and not suffering from serious
physical injury, in a safe place prior to his

apprehension, then you cannot find James Hickman
Holloman guilty of capital murder under count II
of the capital murder indictment.

(C. 532)

At trial, the defense objected after the court's jury
charge did not include the affirmative defense under the
First Degree Kidnapping statute.  The court pointed out
that, under the statute [§13A-6-43(b), Code of Alabama
(1975)], it is not an affirmative defense to any other
crime such as capital murder.  (R. 1817-1820)  Even after
the defense asserts this defense, the burden of proof does
not shift under this rule.

The State refers this Honorable Court to Argument IX of
this brief for a discussion of why the release of the
victim unharmed, while affecting kidnapping in the first
degree, had no effect on the capital murder charge where
the murder was committed during the course of a kidnapping.
Therefore, the language in the requested charges dealing
with the victim's release no longer applied to the facts of
this case once the kidnapping in the first degree charge
was dismissed.  The court properly refused charges #17 and
#18.  A requested instruction is properly refused if it is

33

not applicable to the facts of the case.  Bogan v. State, 529 So. 2d 1029, 1032 (Ala. Crim. App. 1988).

Holloman continues his argument on appeal by arguing that the giving of defendant's #20 charge without giving an instruction on what would reduce first degree kidnapping to second degree kidnapping or giving instructions on second degree kidnapping was error.  This ground was not raised at trial and was not included in the specific objections that the defense did make.

No party may assign as error the court's giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection. Rule 21.3, Ala.R.Crim.P.; see also McCollum v. State, 678 So. 2d 1210 (Ala. Crim. App. 1995).

## XII.   No Reversible Error Was Committed By The Trial Judge Going Into The Jury Room.

When the jury exited the courtroom to begin their deliberations during the guilt phase of the trial, the trial court stated there was one more thing that the court

34

needed to tell them concerning the fact that their verdicts needed to be unanimous. The court informed the attorneys that the court reporter would accompany him and asked if this would be agreeable. Counsels for both the defense and the State agreed to this action by the trial court. The court then went to the jury room and spoke to them on the record. (R. 1826-1828)

The present issue was clearly not objected to at trial. The record and Holloman's brief agree that trial counsel did not object to the trial court going into the jury room. To preserve an issue for appellate review, it must be presented to the trial court by a timely objection. Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003). The trial court will not be put in error on grounds raised for the first time on appeal. Ex parte Frith, 526 So. 2d 880 (Ala. 1987).

Further, Holloman on appeal attempts to allege this issue in terms of ineffective assistance of trial counsel for not objecting to the trial court's action. This claim of ineffective assistance of counsel was also not presented to the trial court and cannot be considered on appeal.

Brown v. State, 701 So. 2d 314, 319-320 (Ala. Crim. App. 1997).(See Arguments II, III, XI, & XVII)

For the reasons stated above, the present issue should not be reviewed by this Honorable Court.

## XIII.   Holloman Failed To Preserve For Appellate Review His Claim That The Prosecutor Made Prejudicial Attacks On The Veracity Of The Defense Team.

Holloman contends that, during closing arguments, the prosecutor told the jury that defense counsel was lying. This allegedly is recorded on pages R. 1725-1726.  Once again, Holloman admits that no objection was made concerning these comments.

Appellate review is restricted to questions and issues properly and timely raised at trial.  An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented. Pate v. State, 601 So. 2d 210, 213 (Ala. Crim. App. 1992). Because Holloman failed to object to the prosecutor's alleged prejudicial statements at trial, there is nothing for this Court to review.

At the end of his argument on appeal, Holloman includes a claim of alleged prosecutorial misconduct in presentation

of graphic photographs of the victim.  Before one of the surviving victims, Becky Clark, testified, the defense questioned the propriety of showing her photos of her deceased husband's autopsy.  The concern was an emotional outburst from her when she saw the photos.  An off-the-record discussion was held during which she was instructed to control herself.  (R. 459-460)  Holloman alleges that this was somehow prosecutorial misconduct.  The State asserts that it can find no prejudice with regard to this issue because the autopsy photos were not shown to the witness, but were instead identified later by the doctor who performed the autopsy.  (Vol. V, trial R. 18-19)  Moreover, the admission of such evidence lies within the sound discretion of the trial court.  Ex parte Siebert, 555 So. 2d 780, 783-84 (Ala. 1989).  The photographs were relevant pieces of evidence.  Their emotional content was obvious but their capacity to elicit an emotional response was lessened by the trial court's instruction to Becky Clark and the fact that autopsy photographs were not shown to her.  The photos she did see were of the crime scene and were properly admitted.  Siebert, id.

37

## XIV.  Statement By The Prosecutor During Closing Arguments Was Not Improper Or Grounds For A Mistrial.

Holloman argues on appeal that the prosecutor's misconduct during closing argument required a mistrial be granted.  The first alleged instance was the only one where there was an actual objection and motion for mistrial.  It occurred as follows:

> Mr. Decker says, poor Holloman is sick.  He's not sick.  He's got a personality disorder.  He's had that from that day he was born.  He will have that till the day he dies.  You can't cure that.
>
> You know how Mr. Decker wants you to cure it? Find him guilty of manslaughter and put him back in the community.  Decker –
>
> MR. DECKER:  Objection, Your Honor.
>
> MR. VALESKA:  That is what he wants you to do.
>
> MR. DECKER:  That is not exact – that is not the law to put him back in the community.  The jury knows, and Mr. Valeska knows, that if he is found guilty of manslaughter that this Court will incarcerate him for a period of time according to the State statute.
>
> Mr. Valeska knows that he will not be released into the community and that is an improper argument.  We move for a mistrial at this time.
>
> THE COURT:  And I overrule the motion for a mistrial, but ladies and gentlemen, that would not be a correct statement of the law and you are not to consider that when you come to weigh and consider the evidence and make up your verdict in this case.

38

Go ahead, Mr. Valeska.

(R. 1727-28)

A mistrial is an extreme measure that should be taken only when the prejudice cannot be eradicated by instruction or other curative actions of the trial court. Ex parte Lawrence, 776 So. 2d 50, 55 (Ala. 2000). Here, the court's curative instruction removed any misconceptions the jury might have had.

In addition, the prosecutor's statement was a proper reply to statements by defense counsel. Defense counsel had ended his closing argument by saying the jury should find Holloman guilty of manslaughter, that he was sick and he had been promised help. (R. 1724) This left the jury with the impression that, if they convicted Holloman of manslaughter, he could get help for his mental condition and could function in society again. A prosecutor has the right to reply in kind to statements made by defense counsel in the defense's closing argument. Ex parte Taylor, 666 So. 2d 73, 88 (Ala. 1995). A challenged comment of a prosecutor made during closing arguments must be viewed in the context of the evidence in the case and

39

the entire closing arguments of both sides.  Ex parte

Brooks, 695 So. 2d 184, 189 (Ala. 1997).

The next alleged instance of alleged prosecutorial

misconduct occurred as follows:

> If I'm wrong there was one shred of evidence, one
> time Decker argued it where Sherry had met this
> man on the Internet.  There was nobody that
> testified to that.  Decker just argued that.  You
> think about that.  I didn't miss it.  Not one of
> his witnesses said that.  He just argued it to
> you.  Decker is wrong.  Decker is wrong again.
>
> Remember what he said?  This is their smokescreen,
> what they want you to buy.  This is the mumbo
> jumbo from the defense, what Decker says.  While
> this man, Holloman, was in Bradford, John Gallia
> was taking his children to the beach with Sherry.
> You're wrong, Mr. Decker.
>
> MR. DECKER:  No, sir, I'm not.
>
> MR. VALESKA:  Now he wants to argue.  Listen to
> him.
>
> THE COURT:  Okay, gentlemen.
>
> MR. VALESKA:  What was the testimony?  The
> testimony was this:  That Saturday, the day of the
> killing, Holloman was not in Bradford.  Was he?
> No.  He got out when?  May the 1st.  When were the
> children taken to the beach?  Remember the
> testimony, what it was, what Becky said.  It was
> that day.  He was not in Bradford like Mr. Decker
> argued to you.
>
> MR. DECKER:  I didn't say that.
>
> MR. VALESKA:  Did you miss the point?  That's what
> he said.  Now he said, I didn't say that.  That's
> exactly what he said.

(R. 170-31)

On appeal, Holloman alleges these statements cast doubt on the integrity of defense counsel. The State would once again aver that this was reply-in-kind to statements defense counsel made in closing and also proper comment on statements defense counsel made. The defense did say Holloman was in Bradford and found out that his wife was having an affair with a man she met on the internet, and she and her boyfriend had taken the children to the beach when there was not any evidence that Sherri met Gallia on the internet or that Holloman found out the children were at the beach with Gallia. (R. 1710-1713, R. 1715-1716) The defense also questioned the prosecutor's integrity by alleging the prosecutor was laying out a "red herring." (R. 1712)

This Court must consider the impact of the statements in question in the context of the particular trial and not view them in the abstract. Whitlew v. State, 509 So. 2d 252, 256 (Ala. Crim. App. 1987) "[S]tatements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become

41

factors in the formation of the verdict." <u>Bankhead v. State</u>, 585 So. 2d 97, 106 (Ala. Crim. App. 1989).

Questions regarding the propriety of argument of counsel are largely within the discretion of the trial court, that is given broad discretion in determining what is permissible argument. <u>McCullough v. State</u>, 357 So. 2d 397, 399 (Ala. Crim. App. 1978); <u>Hurst v. State</u>, 397 So. 2d 203, 208 (Ala. Crim. App. 1981). The court's decision should not be reversed unless there was abuse of discretion. <u>Miller v. State</u>, 431 So. 2d 586, 591 (Ala. Crim. App. 1983).

Holloman also argues that the cumulative effect of the prosecutor's misconduct warrants reversal. The State asserts that, because there was no error in the specific instances alleged by Holloman, there is no cumulative error. <u>Minor v. State</u>, 780 So. 2d 707, 786 (Ala. Crim. App. 1999).

## XV. The Trial Court Committed No Error In Summarily Denying Holloman's Motion For New Trial Without A Hearing.

On July 8, 2003, Holloman filed a Motion for New Trial. All of the claims dealt with the State's alleged failure to present a prima facie case of the charged offenses and

42

prove the elements of the offenses. (C. 594-596)  On July

21, 2003, the trial court entered an order stating as

follows:  "The matters raised in the Motion for New Trial

were all presented to the Court during the course of the

trial and ruled upon adversely to the defendant.  Those

matters having been duly weighed and considered by the

Court the said Motion for New Trial is hereby denied."  (C.

597)

On appeal, Holloman speculates that, had the court

conducted a hearing rather than summarily denying the

Motion for New Trial, new evidence and issues could have

been presented.  This Court is not required to enter into

such speculation.  The trial court's ruling was proper

based upon the motion that was before it at that time.  A

trial court's decision to deny a motion for new trial will

not be disturbed on appeal unless there is a clear showing

of abuse of discretion.  This Court will indulge every

reasonable presumption in favor of the correctness of the

trial court's ruling.  Mims v. State, 816 So. 2d 509, 515

(Ala. Crim. App. 2001).

Because the issues presented in the Motion for New

Trial had already been presented and ruled upon at trial,

the trial court did not abuse its discretion in denying the motion.

**XVI. There Was Sufficient Evidence To Find Holloman Guilty Of Attempted Murder In CC-00-757 And CC-00-758.**

In addition to the capital murder charges, Holloman was charged with the attempted murders of John Gallia and Becky Clark in CC-00-757 and CC-00-758. (Supp. Record C. 44-47) At the close of the State's case-in-chief, the defense moved for a judgment of acquittal and, with respect to the attempted murder charges, Holloman argued that the State had not proved the "intentional element" of the charges and failed therefore to prove a prima facie case. (R. 1060) On appeal, Holloman alleges the State failed to prove the element of intent or the life threatening nature of Becky Clark and John Gallia's injuries.

Hollomon shot both of these individuals twice with a 20 gauge shotgun from a distance of only a few feet. (R. 513, 517, 520, 522) Becky lost bone in her shoulder, part of her stomach, and a large portion of her intestines. (R. 537-540) Gallia had a fractured left arm, gunshots to the left and right side of chest, a collapsed lung, and a

44

spinal cord injury that left him permanently paralyzed. (R. 878-9, 884)   The doctor who treated Gallia testified his injuries were life threatening.   These injuries are not, however, elements of attempted murder.

The elements of attempted murder under Sections 13A-4-2 and 13A-6-2, Code of Alabama (1975) are the specific intent to commit murder and an overt act toward commission of that intent.   Wells v. State, 768 So. 2d 412, 415 (Ala. Crim. App. 1999); Chaney v. State, 417 So. 2d 625, 626-7 (Ala. Crim. App. 1982).   Intent may be presumed from the use of a deadly weapon, the character of the assault, and other attendant circumstances surrounding the assault.   Chaney, at 626-627.

Holloman's use of a shotgun at close range, shooting both victims twice and in the torso, along with Holloman's statement to individuals that he was going to kill his wife and her boyfriend (R. 930), were sufficient evidence to allow the jury to conclude by fair inference that Holloman shot at Becky Clark and John Gallia with the intent to murder them.   Long v. State, 668 So. 2d 56, 60 (Ala. Crim. App. 1995).

Considering the evidence in the light most favorable to the State, the evidence of Holloman's intent to murder Becky Clark and John Gallia was sufficient to support a conviction for attempted murder. The court therefore properly denied his motion for judgment of acquittal and allowed the case to go to the jury.

## XVIII. The Trial Court Properly Denied Holloman's Motion For Change Of Venue.

On April 9, 2002, Holloman filed a motion for change of venue. (C. 243-247) On March 4, 2003, Holloman subsequently moved for a hearing before trial. (C. 4, 317-318) On April 2, 2003, a hearing was held on Holloman's change of venue motion. (Vol. V, April 2, 2003 hearing) (R. 2-43) During jury voir dire, the venirepersons were questioned extensively concerning what they had seen or heard in the newspapers and television reports about this case. Those that had some knowledge were questioned on whether they could put it aside and base their verdict strictly on the evidence from the witness stand. They were also asked if it would bias their minds and prejudice their verdict and prevent them from being fair and impartial. In

all instances, the jurors who served replied that they would not be affected by the media's coverage. (R. 297-328)

Holloman contends on appeal that the trial court erred in denying his motion for change of venue. The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge and that ruling will not be reversed absent an abuse of discretion. Nelson v. State, 440 So. 2d 1130, 1132 (Ala. Crim. App. 1983); Sockwell v. State, 675 So. 2d 4, 15 (Ala. Crim. App. 1993). The defendant must show evidence of prejudice than simply that the case generates widespread publicity. Oryang v. State, 642 So. 2d 979, 983 (Ala. Crim. App. 1993).

"The standard of fairness does not require jurors to be totally ignorant of the facts and issue involved." Murphy v. State, 421 U.S. 794, 799-800 (1975). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Ex parte Fowler, 574 So. 2d 745, 747 (Ala. 1990).

The record in this case of the juror voir dire supports the trial court's denial of the motion for change of venue.

Holloman failed to show that the pretrial publicity of this three-year-old crime so saturated the community as to make the trial nothing more than a hollow formality.  Ex parte Neal, 731 So. 2d 621, 624 (Ala. 1999).

## XIX.  The trial court properly refused to give Holloman's written requested jury instruction #13 and #19.

Holloman filed the following written requested jury charges at trial:

13.  I charge you, members of the jury that a person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:

(1)  Is armed with explosives or a deadly weapon; or

(2)  Causes physical injury to any person who is not a participant in the crime; or

(3)  Uses or threatens the immediate use of a dangerous instrument.

To convict the Defendant, James Hickman Holloman of capital murder in this case the State must prove beyond a reasonable doubt each of the following elements of burglary in the first degree:

1.  That the defendant, James Hickman Holloman, knowingly and unlawfully entered or remained unlawfully in the dwelling at 526 Malvern Road, Dothan, Houston County, Alabama, and;

48

2.   That the Defendant did so with intent to
commit a crime therein, and;

3.   That the Defendant, while effecting entry or
while in dwelling or in immediate flight
therefrom, he or another participant in the crime:
(1)  Was armed with explosives or a deadly weapon;
or (2) Caused physical injury to any person who is
not a participant in the crime; or (3)  Used or
threatened the immediate use of a dangerous
instrument.

If you find that the State has failed to prove
beyond a reasonable doubt any one or more of the
elements of the offense of burglary in the first
degree, then you cannot find the defendant guilty
of capital murder under this count.

(C. 530)

18.  I charge you, members of the jury, that the
only degree of kidnapping that a person can commit
if he or she voluntarily releases the victim,
alive, and not suffering from serious physical
injury, in a safe place prior to the Defendant's
apprehension is kidnapping in the second degree.

The court refused to give these two jury charges, and,

at the charge conference, no objection was made by

Holloman.  (R. 1657-1671)  Following the trial court's jury

charge, no objections were made concerning the failure to

give these written requested jury charges.  (R. 1817-1823)

Therefore, the State first argues that Holloman has not

preserved this issue under Rule 21.3, Ala.R.Crim.P.

Furthermore, the State asserts that #13 was properly refused because it was misleading, confusing as written, and the law on this matter was fairly and substantially covered in the court's oral charge. (R. 1754-1758)  As to #19, the trial court correctly noted that it was not applicable to the facts of this case.  (See Arguments IX and X in the State's brief)  When requested charges are either fairly and substantially covered by the trial court's oral charge or are confusing, misleading, not predicated on a consideration of the evidence, argumentative, abstract, a misstatement of the law, or contain misspelled or misused words that would tend to confuse the jury, the trial court may properly refuse to give such charges.  Ex parte Wilhite, 485 So. 2d 787, 789 (Ala. 1986).

## CONCLUSION

The State asserts that no reversible error occurred at Holloman's trial and that the judgment and sentence of the Circuit Court of Houston County is due to be affirmed.

Respectfully submitted,

Troy King
*Attorney General*

Andy S. Poole
*Assistant Attorney General*

Cecil G. Brendle, Jr.
*Assistant Attorney General*
Counsel of Record *

51

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of May, 2004, I

served a copy of the foregoing on the attorney for

Appellant, by placing the same in the United States Mail,

first class, postage prepaid and addressed as follows:

> Hon. Gary A. Hudgins
> P. O. Box 1142
> Dothan, AL  36302

Cecil G. Brendle, Jr.
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, AL  36130-0152
(334) 242-7401, 242-7357 *

149592/57212-001

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

### State of Alabama
### Judicial Building, 300 Dexter Avenue
### P. O. Box 301555
### Montgomery, AL 36130-1555

RELEASED

AUG 20 2004

CLERK
ALA COURT CRIMINAL APPEALS

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-02-1958                    Houston Circuit Court CC-00-755;
                                              CC-00-757; CC-00-758

James Hickman Holloman v. State of Alabama

WISE, Judge.

The appellant, James Hickman Holloman, was convicted of two counts of capital murder and two counts of attempted murder.[1] He was sentenced to life imprisonment without the

_____

[1]Holloman was charged in CC-00-755 with the capital murder of Jimmy Clark during a burglary or an attempt thereof, a violation of § 13A-5-40(a)(4), Ala. Code 1975, and the capital murder of Jimmy Clark during a kidnapping or an attempt thereof, a violation of § 13A-5-40(a)(1), Ala. Code 1975. Holloman was also charged with the attempted murders of John

1


EXHIBIT

D

possibility of parole for the capital-murder convictions, 75 years' imprisonment for the attempted murder of Becky Clark, and 50 years' imprisonment for the attempted murder of John Gallia. He was sentenced to 50 years' imprisonment for CC-00-757, 75 years' imprisonment for CC-00-758, and life without parole in CC-00-755. This appeal followed.

The evidence presented at trial established that Holloman had been married to Sherri Holloman for nine to ten years at the time of the offenses. During their marriage, the Hollomans lived in Prattville. Two children were born as a result of that marriage, 8-year-old Jamie and 6-year-old Leslie. There was a history of domestic abuse during the course of the marriage; the most recent incident occurred in April 2000, when Holloman broke Sherri's nose. As a result of this incident, Sherri planned to divorce Holloman. Thereafter, Sherri took the children and moved in with her parents, Jimmy and Becky Clark, in Rehobeth. While living with her parents, Sherri began dating John Gallia.

Holloman's father, who had observed that his son had anger-management problems, suggested that he seek professional help. On April 11, 2000, Holloman checked into Bradford Health Services. He admitted to the professionals there that he had substance abuse problems, marital problems, and that he had been charged with domestic assault. Holloman received in-patient rehabilitation between April 11 and May 1, 2000. His time at Bradford was not without consequence, however. On April 28, 2000, Becky Encizo, a Bradford counselor, was called outside by another patient to find Holloman, with his hand bleeding from hitting a post because he was upset about something.

On another occasion, Holloman's father called and told him that a private investigator had stated that Sherri was having an affair. Holloman told Encizo that he had to "take care of business." He then explained that he planned to "lie

---

Gallia (CC-00-757) and Becky Clark (CC-00-758), a violation of §§ 13A-4-2 and 13A-6-2, Ala. Code 1975. Holloman was also charged with the first-degree kidnapping of Sherri Holloman. However, at the close of the defendant's case, the trial court dismissed this charge.

in wait," kill his wife and her lover, then pen a suicide note and kill himself. Following this statement, Holloman ran into the woods behind the treatment facility. Officials at Bradford notified Sherri of this incident and recommended that she take herself and her children to a safe place. Holloman left Bradford on May 1, 2000.

On May 5, 2000, Holloman, who was in Prattville, had a conversation with his friend, Joey Oates. During the conversation, Holloman stated that his wife was visiting her mother in Dothan; he further stated that he was going to Dothan to kill his wife. Still in Prattville, Holloman went to another friend's house and borrowed a Mossberg 20 gauge pump-action shotgun. During this time, he was driving a red pick-up truck.

On May 6, 2000, Gallia and Sherri took the two children on a day trip to the beach. That same day, Sherri's father, Jimmy Clark, asked the Sheriff's department to patrol the neighborhood for the family's protection. That afternoon, Holloman telephoned the Clark residence and asked to speak to his children. Sherri's mother, Becky Clark, told him that they were gone to the beach. Holloman became hostile and told her that no one was going to keep his children away from him. Mrs. Clark told him that no one was trying to keep his children away from him, but that Sherri wanted a divorce. She told him that he could see the children any time he wanted as long as he worked it out with Sherri. Holloman reiterated that anybody who kept him from his children would be sorry. Frightened by the exchange, Mrs. Clark told her husband what had occurred.

Later that day, after Sherri, Gallia, and the children had returned from the beach, Holloman called back and had a telephone conversation with Sherri. The family assumed that Holloman was telephoning from Prattville.

At some point, between 8:00 and 8:30 p.m., Mrs. Clark looked up and saw Holloman standing a few feet away from her, armed with a shotgun. Jimmy Clark was sitting on one couch, Mrs. Clark was on another couch, and Gallia was sitting on the floor with eight-year-old Jamie resting against his leg. Sherri was in another room, and six-year-old Leslie was asleep in a bedroom. Holloman moved toward Gallia, who was unarmed,

and shot him in the back while he sat on the floor with Jamie. Next, Holloman shot Mr. Clark, and then shot Mrs. Clark in the shoulder and the stomach. Sherri came running from the computer room and begged Holloman to stop shooting. Instead, Holloman shot Gallia a second time. Sherri ran toward the back of the house with Holloman firing the gun and chasing after her. Holloman then dragged a screaming Sherri by her hair through the house. As he dragged Sherri through the house and out the back door, Holloman told one of his daughters that she needed to find herself a new mommy and daddy. Mrs. Clark told her granddaughter to check on Mr. Clark. The child shook him, but he did not move. The child got a towel for Mrs. Clark and helped to telephone 911 for emergency assistance.

Some of Clark's neighbors had observed a suspicious red truck driving up and down the Clark's street before the shootings. When they heard screams, the neighbors also telephoned for emergency assistance. Two young men ran toward the red truck as Holloman was placing Sherri in it. One of the men, John Daw, punched Holloman, who then put the shotgun on Daw's face. Holloman pulled the trigger, but nothing happened. Sherri pleaded for her husband to stop the killing and struggled to keep him from shooting Daw. Daw ran to his car and chased Holloman's truck, but he lost sight of it at an intersection.

Around 2:00 or 3:00 a.m., Holloman telephoned his father in Prattville from Florida. Later that morning, Holloman and Sherri arrived at Holloman's father's house in Prattville. Holloman gave his dad the shotgun and, after talking with the family, agreed to turn himself in to local authorities.

Forensic evidence was revealed that showed that the shell casings recovered from the crime scene came from the shotgun fired by Holloman. Additional testimony was offered to show that the cause of death for Jimmy Clark was multiple buckshot injuries to the base of the neck and upper chest, including a severed carotid artery and jugular vein. Becky Clark survived the attack, but lost bone in her shoulder, part of her stomach and a major portion of her intestines. John Gallia had a fractured arm, a collapsed lung, and suffered a life-threatening spinal injury from the shotgun blast that left him permanently paralyzed.

4

After hearing all of the evidence and being instructed on the law applicable to the case, the jury returned a verdict finding Holloman guilty of two counts of capital murder and two counts of attempted murder. This appeal followed.

I.

On appeal, Holloman argues that the trial court committed reversible error when it denied a motion for continuance so that he could obtain the testimony of John Gallia. Holloman's case had been continued from two pervious trial settings. The first continuance was granted so that Holloman could complete a psychiatric examination. Before the second scheduled trial date, defense counsel advised the court that he wanted to secure the attendance of John Gallia at trial. However, due to Gallia's reluctance to return to Alabama from California where he had moved after the shooting, and the hardship of travel due to his handicap, it was determined that a video deposition would suffice. The second continuance was granted for that purpose. On May 9, 2003, with all parties prepared and the court reporter and videographer present, Gallia did not appear for the deposition. Defense counsel wanted to be granted a third continuance to attempt to obtain an Alabama court order to be forwarded to the proper California court to compel Gallia's appearance for the deposition. During a hearing on the motion for continuance, the trial court learned from defense counsel that Gallia had attempted to extort money from counsel in exchange for his testimony, and had told them that he would never be served to appear in Alabama. The trial court was not convinced that Gallia's testimony was necessary and material for Holloman's defense and would, in fact, be inculpatory. The trial court denied the request for a continuance.

> "It is well settled that a motion for continuance is addressed to the sound discretion of the trial judge, whose exercise of that discretion will not be disturbed on appeal without proof that it was clearly abused. E.g., Arthur v. State, [711 So. 2d 1031] (Ala. Crim. App. 1996); Smith v. State, 698 So. 2d 189 (Ala. Crim. App. 1996); Long v. State, 611 So. 2d 443 (Ala. Crim. App. 1992). Review of a denial of a motion for continuance requires a review of the circumstances of the case,

5

including the reasons the defendant gave to the
trial judge in support of the motion, in order to
determine whether there was a clear abuse of
discretion. Arthur, supra."

R.D. v. State, 706 So. 2d 770, 783 (Ala. Crim. App. 1997).

In considering the circumstances of this case, it is
clear from the record that the trial judge was concerned by
the apparent desire to have testimony from one of the victims
in the case.    Indeed, the proceedings had already been
continued once in order to obtain testimony from Gallia.
However, the trial court was aware that the witness was
hostile, and another continuance would not guarantee that the
witness's participation could be obtained.  The trial judge
did not abuse his discretion by denying Holloman's motion for
a third continuance.

II.

Holloman makes several allegations that his trial counsel
rendered ineffective assistance. Specifically, he alleges (1)
that counsel failed to develop a defense concerning the
effects of medication; (2) that trial counsel failed to
effectively prepare to properly question witnesses at trial;
(3) that trial counsel was ineffective for failing to request
certain jury charges.  We find no need to analyze the merits
of Holloman's claims because he never presented or raised
these contentions at the trial court level; therefore they are
not properly before this Court. "Such claims cannot be
presented on direct appeal where they were not first presented
to the trial court." Willingham v. State, 796 So. 2d 440, 445
(Ala. Crim. App. 2001).

"'"[A]n ineffective-assistance-of-counsel claim must
be presented in a new trial motion filed before the
30-day jurisdictional time limit set by Rule
24.1(b), Ala. R. Crim. P., expires, in order for
that claim to be properly preserved for review upon
direct appeal."' [Montgomery v. State, 781 So. 2d
1007,] at 1010 [Ala. Crim. App. 2000)](quoting Ex
parte Ingram, 675 So. 2d 863, 865 (Ala. 1996))."

Id.

6

Because Holloman did not present these claims to the trial court in a motion for new trial, they are not properly before this Court.

III.

Next, Holloman argues that his trial counsel coerced him into not testifying at trial. This claim is being raised for the first time on appeal. Therefore, nothing has been preserved for this Court's review. Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003). Moreover, it appears that this claim is also another allegation of ineffective assistance of trial counsel, rather than a denial of his right to testify in his own behalf. Therefore, to the extent that this claim involves an allegation of ineffective trial counsel, the claim is likewise not properly before this Court for review. See Willingham v. State, supra.

IV.

Holloman contends that the trial court erred to reversal when it allowed testimony concerning statements he made to an employee of Bradford Health Services in the presence of a third party.

At trial, testimony was received from Rebecca Encizo, a social work counselor at Bradford's facility in Warrior. Defense counsel objected to the admission of Encizo's testimony based on the psychotherapist-patient privilege contained in Rule 503, Ala. R. Evid. After hearing voir dire testimony from Encizo and argument of counsel, the trial court overruled the objection of defense counsel and permitted Encizo to testify about conversations she had with Holloman, one that occurred outside the building and another that took place in the woods, wherein Holloman told Encizo that he had to leave the facility to kill his wife and her lover.

Rule 503(b) provides a patient privilege to refuse to disclose confidential communications made for purposes of diagnosis or treatment. Rule 503(a)(3) provides that a communication is confidential when it is not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation.

7

The record supports the admission of the testimony. Holloman was not engaged in a therapy session at the time of the admissions. The statements were knowingly made in the presence of a third party who was not necessary to the delivery of counseling services; thus, it was not a privileged communication. See generally, Advisory Committee's Notes to Rule 503, Ala. R. Evid., specifically subsection (a)(3). Because no privelege existed that would protect the statements from being admitted into evidence, the trial court properly overruled Holloman's objection.

V.

Next, Holloman contends that the trial court erred when it denied his motion to suppress the emergency 911 audiotape that originated from the scene of the crime.

At trial, Holloman argued that the inflammatory effect of the audiotape far outweighed the probative value of the evidence. After a suppression hearing, the trial court held that the audiotape was a part of the res gestae and was properly admissible.

> "'Generally, a person's statement concerning a startling occurrence made while he is perceiving the occurrence, or soon after his perception thereof, and while he is under the stress of a nervous excitement created by such perception, is admissible as tending to prove the truth of the matter asserted.'"

Dawson v. State, 675 So. 2d 897 (Ala. Crim. App. 1995) (quoting C. Gamble, McElroy's Alabama Evidence, § 265.01 (4th ed. 1991).

In this case, the 911 telephone call was made shortly after the crimes occurred when one of the gunshot victims, Becky Clark, with the assistance of her eight-year-old granddaughter, telephoned 911 for emergency assistance. The trial court properly admitted the 911 recording.

VII.

Holloman argues on appeal that his two capital murder

8

convictions -- one for the murder of Jimmy Clark during the commission of a burglary, and one for the murder of Jimmy Clark during a kidnapping -- violate the constitutional protections against double jeopardy. Again, because Holloman failed to raise this issue at the trial court level, it is not properly before this court.   "'[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.'"   Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003) (quoting McKinney v. State, 654 So. 2d 95, 99 (Ala. Crim. App. 1995).   The trial court will not be put in error on grounds raised for the first time on appeal.   Ex parte Frith, 526 So. 2d 880 (Ala. 1987).

Moreover, even if this issue had been preserved, Holloman would not be able to satisfy the requirements of Blockburger v. United States, 284 U.S. 299 (1932).   Holloman was charged with the capital murder of Clark during a kidnapping and the capital murder of Clark during a robbery.   Thus, each of the capital-murder charges required an element that the other did not; therefore, his convictions do not run afoul of the rule in   Blockburger.   See Williams v. State, 710 So. 2d 1276, 1320-21 (Ala. Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997).   No basis for relief exists as to this claim.

VII.

Holloman argues that the trial court erred when it "gave jury instructions that allowed the jury to infer that the mere killing of Jimmy Clark was committed in the course of a burglary by being committed after the privilege had been revoked."   Specifically, Holloman contends that, rather than unlawfully remaining on the premises, he obtained lawful entry to the house as an invited guest.   Holloman argues that testimony that could have been presented by John Gallia would have supported his argument.   The instructions challenged by Holloman related to remaining unlawfully in or upon a premises when an individual is not licensed, invited, or privileged to do so.

Holloman did not object to this charge when it was made at trial; thus, this claim is not properly before this Court. Rule 21.3, Ala. R. Crim. P., provides, in pertinent part:

9

"No party may assign as error the court's giving or
failing to give a written instruction, or the giving
of an erroneous, misleading, incomplete, or
otherwise improper oral charge, unless the party
objects thereto before the jury retires to consider
its verdict, stating the matter to which he or she
objects and the grounds of the objection."

In order to preserve an issue regarding jury instructions
for appellate review, the defendant must object before the
jury retires to deliberate.  See <u>Davis v. State</u>, 747 So. 2d
921, 924 (Ala. Crim. App. 1999); <u>Hinton v. State</u>, 632 So. 2d
1345, 1350 (Ala. Crim. App. 1993).  Because Holloman did not
object, nothing is preserved for this Court's review.

Moreover, to the extent that Holloman is arguing that his
trial counsel was ineffective for failing to provide a jury
instruction on this principle of law, this claim is not
preserved for appellate review for the reasons discussed in
Part II of our decision.  We further note that defense counsel
did, in fact, request a charge on this general principle of
law, which was given by the trial court as part of its oral
charge.  No basis for reversal exists as to this claim.

### VIII.

Holloman alleges that the trial court erred when it
allowed the charge of capital murder during the course of a
kidnapping to go to the jury.  In an indictment not made a
part of this record, Holloman was charged with first-degree
kidnapping of his estranged wife, Sherri Holloman.  At the
close of the State's case-in-chief, defense counsel moved for
a judgment of acquittal with respect to each of the
individual charges against Holloman.  The trial court
expressed concern about the first-degree kidnapping charge,
but nonetheless denied the motion at that time.  At the close
of all the evidence, the trial court ruled that the evidence
was sufficient to support capital murder during the course of
a kidnapping or an attempt thereof, but granted Holloman's
motion for acquittal with respect to the first-degree
kidnapping charge.  On appeal, Holloman now argues that
because the first-degree kidnapping charge was dismissed on
the ground that the victim was released without harm, before
apprehension, and in a safe place, the trial court erred in

10

not dismissing the charge of capital murder during the course of kidnapping Sherri Holloman.  We disagree.

It is enough to sustain a conviction under § 13A-5-40(a)(1), Ala. Code 1975, for the capital offense of murder during a kidnapping, if the State proved beyond a reasonable doubt: (1) a kidnapping in the first degree, as defined by § 13A-6-43(a), or an attempt thereof; (2) an intentional murder, as defined by § 13A-6-2(a)(1); and (3) that the murder was committed during the course of the kidnapping or attempted kidnapping.  See Boyd v. State, 542 So. 2d 1247, 1256 (Ala. Crim. App. 1988).

As the State correctly notes in its brief to this Court, § 13A-6-43(b), Ala. Code 1975, provides that one does not commit the offense of kidnapping in the first degree if he voluntarily releases the victim alive, and not suffering from serious physical injury, in a safe place prior to apprehension.  However, § 13A-6-43(b) goes on to state that this defense to first-degree kidnapping "does not apply to a prosecution for or preclude a conviction of kidnapping in the second degree or any other crime."  (emphasis supplied). Given this language, the fact that Holloman was not convicted of the first-degree kidnapping as originally charged in the indictment, does not prevent him from being convicted of the capital murder of Clark which was committed before he renounced his plan to kidnap Sherri Holloman.  Thus, no basis for reversal exists as to this claim.

Holloman also argues that the trial court committed reversible error when it instructed the jury on capital murder and first-degree kidnapping, yet failed to give instructions on second-degree kidnapping.[2]  Defense counsel never requested that the trial court give an instruction on second-degree kidnapping.  Moreover, counsel made no objection when the court recharged the jury.  "No party may assign as error the court's...failing to give a written instruction...unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the

---

[2]We note that when the State tried to amend the charge to second-degree kidnapping, defense counsel objected.  (R. 1530.)

11

grounds of the objection." Rule 21.3, Ala. R. Crim. P. In order to preserve an issue regarding jury instructions for appellate review, the defendant must object before the jury retires to deliberate. See <u>Davis v. State</u>, supra. Therefore, this issue is not properly preserved for our review.

X.

Next, Holloman contends that the trial court erred when it denied his request for certain jury charges. Specifically, the trial court refused to give Requested Charges 17 and 18. Requested Charge 17 stated:

"17. I charge you, members of the jury that a person does not commit the crime of kidnapping in the first degree if he voluntarily releases the victim alive, and not suffering from serious physical injury, in a safe place prior to his apprehension.

"To convict the Defendant, James Holloman of capital murder in this case, the State must prove beyond a reasonable doubt each of the following elements of kidnapping in the first degree:

"First, that the defendant, James Holloman, abducted Sherri (Holloman) McSwain in Houston County, Alabama and;

"Second, that the defendant did so with intent to:

"1) Hold her for ransom or reward; or

"(2) Use her as a shield or hostage; or

"(3) Accomplish or aid the commission of any felony or flight therefrom; or

"(4) Inflict physical injury upon her, or to violate or abuse her sexually; or

"(5) Terrorize her or a third person; or

"(6) Interfere with the performance of any

12

governmental or political function.

"Further, in order to convict James Hickman Holloman of capital murder under this count of the indictment, you must find from the evidence that the State has proved beyond a reasonable doubt the following elements:

"(1) That James Hickman Holloman DID NOT voluntarily release Sherri (Holloman) McSwain ali; AND

"(2) That she WAS suffering from serious physical injury; AND

"(3) That she WAS NOT released in a safe place; AND

"(4) That said release WAS NOT prior to his apprehension.

"If you find from the evidence that the State has failed to prove beyond a reasonable doubt each of the above elements of the offense of kidnapping in the first degree as charged, then you cannot find James Hickman Holloman guilty of capital murder under this count of the indictment."

(C.R. 531-32).

Requested Charge 18 provided:

"18. With regard to count II of the capital murder indictment, wherein the defendant is charged with committing murder while in the course of a kidnapping in the first degree, I charge you, members of the jury, that if you find from the evidence that the Defendant, James Hickman Holloman, voluntarily released Sherri (Holloman) McSwain, alive, and not suffering from serious physical injury, in a safe place prior to his apprehension, then you cannot find James Hickman Holloman guilty of capital murder under count II of the capital murder indictment."

(C.R. 532).

13

At trial, defense counsel objected after the court's jury instruction that it did not include the affirmative defense found in the first-degree kidnapping statute at § 13A-6-43(b). The trial court responded by stating that the particular affirmative defense had no application as a defense to capital murder, but only to first-degree kidnapping.

As stated in Part VIII, although the release of the victim unharmed would mitigate against a conviction for first-degree kidnapping, it has no bearing on the charge of capital murder. See § 13A-6-43(b). Thus, the trial court was correct in refusing to give Requested Charges 17 and 18. Requested instructions are properly refused if they are not supported by the facts of the case. <u>Washington v. State</u>, 818 411, 423 (Ala. Crim. App. 1998).

X.

Next, Holloman argues that the trial court erred to reversal when the trial judge stepped inside the jury deliberation room to tell the jury something that he had forgotten -- that their verdict must be unanimous. The court informed the parties that the court reporter would accompany him in order to transcribe this part of the proceeding. Counsel for the parties stipulated that this procedure was acceptable and no objection was made to the trial court's actions.

To preserve an issue for appellate review, it must be presented to the trial court through timely objection and we will not hold the trial court in error on grounds raised for the first time on appeal. <u>Ex parte Frith</u>, 526 So. 2d 880 (Ala. 1987). Moreover, because defense counsel stipulated to the propriety of the court's conduct, he is estopped from arguing that such action was error. See <u>Taylor v. State</u>, 808 So. 2d 1148, 1202 (Ala. Crim. App. 2000), aff'd, 808 So. 2d 1215 (Ala.2001).

Finally, we note that to the extent that Holloman attempts to couch his claims in the form of an ineffective assistance of counsel argument based on counsel's failure to object to the trial court's actions, such a claim was not preserved for appellate review, based on the grounds discussed in Part II of this decision.

14

XI.

Next, Holloman argues that the State was guilty of prosecutorial misconduct, based on remarks made by the prosecutor attacking the veracity of his attorneys which prejudiced his defense. Specifically, Holloman contends that during closing arguments the prosecutor told the jury, in essence, that defense counsel was lying to them. The record reveals no objection to the prosecutor's remarks at trial. Thus, this issue is not properly preserved for appellate review.

As previously noted, the trial court will not be put in error on grounds raised for the first time on appeal. Ex parte Frith, 526 So. 2d 793, 794 (Ala. 1987). Furthermore, even if the comment was improper, it would not warrant reversal. "'Statements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth.'" Stephens v. State, 580 So. 2d 11, 22 (Ala. Crim. App. 1990), aff'd, 580 So. 2d 26 (Ala. 1991) (quoting Harris v. State, 539 So. 2d 1117, 1123 (Ala. Crim. App. 1988).

Holloman also argues that the State committed prosecutorial misconduct when it presented graphic autopsy photographs of the victim Jimmy Clark as evidence, knowing that the photographs would elicit an emotional response from prosecution witness Becky Clark. We note that the photographs were not shown to Becky Clark. Rather, they were identified by the physician who performed the autopsy on the victim. Moreover, the photographs were relevant, admissible evidence. See Ex parte Siebert, 555 So. 2d 780, 783-84 (Ala. 1989). Accordingly, no basis for reversal exists.

XII.

Holloman also argues that the State committed prosecutorial misconduct by conducting improper closing argument to the extent that the trial court should have granted a mistrial. Specifically, the record reveals the following:

"[Prosecutor]:    Mr. Decker says, poor Holloman is sick.    He's got a personality

15

disorder.  He's had that from the
day he was born.    He will have
that till the day he dies.    You
can't cure that.

"You know how Mr. Decker wants
you  to cure it?  Find him guilty
of manslaughter and put him back
in the community.    Decker-

"[Defense Counsel]: Objection, your Honor.

"[Prosecutor]:      That is what he wants you to do.

"[Defense Counsel]:That is not exact -- that is not
the law to put him back in the community.  The jury
knows and Mr. Valeska knows, that if he is found
guilty   of   manslaughter   that   this   court   will
incarcerate him for a period of time according to
the State statute.

    "Mr. Valeska knows that he will not be released
into the community and that is an improper argument.
We move for a mistrial at this time.

"[The Court]:        And I overrule the motion for a
                    mistrial,    but    ladies    and
                    gentlemen, that would not be a
                    correct statement of the law and
                    you are not to consider that when
                    you come to weigh and consider
                    the evidence and make up your
                    verdict in this case.  Go ahead,
                    Mr. Valeska."

(R. 1727-28).

    "[A] prosecutor has the right to 'reply in kind' to
statements made by defense counsel in the defense's closing
argument." Ex parte Musgrove, 638 So. 2d 1360, 1369 (Ala.
1993), cert. denied, Rogers v. Alabama, 513 U.S. 845, 115 S.
Ct. 136, 130 L. Ed. 2d 78 (1994).  The prosecutor's remark was
not reversible error.

> "'It is a well-decided rule of this court that
> the granting of a mistrial is an extreme measure and
> should be taken only when it is manifestly necessary
> or when the ends of justice would otherwise be
> defeated. Hagood v. State, 588 So.2d 526 (Ala. Crim.
> App. 1991), cert. denied, Martin v. Alabama, [504]
> U.S. [911], 112 S. Ct. 1943, 118 L. Ed.2d 548
> (1992).   "[T]he trial judge is allowed broad
> discretion in determining whether a mistrial should
> be declared because he is in the best position to
> observe the scenario, to determine its effect upon
> the jury, and to determine whether a mistrial should
> be granted." Garrett v. State, 580 So.2d 58 (Ala.
> Crim. App. 1991).'"

Stone v. State, 641 So. 2d 293, 298 (Ala. Crim. App. 1993)
(quoting Harrell v. State, 608 So. 2d 434, 436 (Ala. Crim.
App. 1992)).  "'"When there is no showing to the contrary, the
presumption is always in favor of correct action on the part
of the trial judge."'" Wilson v. State, 651 So. 2d 1119 (Ala.
Crim. App. 1994) (quoting Thomas v. State, 555 So. 2d 1183,
1184 (Ala. Crim. App. 1989) (quoting, in turn, Ballard v.
State, 236 Ala. 541, 542, 184 So. 260 (1938)).  Because the
prosecutor's remark was a reply in kind, the trial court did
not abuse its discretion in denying Holloman's mistrial
motion.

XIII.

    Holloman argues that the trial court erred to reversal
when it summarily denied his motion for new trial without a
hearing.   Specifically, the record reveals that all of the
claims in Holloman's motion for a new trial concerned the
State's alleged failure to present a prima facie case of the
charged offenses.   The trial court, in a detailed written
order, determined that all of the matters raised in the motion
for new trial had been raised during the course of the trial
and the outcome was adverse to the appellant.   The trial court
ruled that the motion was properly due to be denied.

    A trial court's decision to deny a motion for a new trial
will not be disturbed on appeal unless there is a clear
showing of abuse of discretion, and this court will indulge
every reasonable presumption in favor of the correctness of

the trial court's ruling. <u>Mims v. State</u>, 591 So. 2d 120 (Ala. Crim. App. 1991); <u>Nichols v. State</u>, 500 So.2d 92 (Ala. Crim. App. 1986). Here, the trial court expressed that the issues presented in the motion for new trial had already been raised and ruled upon at trial. We find no abuse of discretion by the trial court.

XIV.

Holloman also claims that there was insufficient evidence to support his conviction for the attempted murders of Gallia and Becky Clark. Specifically, he argues that the State failed to prove the intent element or the life-threatening nature of these victims's injuries.

As previously stated, Holloman shot Gallia and Becky Clark at close range with a shotgun. Becky's injuries resulted in her loss of bone in her shoulder, the loss of her stomach and a large portion of her intestine. Gallia suffered a fracture to his arm, gunshot wounds to the chest, a collapsed lung, and a spinal cord injury that left him paraplegic.

In order to sustain a conviction for attempted murder, the State's burden is to prove that the specific intent to commit murder existed and that an overt act toward the commission of that intent was executed. See § 13A-4-2 and § 13A-6-2, Ala. Code 1975. Obviously, the record supports the trial court's finding that there was sufficient evidence to sustain both of the attempted murder convictions.

XV.

Next, Holloman argues that the trial court erred when it failed to grant his motion for change of venue. We disagree.

The Alabama Supreme Court, in <u>Ex parte Grayson</u>, 479 So. 2d 76 (Ala. 1985), set out the standard for determining whether to grant a criminal defendant's motion for a change of venue on the basis of publicity surrounding the case:

> "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. In order [for the court] to

18

grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Newspaper articles or widespread publicity, without more, [is] insufficient to [support] a motion for change of venue.

"...

"'The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Thus, "[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination."'

479 So. 2d at 80 (citations omitted) (quoting Anderson v. State, 362 So. 2d 1296, 1299 (Ala. Crim. App. 1978)). Here, during juror voir dire, the venirepersons were questioned extensively concerning their exposure to pretrial newspaper and television reports about the offenses. Those who indicated that they had some knowledge of the case were questioned further, specifically as to whether they could put that knowledge aside and render a verdict based strictly on the evidence presented at trial. Additionally, they were asked whether that knowledge would cause them to be biased and prejudice their verdict. We find nothing in the record below to suggest that the jurors could not or did not render a verdict based solely on the evidence presented at trial. The trial court did not abuse its discretion in denying the motion for change of venue.

XVI.

Holloman argues that the trial court erred to reversal when it refused to give certain requested jury charges at trial. Specifically, the jury charges were as follows:

"13. I charge you, members of the jury that a person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein,

19

and, if, in effecting entry or while in a dwelling or in immediate flight therefrom, he or another participant in the crime:

"(1) Is armed with explosives or a deadly weapon; or

"(2) Causes physical injury to any person who is not a participant in the crime; or

"(3) Uses or threatens the immediate use of a dangerous instrument.

"To convict the Defendant, James Hickman Holloman, of capital murder in this case the State must prove beyond a reasonable doubt each of the following elements of burglary in the first degree:

"1. That the Defendant, James Hickman Holloman, knowingly and unlawfully entered or remained unlawfully in the dwelling at 526 Malvern Road, Dothan, Houston County, Alabama, and;

"2. That the Defendant did so with intent to commit a crime therein, and;

"3. That the Defendant, while effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime: (1) Was armed with explosives or a deadly weapon; or (2) Caused physical injury to any person who is not a participant in the crime; or (3) Used or threatened the immediate use of a dangerous instrument.

"If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of burglary in the first degree, then you cannot find the Defendant guilty of capital murder under this count."

(C. 530.)

"19. I charge you, members of the jury, that the only degree of kidnapping that a person can commit

20

if he or she voluntarily releases the victim, alive,
and not suffering from serious physical injury, in
a safe place prior to the Defendant's apprehension
is kidnapping in the second degree."

(C. 533.)

Our review of the transcript of the charge conference
reveals that no objection was made concerning the denial of
either of these two charges. Likewise, defense counsel failed
to object to the court's failure to give these charges at the
conclusion of the court's oral charge, before the jury retired
to deliberate. Given these circumstances, Holloman did not
properly preserved this matter for appellate review; thus,
this issue is not properly before this Court. See Rule 21.3,
Ala. R. Crim. P.; Davis v. State, supra.

In any event, we note that the trial court's refusal to
give the aforementioned charges was proper. Requested Charge
13 was covered in the trial court's instructions. See
Hammonds v. State, 777 So. 2d 750, 773 (Ala. Crim. App. 1999)
(no error occurs in refusing to give requested charge that is
substantially covered by the trial court's oral charge).
Requested Charge 19 was not applicable to the facts of this
case. See Britton v. State, 631 So. 2d 1073, 1080 (Ala. Crim.
App. 1993) (no error in refusing to give requested charge that
is not applicable to the facts of the case).

Based on the foregoing, the judgment of the trial court
is due to be, and is hereby, affirmed.

**AFFIRMED.**

McMillan, P.J., and Cobb, Baschab, and Shaw, JJ., concur.

21

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

September 17, 2004

**CR-02-1958**

James Hickman Holloman v. State of Alabama  (Appeal from Houston  Circuit Court:
CC00-755; CC00-757; CC00-758)

## <u>NOTICE</u>

You are hereby notified that on September 17, 2004 the following action was taken in
the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Judy Byrd, Circuit Clerk
Gary A. Hudgins, Attorney
Cecil G. Brendle, Jr., Asst. Atty. Gen.



EXHIBIT

*E*

# IN THE SUPREME COURT OF ALABAMA



December 10, 2004

**1040023**

Ex parte James Hickman Holloman.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: James Hickman Holloman v. State of Alabama)  (Houston Circuit Court: CC00-755; CC00-757; CC00-758; Criminal Appeals : CR-02-1958).

## <u>CERTIFICATE OF JUDGMENT</u>

### <u>Writ Denied</u>

    The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.

    WOODALL, J. -  Nabers, C.J., and Houston, Lyons, and Johnstone, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this _10th_ day of _December,  2004_

Clerk, Supreme Court of Alabama

**EXHIBIT**

_F_

PENGAD 800-631-6989

/bb

FILED

DEC – 5 2005

RICHIE72/7/05

CLERK
ALA COURT CRIMINAL APPEALS

IN THE ALABAMA COURT OF CRIMINAL APPEALS

ATTORNEY GENERAL'S COPY

**CR-05-0245**

James Hickman Holloman,
Petitioner/Appellant, Pro se,

v.

State of Alabama,
Respondent/Appellee

---

ON APPEAL
DENIAL OF RULE 32 PETITION BY CIRCUIT JUDGE WHITE
IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA
CASE NUMBERS CC-2000-755 THROUGH 758.60.

---

BY:

James Hickman Holloman
#229746 (G4A-106)
1000 St. Clair Road
Springville, Alabama 35146-5582

---

NO ORAL ARGUMENT REQUESTED

---

PENGAD 800-631-6989

EXHIBIT

G

## TABLE OF CONTENTS

Table of Contents...................................................................................................2

Table of Authorities................................................................................................3

Statement of Case ...............................................................................................4-8

Issue presented for review ........................................................................ ..............8

Statement of Facts.............................................................................................8-11

Standard of Review...............................................................................................12

Summary of Argument ....................................................................................12-13

Argument One...............................................................................................13-15

Argument Two...............................................................................................15-26

Cumulative Claim..........................................................................................26-38

Conclusion ..........................................................................................................38

Certificate of Service ...........................................................................................39

# TABLE OF AUTHORITIES

## RULES OF COURT, A.R.CR.P.                                    PAGE

9.1...............................................................................................................9, 10, 12
13.3(c) ......................................................................................................................10
32.1(b)......................................................................................................................10
32.2(d)......................................................................................................................11
1.2(A), A.R. Pro.Con. .............................................................................................26

## CODE OF ALABAMA 1975

13A-3-1(c)................................................................................................................14
13A-3-2(a)(b)...........................................................................................................27

## CASE LAW

*Berness v. State*, 40 Ala. App. 106 So.2d 738 (1958)............................................12
*Chavers v. State*, 361 So.2d 1106, 1107 (Ala.1987)..............................................28
*Coon v. Tate*, 494 So.2d 184, 187 (Ala.Cr.App. 1986) .........................................28
*Crosslin v. State*, 446 So.2d at 682 ......................................................................28
*Daniels v. State*, 650 So.2d 544, 552 (Ala.Cr.App. 1994).....................................25
*Davis v. State*, 682, So.2d 476 (Ala.Cr.Cpp. 1995)...............................................14
*Elder v. State*, 494 So.2d 922 (Ala.Cr.App. 1986) ................................................14
*Ex parte Anthony*, 565 So.2d 565 (Ala. 1990) ......................................................15
*Ex parte Lawley*, 512 So.2d 1370, 1370, 1371 (Ala. 1987)...................................22
*Fletcher v. State*, 621 So.2d at 1020-21 ...............................................................28
*Hammond v. State*, 776 So.2d 884 (Ala.Cr.App. 1998)..........................................27
*Frazier v. State*, 758 So.2d 577 (Ala.Cr.App.) 758, So.2d 611 (Ala.Cr.App. 1999)..............23
*Haynes v. State*, 40 Ala. App. 106, 109 So.2d 738 (1958) ....................................12
*Hill v. Lockhart*, U.S. 106  . Ct. 366, L.Ed.2d (1986)...........................................11
*Holladay v. State*, 545 So.2d 213 (Ala.Crim.App. 1989) .....................................
Cert. Den., 545 So.2d 213 (Ala. 1989) ............................................................10, 13
*Nichols v. Butler*, 952 F.2d 1550 (11th Cir. 1992) ...............................................16, 26
*Owen v. State*, 611 So.2d 1126 (Ala.Cr.App. 1992).............................................28
*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984)...............11, 22
*United States v. Lewis*, 592 F. 2d 1282 (5th Cir. 1979)........................................28

STATEMENT OF CASE

Holloman prosecuted a pro se Rule 32 post conviction petition in the Circuit Court of Houston County, Alabama.

Holloman raised the following two grounds and twenty three claims, to wit:

Ground 1    THE COURT WAS WITHOUT JURISDICTION TO RENDER A JUDGMENT OR TO IMPOSE SENTENCE.

1. Claim: Holloman was deprived of the right to be present during the giving of additional jury instructions. (C.R. 14-17).

2. Claim: The trial court deprived Holloman of his right to be present and heard during an exclusive bench conference concerning the consolidation of an offense charged in a separate indictment. (C.R. 22-25).

3. Claim: Holloman's indictment Counts One and Two for capital murder both wholly fail to charge he acted intentionally with respect to conduct described by the statute defining intentional murder to signify his purpose was to engage in that conduct. (C.R. 27-29).

4. Claim: Holloman's indictments for attempted murder on John Gallia and Becky Clark wholly fail to charge he acted intentionally with respect to the result to signify his purpose was to cause that result. (C.R. 29).

5. Claim: Holloman's indictments for attempted murder wholly fail to charge the overt act caused the victim's serious physical injury to encompass the lesser offense of assault in the first degree to constitute the greater indicted offense. (C.R. 30-31).

Ground 2    THE CONSTITUTION OF THE UNITED STATES OR THE STATE OF ALABAMA REQUIRES A NEW TRIAL, A NEW SENTENCE PROCEEDING, OR OTHER RELIEF FOR DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL.

4

1. Claim: Holloman claims both his trial counsel, Brantley and Decker, are ineffective because they did not object to the trial courts actions of giving additional instructions to the petit jury in the Defendant's absence and without waiver of his right to continuous presence. (C.R. 18-22).

2. Claim: Holloman claims his appellate counsel Hudgins was ineffective because he raised an ineffective assistance of trial counsel argument on direct appeal that was not preserved for appellate review, because it was not raised on motion for new trial that the trial court erred to reversal when the trial Judge stepped inside the jury deliberation room to tell the jury something that he had forgotten—that the verdict must be unanimous. (C.R. 18-22).

3. Claim: Trial counsel did not inform Holloman they filed motions for consolidation of cases and waived his right to be present and heard during the bench hearing with the court for consolidation of an offense charged in a separate indictment. (C.R. 25-27).

4. Claim: Holloman claims his trial counsel failed to object when the trial court failed to instruct the petit jury that the Defendant has the burden of proving the defense of insanity by clear and convincing evidence. (C.R. 31-33).

5. Claim: Holloman claims his trial counsel was ineffective for failing to call Sherri Holloman as a witness to the crime and to her infidelity. (C.R. 33-34).

6. Claim: Holloman claims he was deprived of the right to testify on his own behalf at trial. (C.R. 34-36).

7. Claim: Holloman claims his trial counsel was ineffective because they coerced him into not testifying at trial. (C.R. 36-39).

5

8. Claim: Trial counsel was ineffective for failing to develop a defense concerning the effects of the medications he was taking and the effects of abruptly discontinuing the medications. (C.R. 39-42).

9. Claim: Trial counsel was ineffective for failing to get certified by a Psychologist that Holloman needed a C.T. Scan examination for his defense of insanity after the trial Court denied the Ex parte motion for C.T. Scan examination. (C.R. 53-55).

Cumulative claim of ineffective assistance of counsel. (C.R. 42-53).

10. Counsel failed to develop a defense concerning the effects and discontinuance of the medications Holloman had been taking before and at the time of the incident.

11. Counsel did not review thorough enough with Holloman to know what questions Holloman wanted asked to the witnesses for their answers and counsel failed to object or ask questions to explain evidence that was elicited by the prosecution.

12. Counsel failed to object to the District Attorney portraying Holloman as taking psychology for the purpose of playing crazy.

13. Counsel failed to object to the district attorney bringing out evidence that Holloman had a pair of binoculars in his truck for stalking.

14. Counsel failed to cross examine Becky Clark's statement: "you are going to need to get a new mommy and daddy", addressed to the children.

15. Counsel did not do enough pretrial interviewing with Holloman.

16. Counsel coerced Holloman into not testifying on his behalf.

17. Counsel failed to request a jury charge similar to the intoxication charge.

18. Appellate counsel failed to raise any of these claims on motion for new trial before appeal.

6

The Respondent filed a motion for summary disposition alleging, to wit:

1.  The petition fails to state a claim for which relief may be granted.

2.  The grounds in the petition either were raised at trial or could have been but were not raised at trial.

3.  The grounds in the petition were raised on appeal or could have been raised but were not raised on appeal.

4.  The grounds and facts do not amount to newly discovered evidence.

5.  The petitioner alleges that he was deprived of the right to be present during the giving of additional jury instructions.  This claim was addressed by the court of criminal appeals wherein they stated, "because defense counsel stipulated to the propriety of the court's conduct, he is estopped from arguing that such action was error."

6.  The petitioner alleges that the court deprived him of his right to be present during a bench conference hearing concerning consolidation of offenses.  The record shows that the petitioner was present and it does not show that he was prevented from participating.  The record further shows that the defense consented to the consolidation.

7.  The petitioner alleges that the indictment charging him with capital murder failed to charge that he acted intentionally—This issue is without merit in that the indictment is in all respects in proper form.

8.  The Court's instructions to the jury regarding the issue of mental disease or defect was proper.

9.  The petitioner was not deprived of his right to testify and the record reflects the same.

10.  Trial strategy of defense counsel should not be subjected to Monday quarterbacking. The trial strategy of the petitioner's attorneys does not amount to ineffectiveness.

11. Because a jurisdictional issue does not exist, the petitioner should be barred by the one year statute of limitations. The court of Criminal Appeals issued it's Certificate of Judgment on August 20, 2004 according to petitioner.[1] The petition was not prepared until September 27, 2005 and filed on September 29, 2005.

12. The State denies each and every allegation contained within the petition. (C.R. 61-62).

On October 18, 2005, the trial court dismissed the petition, to wit: "Motion for summary disposition granted. Issues raised by the Defendant in this Rule 32 petition were raised or should have been raised on appeal. Rule 32 petition is hereby dismissed." (C.R. 63).

ISSUE PRESENTED FOR REVIEW

WHETHER OR NOT THE TRIAL COURT ABUSED IT'S DISCRETION WHEN IT SPECIFICALLY DENIED HOLLOMAN'S RULE 32 PETITION BECAUSE HIS CLAIMS WAS RAISED OR SHOULD HAVE BEEN RAISED ON DIRECT APPEAL OR THE COURT'S DECISION IS CORRECT FOR ANY REASON THOUGH NOT STATED?

STATEMENT OF FACTS

In addition to the instant record on appeal, Holloman moves this Court to take judicial notice of it's own records of this case matter.

This is a capital murder case including other triable offenses. The petitioner in this case is James Hickman Holloman. He was charged by the Houston County, Alabama Grand Jury with (1) Capital Murder of Jimmy Clark during a burglary of Clark's dwelling; (2) Count Two: Capital Murder of Jimmy Clark during a kidnapping of Sherri Holloman; (3) Attempted Murder

---

[1] The petitioner reflects the date of the result of the court of Criminal Appeals opinion. The Alabama Court of Criminal Appeals issued it's certificate of Judgment on December 13, 2004 A.D.

of Becky Clark; (4) Attempted Murder of John Gallia; and (5) Kidnapping of Sherri Holloman in which the trial court dismissed during the trial.

Holloman pleaded not guilty and not guilty by mental disease or defect. After a trial by jury, Holloman was convicted for both counts of capital murder of Jimmy Clark and sentenced to life without the possibility of parole and was convicted for both indictments of attempted murder and was sentenced to seventy-five years for victim Becky Clark and fifty years for victim John Gallia.

The Alabama Court of Criminal Appeals affirmed by memorandum Holloman's direct appeal. The Alabama Supreme Court denied Holloman's petition for writ of certiorari. This rule 32, Ala.R.Civ.P., post conviction petition for relief of conviction and sentence, is as follows:

This case involves seven persons: one Defendant, James Hickman Holloman; four victims, Jimmy Clark, Becky Clark, Sherri Holloman, and John Gallia; two witnesses, Jamie Holloman and Leslie Holloman were both asleep during the incident.

It is a fact, Petitioner Holloman did not testify during trial. Jimmy Clark was deceased. Jamie and Leslie Holloman were not present and did not testify. John Gallia was not present during the trial and did not testify. Sherri Holloman was present during the trial but did not testify. Becky Clark was present and did testify during the trial as the State's only eyewitness, to wit:

Becky Clark testified that she was married to Jimmy Clark at the time (C.R. 461). Sherri Holloman is her daughter (R. 462). She testified she knew John Gallia (R. 486).

Becky Clark testified Petitioner Holloman entered uninvited into her home at about 8:00 or 8:30 p.m. on May 6, 2000, and he was holding a shotgun (R.510). She testified petitioner fied the fun into Gallia's back while Gallia was looking at Holloman (R. 513). Then Holloman fired

9

and shot James Clark and fired again and shot Becky Clark in her shoulder (R. 517), and then

shot her again in the stomach (R. 520). Holloman then shot John Gallia again (R. 522). Becky

Clark testified she heard two more shots fired as Sherri Holloman ran back toward the back of

the house (R. 524). Becky Clark testified she thought they all were going to die (R. 525). Becky

Clark testified Holloman was dragging Sherri Holloman by the hair of the head and that she was

screaming and pulling back (R. 527). Becky Clark testified Holloman said to his eight year old

daughter, Jamie Holloman, that she needed to find her a new momma and daddy (R. 531).

Becky Clark testified Gallia shot his pistol twice into the ceiling (R. 534).

On cross examination, Becky Clark testified she did not lock the back door when she

knew Holloman was coming over (R. 614) and knew Holloman always comes in through the

back door (R. 619) and at that point and time, Becky Clark did not tell Holloman he could not

come over (R. 620).

In addition to the only eyewitness of Becky Clark testifying thirty-one other witnesses

testified, twenty-two during trial and nine during Holloman's sentencing.

Dr. John R. Goff is a Neuropsychologist (R.1376). He testified Holloman had below

average intelligence (R. 1394). He determined Holloman was depressed (R. 1405). He testified

he did not honestly know if Holloman was insane or not at the time of the incident (R. 1418).

Dr. Goff believes Holloman has a borderline personality disorder (R. 1422), and that Holloman

had this disorder during the time of the shootings (R. 1423). Dr. Goff found that Holloman

tended to be paranoid (R. 1425). He testified Holloman needed treatment (R. 1430). Dr. Goff

testified the personality disorder is a serious mental or emotional disorder (R. 1431). Dr. Goff

testified that if Holloman did not have the personality disturbance, the shooting would not have

10

happened (R.1432). Dr. Goff testified Holloman was decompensated to the point where he was not interpreting things adequately or rationally during the time of his shooting (R.1461).

Dr. Robert Anthony DeFransico is a State Forensic Psychologist (R. 1476). He believed Holloman is an individual who is volatile, very moody, over reacts to situations, tends to misinterpret things, and gets confused (R. 1497). Holloman is prone to dysfunctional thinking (R.1498). He testified Holloman has a delusional disorder in which there is a non-bizarre delusion (R.1512). Dr. DeFrancisco believed Holloman's judgment was impaired during the time of the shooting (R.1520), and that the shootings were based on impulse by the delusion that Holloman was suffering from at the time (R. 1523). Dr. DeFrancisco believes Holloman had a hard time being compliant because he thinks he is doing well when he is not (R. 1432 and 1543). He testified Holloman was delusional during the commission of the acts (R. 1548). Dr. DeFrancisco testified in his opinion there was never a period of time when he did not believe that he was not going to see his children. He believed he was not going to see his children anymore and that the in-laws and the boyfriend were responsible for this action, this injustice against him. He acted on that, which made him very resentful, very angry, and he became very violent. It is not uncommon for people with borderlines and who are very delusional to become very violent, and they have impaired occupational functioning, they have impaired social judgment, and these actions are irrational because he believes certain faulty premises about his children. (R. 1557).

Dr. Doug McKeown is a Clinical and Forensic Psychologist (R. 1586). He testified Holloman was under a lot of stress (R. 1605). He testified Holloman has a borderline personality disorder (R. 1631), and has dysfunctional thinking (R. 1632). Dr. McKeown testified with regard to a physical scale Holloman's degree of stress and other symptoms would be equivalent to something like the case of the flu (R. 1651).

11

## STANDARD OF REVIEW

The denial of a Rule 32 Petition is reviewed under the abuse of discretion standard and if the Circuit Courts decision is correct for any reason, even if not stated, this Court will not reverse the lower court. *Ex parte Heaton,* 542 So.2d 931, 933 (Ala. 1989); *Grady v. State*, 831 So.2d 646, 647 (Ala. Crim.App. 2001); *Strickland v. State*, 771 So. 2d 1123, 1125 (Ala.Crim.App. 1999), Cert. Den., 771 So.2d 1129 (Ala. 1999).

An abuse of discretion occurs when a court bases it's decisions on an erroneous conclusion of law or if there is no evidence in the record to rationally support the decision. *State v. Jude*, 686 So.2d 528, 530 (Ala.Crim.App. 1996).

Findings of fact are reviewed under the clearly erroneous standard. *Dobyne v. State*, 805 So.2d 733, 741 (Ala.Crim.App. 2000).

When the facts are undisputed and appellate court is presented with pure questions of law, that courts review in a Rule 32 petition is de novo. *Ex parte White,* 792 So2d 1097, 1098 (Ala. 2001).

## SUMMARY OF ARGUMENT

1.    The trial courts decision of denying Holloman's jurisdictional claims is incorrect and is based on an erroneous conclusion of law because these claims are raised under <u>Rule 32.1(b), A.R.Cr.P.</u>, and therefore are not subject to any preclusion of remedy grounds under <u>Rule 32.2, A.R.Cr.P.</u>

2.    The trial courts decision of denying Holloman's ineffective assistance of trial and appellate counsel claims is incorrect and is based on an erroneous conclusion of law because these claims raised under <u>Rule 32.1 (A) A.R.Cr.P.</u> have been raised as soon as practicable and

12

these claims are not subject to any preclusion of remedy grounds under <u>Rule 32.2, A.R.Cr.P.</u> or other laws.

ARGUMENT ONE

In this case sub Judice, Holloman challenged the trial courts Jurisdiction to render judgment. Holloman raised five claims involving in personam and subject matter Jurisdiction. Holloman maintains claims one and two infra, and abandons claims three, four and five. In this case, the evidence is undisputed and the facts are unrefutted. Therefore, these claims are pure questions of law and must be reviewed de novo.

1. Holloman's claim one is meritorious in law. He claimed he was deprived of the right to be present during the courts giving of additional jury instructions. <u>Rule 9.1, A.R.Cr.P.</u>, sets forth the right of the Defendant to be present at every stage of the trial including the giving of additional instructions to the petit jury.

Holloman bases this claim upon the fact that the trial court instructed the following additional jury instructions outside his presence and out of the open court, to wit:

THE COURT: "I need to tell you one additional thing and put it on the record of course, you've got to render three different verdicts, one on each case, and whichever verdict you render, they must be unanimous, and whichever verdict you render, they must be signed. You know, each one of you must agree upon them and they must be signed by your foreman."

"I would recommend that you select a foreman right off to preside over your deliberations and to take a vote and then to sign the verdicts once they are rendered. Okay if ya'll need anything knock and let Lillie know." (R. 1827-1828).

Furthermore, Holloman bases this claim on the fact that a reciting of this jury instruction took approximately forty six (46) seconds to read but the judge and court reporter was in the jury

13

deliberation room for approximately ten or more minutes. Therefore, Holloman believes more instructions than recorded and/or advice was also given by the Judge outside Holloman's presence and outside open court.

Wherefore, based on the above facts, evidence and law, Holloman is due a new trial because he did not knowingly waive or forfeit his right to be present when the trial court gave additional jury instructions to the petit jury out of open court.

2. Holloman's claim two is meritorious. He claimed he was deprived of the right to be present and heard during an exclusive bench conference hearing concerning the consolidation of an offense charged in a separate indictment. Rule 9.1 and Rule 13.3(c), A.R.Cr.P., provides Holloman with a clear right to be present and heard before charges are consolidated for trial.

Holloman bases this claim upon the fact the trial court consolidated an offense without him being present and heard, to wit:

Mr. Brantley: "Can we approach the bench—Mr. Brantley. (bench conference; out of hearing of the trial jury).

Mr. Brantley: Judge we do have one more thing.

The Court: What is that.

Mr. Brantley: This is discovery that we were just given this morning.

Mr. Valeska: I'm not offering any of those. Don't worry about that.

The Court: It's not an issue.

Mr. Valeska: I just showed it to you, Tom. I'm not offering any of that right now. Judge, we have agreed that we are going to go ahead and try the case of Mr. Gallia. We are going to go ahead and try it. I have agreed and they have no objection.

Mr. Brantley: Can you enter an Order consolidating Mr. Gallia's case.

The Court: Yes." T.R. 355-356

Wherefore based on the above facts, evidence and law, Holloman is due a new trial because the trial court did not give him an opportunity to be present and heard before consolidating an offense to the trial in progress.

In a similar case, the Alabama Court of Criminal Appeals held: "it was error to consolidate indictments for trial without giving Defendant and opportunity be heard" and "error could not be harmless." See *Holladay v. State*, 545 So.2d 213 (Ala.Crim.App. 1989), cert. Den., 545 So.2d 213 (Ala. 1989).

Conclusively, based on the aforesaid reasons in law and fact, Holloman's claims are jurisdictional in nature and cause. Therefore, he is due relief of conviction an sentence pursuant to Rule 32.1(b), A.R.Cr.P.

## ARGUMENT TWO

The trial courts decision of denying Holloman's ineffective assistance of counsel claims is incorrect and there is no other unstated reason for these claims to be denied.

In general, the trial court's decision is incorrect because this was Holloman's first opportunity to present his ineffective assistance of trial and appellate counsel claims. Holloman was sentenced on June 18, 2003. Trial counsels timely filed a motion for new trial on July 8, 2003 but the motion did not and could not have included any ineffective assistance of counsel claims on themselves.

The court reporter completed the record on direct appeal more than thirty days after Holloman was sentenced. Therefore, Holloman's new appellate counsel could not have timely

filed a motion for new trial for the trial court to have had proper jurisdiction to have entertained the motion.

Wherefore, based on the above, Holloman's ineffective assistance of counsel claims have been properly raised as soon as practicable. See Rule 32.2(d) A.R.Cr.P.

- Specifically, there is no other unstated reason for Holloman's ineffective assistance of counsel claims to be denied because each of his claims is in compliance with *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), where the supreme court established the standard for evaluating claims of ineffective assistance of counsel. The Defendant must show the following:

(1)    that counsels assistance was unreasonable considering all the circumstances of the case.

(2)    That there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. *Strickland v. Washington*, supra note 97, 104, S.Ct. @ 2065-2067.

This standard applies to claims brought on direct appeal, in motions for new trial, or in collateral proceedings. *Strickland v. Washington*, supra @ 2070; *Hill v. Lockhart*, U.S., 106 S.Ct. 366, L.Ed.2d (1986) (guilty plea).

With respect to each of Holloman's claims, he has clearly shown unreasonable assistance of counsel and without this deficiency the factfinder would not have found him guilty of the instant offenses.

Claim one, ib; Holloman claims his trial counsel are ineffective because they did not object to the trial court's actions of giving additional  instructions to the petit jury in the Defendant's absence and without waiver of his right to continue his presence.

16

It is a fact, the trial Judge gave additional jury instructions to the petit jury in Holloman's absence and without waiver of his right to continuous presence. In fact, trial counsels agreed to this harmful error without first consulting with Hollomans. Also, the court did not include Holloman in this agreement, to wit:

The Court: I need - -there is one more thing I need to tell them and I'm just going to walk to the door and take her with me, and that is, whatever verdicts they render they have to be unanimous—I think they-is that agreeable, for me to do that?

Mr. Brantley: That's fine.

Mr. Decker: That's fine your Honor.

The Court: Is that agreeable.

Mr. Valeska: Yes, Sir.

The Court: For me to just take care of this. (R.1826)

This is a cognizable claim under Rule 9.1, A.R.Cr.P. and the trial court has a duty to ask Holloman for his consent or to get a waiver of his presence for the court to give additional instructions to the petit jury. Therefore counsel should have objected.

> "waiver of the right to be present must be clear and unequivocal-waiver must be affirmative and positive in nature and made by the Defendant personally." *Haynes v. State*, 40 Ala. App. 106, 109 So.2d 738 (1958), cert. Den., 268 Ala. 546, 109 So.2d 746 (1959)

> and,

> "consent or acquiescence of a Defendant to a waiver of the right to be present cannot be presumed but must affirmatively appear from the record." *Berness v. State*, 263 Ala. 641, 83 So.2d 613 (1955).

17

In this case, prejudice per se must be presumed because trial counsel and courts are presumed to know the law and rules of Court. This error cannot be presumed harmless when it affects a critical stage of Judicial proceedings that is fundamental to Defendants right to a fair trial.

Claim Two, ib; Holloman claims his appellate counsel was ineffective because he raised an ineffective assistance of counsel claim argument on appeal that was not preserved for appellate review, because it was not raised on motion for new trial that the trial court erred to reversal when the trial Judge stepped inside the jury deliberation room to tell the jury something that he had forgotten- that their verdicts must be unanimous.

Appellate counsel was clearly ineffective by raising this unpreserved claim on direct appeal because it was not first presented to the trial court.

Appellate counsel prejudiced Holloman's U.S. Sixth Amendment right to effective assistance of counsel on direct appeal when he did not raise this claim as a Jurisdictional issue for the appellate court to address since a Jurisdictional issue can be raised at any time.

Claim Three, ib;    Trial counsel did not inform Holloman they filed motions for consolidation of cases and waived his right to be present and heard during the bench hearing with the court for consolidating an offense charged in a separate indictment.

Trial counsel filed a motion for consolidation of cases CC-00-755, 756, 757, and 758. (C.R. 330-331). The trial court issued an order granting the motion save the exclusion of case No.: CC-00-757. (C.R. 333). Again trial counsel filed a motion to consolidate case no. CC-00-757—the attempted murder of John Gallia but the court denied the motion (C.R. 339-341). During trial a bench conference was held and the court, without Holloman being present and heard, consolidated Case No. CC-00-757 with each and all of the other offenses indicted. None

18

of Holloman's trial counsel informed him that they had filed motions for consolidation and that the trial court made Rulings on these motions and that during trial all parties except Holloman agreed to consolidation of all the offenses.

In *Holladay v. State*, 545 So.2d 213 (Ala.Cr.App. 1989) cert. Den. 545 So.2d 213 (Ala. 1989), Defendant's counsel was present but was not given an opportunity to confer with his client before the scheduled time of the hearing. In this case sub judice, Holloman was within his presence and able to consult with him. Therefore, Counsel should have consulted with Holloman before filing the motions to consolidate and especially agreeing to consolidate another offense during a bench conference hearing outside of Holloman's presence.

Holloman's U.S. Sixth Amendment right to effective assistance of counsel has been prejudiced by failing to inform him he filed motions for consolidation and depriving him of the right to be present at a critical stage of the proceeding to be heard. Holloman had a right to participate in making these critical decisions involving his capital trial.

Claim Four, ib; Holloman claims his trial counsel failed to object when the trial court failed to instruct the petit jury that the Defendant has the burden of proving the defense of insanity by clear and convincing evidence.

13A-3-1(c), Ala. Crim. Code 1975, as amended, requires the Defendant has the burden of proving the defense of insanity by clear and convincing evidence. The trial court informed the jury the burden of proof is upon the Defendant to prove his insanity but did not inform the jury to what degree of proof and define that degree of proof the Defendant must meet to prove his insanity defense, to wit:

"The court charges the jury that regarding the insanity defense, the State of Alabama the all or nothing approach-that is, Defendant is either sane or he is not, the Defendant must either

19

establish his insanity as a complete defense or excuse for the crime, or he must be held full-full responsibility for the crime charged." (T.R. 1816).

Holloman asserts his U.S. Sixth Amendment Right to effective assistance of counsel was violated when counsel did not object to the courts failure to instruct to the petit jury the standard they must use to determine whether Holloman is insane or not. Holloman's right to a fair trial by jury must have been prejudiced because the jury could not have intelligently complied with their duties.

In a similar case on the same principle of law, the requirement that the accused's guilt to be proved beyond a reasonable doubt to a jury is jurisdictional. See *Elder v. State*, 494 So.2d 922 (Ala.Cr.App. 1986) and in *Davis v. State*, 682 So.2d 476 (Ala.Crim.App. 1995) this case was reversed because the court failed to explain the concept of reasonable doubt, the stand by which the jury had to determine the Defendant's guilt.

Insanity is an affirmative defense, thus trial Counsel had a duty and should have known the laws involved in this type of defense pled on behalf of Holloman. Trial Counsel was ineffective for failing to object when the trial court failed to instruct the petit jury that the Defendant had the burden of proving the defense of insanity by clear and convincing evidence.

Claim Five, ib; Holloman claims his trial Counsel was ineffective for failing to call Sherri Holloman as a witness to the crime and to her infidelity.

Sherri Holloman was a material witness to the crime and present in the courtroom. Holloman went off because of her infidelity and counsel knew it. For whatever reasons counsel wanted John Gallia to testify but he was not present at trial. Sherri Holloman could have filled in with her testimony. She could have shed light on Holloman's State of mind at the time he committed the acts for which he was tried.

In *Ex parte Anthony*, 565 So.2d 565 (Ala. 1990), the Supreme Court of Alabama held that "denying Defendant the ability to show knowledge of wife infidelity and to show infidelities as cause of his state of mind was reversible error once insanity defense had been raised in murder prosecution."

There was no reason for the trial counsel not to call Sherri Holloman as a material witness to the crime and Holloman's state of mind. Sherri Holloman's infidelity caused Holloman's actions and this was an important fact the jury needed to know. Counsel prejudiced Holloman by depriving his jury of essential information that would have changed the result of his trial.

Claim Six, ib; Holloman claims he was deprived of his right to testify on his own behalf.

Mr. Brantley: Let the record reflect, and Mr. Decker, Mr. Parker have consulted with James Hickman Holloman just a few minutes ago with regards to his fifth-amendment rights. We specifically asked him did he want to testify. He carried on a conversation with us. He asked us some questions. We answered those questions and as a result of that discussion, Mr. Holloman has instructed us that he will refrain from getting on the stand. And would the court like to examine Mr. Holloman on that decision.

The Court: No. I don't' have any questions about it. I mean, he makes that election. He has that right, and ya'll are well qualified to explain to him his right to either testify or to refuse to testify." (T.R. 1565-1566)

Lastly, Holloman was afraid his attorneys would quit him and not help him if he testified.

Holloman believed the trial court abused its discretion when it did not personally address him in the presence of counsel and ask him if he wanted to testify or not. Had the court done this, Holloman would have told the court he wanted to testify. The court was aware of a conflict

issue between Holloman and his counsel because during the penalty phase the court was again made aware that Holloman wanted to testify and this time the court did personally address Holloman in front of his counsel during this phase. (T.R. 2000). The Court should have asked Holloman about his concerns of testifying at trial also. See *Nichols v. Butler*, 952 F.2d 1550 (11th Cir. 1992) (En Banc).

Clearly, the trial court should have inquired into the problem of testifying during the most important state of trial since the court did at a lesser important stage of trial. Thus, the trial court deprived Holloman of his rights to a fair trial and effective assistance of counsel by failing to personally ask Holloman if he wanted to testify or not during trial.

Claim Seven, ib; Holloman claims his trial counsel was ineffective because they coerced him into not testifying at trial.

Trial counsel refused to abide by Holloman's wish to testify at trial when he clearly informed them he wanted to testify. In fact, trial counsel talked Holloman's parents into telling him not to testify when they were aware Holloman wanted to disprove many lies told by the prosecution. That counsel did not contest but should have. Holloman, against his own will, followed his attorneys' advice after they used these tactics on him to prevent him from testifying.

Mr. Decker: Yes, your Honor. Our client has advised us that he wishes to testify on his own behalf during the penalty phase of his trial. It is our advice, the advice of Mr. Parker, the advice of Ms. Stinson and the advice of myself that Mr. Holloman not take the stand. He is invoking his constitutional right to testify.

The Court: Okay. All right-your aware-you are aware that your attorneys, all four of your attorneys have advised you not to take the witness stand and not testify.

Mr. Holloman: Are you (No Audible response)

22

The Court: Are you aware of that?

Mr. Holloman: Yes sir.

The Court: Okay. All right. And I understand that you—I gave your father an opportunity to go in and talk to you also, and I understand that he advised you not to testify.

Mr. Holloman: There's a lot of things I can prove.

The Court: Well, now. I want you to answer my questions right now.

Mr. Holloman: I've changed my mind. I'm not going to do it because-because of my family, they're upset. And I was wanting to get on the stand last week I was listening to all this stuff, and nobody wanted me on the stand. So I'm just going to forget it.

The Court: Okay. All right-so you are going to—you're going to follow your attorneys' advice.

Mr. Holloman: Yes, sir. (T.R. 2000).

It should be noted that in addition to Holloman wanting to testify the District Attorney wanted him to testify (T.R. 1076). Holloman wanted to testify and had he testified the petit jury would have voted differently. Holloman did not testify because his father told him he would leave the courthouse. The reason Holloman's father told him not to testify is because the trial lawyers believed it would not help him but Holloman believed it would have helped him.

Holloman wanted to testify because his affirmative defense admits he committed the acts on trial but he could have shed light upon all he could remember and have contradicted many lies and improper comments the District Attorney made that was clearly unsupported by any evidence and that trial counsel failed to object or correct the evidence when Holloman specifically informed them of the falsehood and incorrectness.

Holloman wanted to testify and tell his story because he had no criminal history whatsoever, and thereby had nothing to lose to tell his story of the incident. Holloman believes had the jury heard from him they would have voted a different way. Holloman was wrongfully coerced by tactics his trial lawyers used to deprive him of his right to testify on his own behalf during trial. Therefore, Holloman deserves a new trial where a jury can hear the whole story.

Claim Eight, ib: Counsel was ineffective for failing to develop a defense concerning the effects of the medications he was taking and the effects of abruptly discontinuing the medications.

It was shown that Holloman was on several medications while at Bradford Health Services but he stopped taking them after he left. (T.R. 1423). The side effects of these medications was not presented at trial. Holloman was taking Neurotin (T.R. 1313), and Effexor (T.R. 1314). Neurotin was prescribed for psychiatric problems and the Effexor as an anti-depressant. These two drugs were prescribed to Holloman while he was at Bradford. (T.R. 1320).

When Holloman was coming off Effexor and Neurotin a week before the shooting on May 6, 2000 when he left Bradford. He was having bad side effects as described in the physicians desk reference. Some symptoms people have when taking Effexor include nervousness, dizziness, memory loss, headaches, confusion, abnormal behavior (including what occurred on May 6, 2000) out breaks of violence. The medications he was on was confirmed by the Houston County Sheriff's Nurse's testimony, Darla Speigner (T.R. 1306).

With the nurse, and a PDR and/or three experts that testified at trial, the side effects of these medications should have been presented to the jury because had the jury been made aware

24

of these horrific side effects they would have decided a different verdict-clearly not guilty by reason on insanity. The following is a discussion of the side effects of those two drugs.

According to the PDR, Effexor is prescribed for the treatment of depression-that is, a continuing depression that interferes with daily functioning. The symptoms usually include changes in appetite, sleep habits and mind/body coordination, decreased sex drive, increased fatigue, feelings of guilt or worthlessness, difficulty concentrating, slowed thinking and suicidal thoughts. According to the PDR some less common side effects include abnormal taste, abnormal thinking, agitation, chest pain, confusion, decreased sex drive, depression, dilated pupils, dizziness upon standing, high blood pressure, itching, loss of identity, rapid heartbeat, ringing in the ears, trauma, urinary problems, and weight loss. A wide variety of very rare symptoms possibly related to Effexor have also been reported.

More important than the side effects while you are on these drugs are the side effects when you abruptly come off the drugs (Holloman stopped taking the medications after leaving Bradford which is another factor that is not shown in the trial record).

"Do not stop taking the drug Effexor without consulting your doctor, if you stop suddenly, you may have withdrawal symptoms, even though this drug does not seem to be habit forming. Your doctor will have you taper off gradually." (Internet PDR)

Neurontin was also prescribed to Holloman while at Bradford. According to the physicians desk reference it also produced "thinking abnormal" as a side effect, none of these side effects were explained to Holloman and certainly none were explained to the jury. Holloman was effectively intoxicated or under the influence of the side effects of prescribed medication which clouded his thinking and judgment. It could explain why a cooling off period is in connection with heat of passion was not available to Holloman due to his abnormal

25

thinking, the agitation and other side effects arising from the medications at the time. It was the basis for counsel to have asked for an intoxication jury charge. A charge which could have allowed the jury to find out the crimes were committed under heat of passion without a cooling off period. A cooling off period which was not available because Holloman was decompensating, exacerbated by the side effects and withdrawal symptoms. A cooling off period that was not available because he had been told there was no one in the house with Sherri and the children which was something Holloman did not find out for sure until he arrived at the Clark residence.

Holloman is due a new trial because counsel did not attempt to establish a defense or inform the jury of the side effects of the medications Holloman was taking that controlled his mental state during the time of the offense.

CUMULATIVE CLAIM

Ineffective assistance of counsel due to multiple deficiencies.

1. Counsel failed to develop a defense concerning the effects and discontinuance of the medications Holloman had been taking before and at the time of the incident.

2. Counsel did not review case enough with Holloman to know what questions Holloman wanted to ask the witnesses for their answers and failed to object or ask questions to explain evidence that was elicited by the prosecution.

3. Counsel failed to object to the district attorney portrayed Holloman as taking psychology for the purpose of "playing crazy".

4. Counsel failed to object to the district attorney bringing out evidence that Holloman had a pair of binoculars in his truck.

26

5. Counsel failed to properly cross examine Becky Clark's statement: "You are going to need to get a new mommy and daddy."

6. Counsel did not do enough pretrial interview with Holloman.

7. Counsel coerced Holloman into not testifying on his behalf.

8. Counsel failed to request a jury charge similar to the intoxication charge.

9. Appellate counsel failed to raise any of these claims on motion for new trial before appeal.

1. It was shown that Holloman was on several medications while at Bradford Health Services. Holloman was taking several medications including Neurontin, (T.R. 1313) and Effexor (T.R. 1314). Neurontin (T.R. 1313) was prescribed for psychiatric problems and Effexor as an anti-depressant (T.R. 1314). Two drugs, Effexor and Neurontin, were prescribed while at Bradford (T.R. 1320) but stopped taking them after he left. (T.R. 1423). The side effects of these medications were not presented at trial, but they should have been. It would have offered evidence of a disturbed individual and negate some intent elements needed in several of the charges against him.

Mr. Holloman was coming off Effexor and Neurontin a week before the shooting on May 6, 2000 when he left Bradford. He was having the bad side effects as described in the PDR (Physicians Desk Reference). Some of the symptoms people have when taking Effexor include nervousness, dizziness, memory loss, headache, confusion, abnormal behavior, and outbreaks of violence (as occurred on May 6, 2000). The medications he was on was confirmed by the Houston County Sheriff's Nurse, Darla Speigner's, testimony (T.R. 1306).

With the nurse, and a PDR and/or the three experts that testified at the trial, the side effects of these medications should have been presented to the jury. The following is a discussion of the effects of two of those drugs. (Had there been a motion for a new trial, this is one of the items which should have been presented at trial and definitely should have been presented at a motion for new trial).

According to the PDR, Effexor is prescribed for the treatment of depression that is a continuing depression that interferes with daily functioning. The symptoms usually include changes in appetite, sleep habits, and mind/body coordination, decreased sex drive, increased fatigue, feeling of guilt or worthlessness, difficulty concentrating, slowed thinking and suicidal thoughts. According to the PDR, some less common side effects include abnormal taste, abnormal thinking, agitation, chest pain, confusion, decreased sex drive, depression, dilated pupils, dizziness upon standing, high blood pressure, itching, loss of identity, rapid heartbeat, ringing in the ears, trauma, twitching, urinary problems, and weight loss. A wide variety of very rare symptoms possibly related to Effexor have also been reported. Currently, there are countless lawsuits being pursued on the civil side that deal with the suicide problems and other side effects of these drugs. If this information had been available to the jury, they might have been able to seriously consider convicting on murder or even manslaughter due to the drug induced state of mind.

More important are the side effects of the drugs as you abruptly come off the drugs. (Holloman stopped taking the medications after leaving Bradford which is another factor that is not shown in the record).

"Do not stop taking the drug (Effexor) without consulting your doctor. If you stop suddenly, you may have withdrawal symptoms, even though this drug does

28

not seem to be habit-forming. Your doctor will have you taper off gradually."
(Internet PDR, See Appendix).

Neurontin was also prescribed to Mr. Holloman while at Bradford. According to the PDR, it also lists "thinking abnormal" as a side effect. None of the side effects were explained to Holloman and certainly none were explained to the jury. It would show that Holloman was effectively "intoxicated" or under the influence of the side effects of prescribed medication which clouded his judgment and thinking. It could explain why a "cooling off period" in connection with the "heat of passion" was not available to Mr. Holloman, due to the abnormal thinking, the agitation, and other side effects of the medication. It was the basis to ask an intoxication jury charge, a charge that would have allowed the jury to find that the crimes were committed under a heat of passion without a cooling off period. A cooling off period was not available because he was de-compensating, exacerbated by the side effects and withdrawal symptoms. A cooling off period that was not available because he had been told there was no one else in the house with Sherri and his children which was something he did not find out for sure until he arrived at the Clark residence.

Failure to present this to the jury was not a "strategy" but a missed opportunity to present evidence favorable to the accused. It was ineffective assistance of counsel. [nder *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Holloman alleges that counsels' performance fell below an objective standard of reasonableness *Strickland*, at 687-88, 104 S.Ct. at 2064, 80 L.Ed2d at 693 (1984). Failure to provide this evidence to the jury prejudiced the defense and deprived the appellant of a fair trial. With this additional evidence the appellant believes that the probable outcome of the trial would have been different. *Ex parte Lawley*, 512 So.2d 1370, 1372 (Ala. 1987).

29

The standard for determining ineffective assistance of counsel was set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(a) (1984). In order to prove a claim of ineffective assistance of counsel, an appellant must meet a two-pronged test.    First, the appellant must show that counsel's performance was deficient, that is, that counsel made errors so serious that counsel was not functioning as "counsel" under the Sixth Amendment and that counsels' performance fell below an objective standard of reasonableness.

*Strickland*, 466 U.S. at 687-88, 104 S.Ct. at 2054, 80 L.Ed.2d 693 (1984).    Second, the appellant must show that this deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the appellant of a fair trial and that the probable outcome of the trial would have been differently but for counsel's ineffective performance (*Ex parte Lawley*), 512 So.2d 1370, 1370, 1371 (Ala. 1987).

Appellant alleges he did not receive effective assistance of counsel as guaranteed him by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 6 of the Alabama Constitution of 1901.

Although Holloman did not present the allegations of ineffective assistance of counsel to the trial court, he had not opportunity to do so.  There was no hearing on a motion for new trial. Further, the trial court summarily denied the motion for new trial.  We had asked the Appeals Court to look at and review Appellant's allegations, pursuant to the plain error doctrine even though Holloman was given life without parole.  We are not asking for the Court to look at this. Rule 45A, Ala.R.App.P., and *Frazier v. State*, 758 So.2d 577 (Ala.Cr.App.), aff'd, 758 So.2d 611 (Ala.Cr.App. 1999).

2. The appellant has expressed his belief that counsel did not review the case enough with client to know what questions to ask of the witnesses and failed to object to ask questions to explain evidence that was elicited by the prosecutor. The Defendant has alleged that many "facts" coming out at trial were inaccurate and a proper, better direct and cross examination could have been presented if the Defendant had been more thoroughly consulted as to the questions to ask.

3. The District Attorney portrayed Holloman as taking psychology for the purposes of "playing crazy".

The District Attorney portrayed Mr. Holloman as going to college and taking psychology, thereby implying that Holloman took psychology courses for the purpose of trying to mislead and to fake mental instability. District Attorney: "He went to Troy State University, to college, for a years. Which course did he take? Psychology. Remember that? Psychology." (Vol. 14T 1734).

The defense failed to show that this was a two-year associate in business paid by the Veterans Administration and was taken as a required course of study along with a host of other courses. The college was attended in 1995 and 1996 and should have been brought out to the jury to prevent the inference that Holloman took the course to be able to fake mental illness.

4. The District Attorney brought out evidence that Holloman had a pair of binoculars in his truck.

The prosecutor then used this information to allow or argue that they were for the purpose of spying on the Clarks and Sherri Holloman to carry out his plan. The appellant had these for years and they were always in the truck and were not placed in there for the purpose of "spying" on his wife. This could have been shown with other family members testimony if

counsel had been better prepared, The District Attorney argued, "He's got binoculars where he has been watching." (Vol. 14 T1735).

5. The defense failed to properly cross-examine Becky Clark as to the statement, "You are going to need to get a new mommy and daddy."

Although the defense asked Becky Clark about this statement, the defense accepted her answer and went on. This should have been brought up in trial on with an effective cross-examination. Not available to the court of Appeals, is the taped statement of Jamie Holloman-the daughter heard on the 911 tape. In her taped statement she said she heard her daddy say "sorry baby that I did this, I love you, all I know is I want to say goodbye." None of the other witnesses said in their taped statements anything about "You are going to need a new mommy and daddy." This statement came from Chief Deputy William Lands' recount of the statement of Jamie Holloman. Again, this police report by Deputy William Land is not in the transcript and is not properly before the Court. It should have been brought up in an effective cross-examination and/or at a motion for new trial. The taped statement of Becky Clark indicated that Holloman did not say anything in the house. The taped statement of Sherri Holloman made no mention of any statement like this. The taped statement of John Gallia made no mention of a "you are going to need a new mommy and daddy." As you can see the problem I have with this argument, if that all of the taped statements are not part of the record, but as stated above, they could have been used effectively cross-examine Becky Clark.

A vigorous cross-examination of Becky Clark on this point was necessary to counter the burglary charge and the intent element. "You are going to need a new mommy and daddy" carried such a strong impact that it could not help but be one of the emotional and prejudicial factors that convinced the jury that this should be capital murder rather than just plain murder. It

32

was one of the factors stated by the judge as to why he would not throw out the "kidnapping capital murder" charge. The assistance of counsel is therefore ineffective under *Strickland*.

6. The jury was told three different stories of the first head injury due to the fact that defense counsel did not do enough pretrial interview with client.

The Defendant had actually hit his head playing football at age 11 when he ran into a brick wall. The defense said he fell off a bike. Holloman's father said he fell of bleachers. Brantley said he ran into a wall. Inconsistencies in the testimony concerning an easily ascertainable fact undermined the credibility of the Defendant's case and allowed jurors to discount the testimony of the defense witness and the credibility of the defense case.[2]

The performance component outlined in *Strickland* is an objective one: that is, whether counsel's assistance, judged under "prevailing professionals norms," was reasonable considering all the circumstances. *Daniels v. State*, 650 So.2d 544, 552 (Ala.Cr.App. 1994) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065). As argued before, perhaps just one of the errors listed above might not be sufficient, but the multitude of mistakes pushes this outside the range of professionally competent assistance.

7. Defendant was coerced into not testifying and thereby denying him a right to testify and his rights under Fifth Amendment USCA.

The appellant says he has been denied his opportunity to testify in his own behalf. This is perhaps more important at the guilt/innocence phase of the trial when at the penalty phase, as the recommendation was life without parole. However, the Appellate Court can see the pressures

---

[2] Again Holloman is presenting matters which are not in the record and would not be available for the record without a motion for new trial and/or a Rule 32 Petition. Some of these things not presented or errors at trial include: Defense counsel failed to interview Jim Hayward before the trial as to what his testimony might be at trial. Further, this witness was a personal friend of the District Attorney having playing tennis together. Counsel failed to show the allegations of threats against Jimmy Clark were years before and failed to call Joey Oates girlfriend, Tammy, who would have testified that Holloman never said he would like to kill his wife when Holloman was

not to testify that were placed upon him at the sentencing phase. These same pressures were previously placed upon him at the guilt/innocence phase of the trial. Defendant wanted to testify but was talked out of testifying by his trial counsel.[3] See Transcript at (T1999-2000).

The same tactics had been used a week before during the guilt or innocence phase of the trial. Counsel asked for 10-15 minute recess to talk with his client behind closed doors. (Vol. XIII-T1563-1564).

After the brief recess, the Defendant and counsel came back to the courtroom whereupon the following exchange took place.

> Mr. Brantley: Let the record reflect that I myself, and Mr. Decker, Mr. Parker, have consulted with James Hickman Holloman just a few minutes ago with regard to his Fifth Amendment Rights. He carried on a conversation with us. He asked us some questions. We answered those questions, and as a result of that discussion, Mr. Holloman has instructed that he will refrain from getting on the stand and would the Court like to examine Mr. Holloman on that decision? (emphasis supplied) (Vol. XIII-T1565-1566).

You don't usually ask the Court to question your client on whether he really wants to testify or not unless there is a problem. *Nichols v. Butler*, 952 F.2d 1550 (11th Cir. 1992) (en banc) set out the importance of allowing the Defendant to testify. In *Nichols* the attorney threatened to withdraw if Nichols testified. In our case, Holloman was pressured into not testifying. Under the *Alabama Rules of Professional Conduct* 1.2(a) (1991), a lawyer shall abide by the client's decision, after consultation with lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify. Further, we noted that the first prong of the *Strickland* test would be met "if defense counsel refused to accept the Defendant's decision to testify and would not call him to the stand." (*Nichols*, supra at 1553). Based upon this argument, Defendant should be granted a new trial and an opportunity to testify.

---

talking with Joey Oates. As previously mentioned in a separate argument the defense counsel failed to pursue the effects of the drugs Holloman was taking.

8. Counsel should have requested a jury charge similar to the intoxication charge.

On the theory that the Defendant was under the influence of medication of under the withdrawal symptoms of prescribed medications the defense counsel should have been asked for an instruction similar to the instruction on intoxication. In *Hammonds v. State*, the Defendant obtained a reversal of his conviction based upon a failure to instruct on intoxication. *Hammonds v. State*, 776 So.2d 884.

We do not intend to continue that the Court should reverse on the basis that the Court refused to give a charge of intoxication because one was not requested and the line of questioning to support such a charge was not pursued. The defense team did not ask for a special jury instruction, but it should have. Based on the information given in a preceding issue on the effects of withdrawal from Effexor, defense counsel should have presented a jury instruction to cover the withdrawal effects of the drug. We allege that the withdrawal symptoms were such that they affected Holloman to the same extent that alcohol or other drug-induced psychosis would have affected him. The drugs which caused abnormal thinking and contributed to the outburst of violence was such that the jury should have been informed and allowed to consider an intoxication charge.

The medications he took were by prescription and the side effects were unknown to him. He did what his doctor told him. These medications or should I say the withdrawal from these medications influenced his actions as much as the drinking of alcohol or the taking of illegal drugs would have influenced his actions. Therefore, charges as to intoxication could have been allowed.

Those instructions as taken from Section 13-A-3-2(a)(b) would have told the jury that intoxication of the Defendant, whether voluntary or involuntary, may be considered by the jury

---

[3] This is yet another issue that could have been presented at a motion of new trial.

whenever it irrelevant to negate an element of the offense charge such as "intent". (Alabama

Pattern Jury Instructions).

In *Hammond v. State*, 776 So.2d 884 at 887, (Ala.Crim.App. 1998) the court of criminal

appeals has previously addressed the question of when an instruction of intoxication should be

given:

> A charge of intoxication should be given if "there is an evidentiary foundation in
> the record sufficient for the jury to entertain a reasonable doubt" on the element of intent.
> *Coon v. State*, 494 So.2d 184, 187 (Ala.Cr.App. 1986) [quoting other citations which are
> omitted] intoxication should be given if there is a sufficient evidence of intoxication in
> the record for a reasonable person to entertain a doubt as to the element on that basis').
> An accused is entitled to have the jury consider the issue of his intoxication where the
> evidence of intoxication is conflicting, *Owen v. State*, 611 So.2d 1126, 1128 (Ala.Cr.App.
> 1992).

While the degree of intoxication necessary to negate specific intent must rise to the level

of insanity, it is clear that where there is evidence of intoxication, the extent to which the accused

is intoxicated is a question to be decided by the jury. *Crosslin v. State*, 446 So.2d at 682.

> "In order to determine whether the evidence is sufficient to necessitate an
> instruction and allow the jury to consider the defense, 'we must accept the testimony
> most favorable to the Defendant'...*United States v. Lewis*, 592 F. 2d 1282, 1286 (5th Cir.
> 1979).   The Alabama Supreme Court has indicated that proper written requested
> instructions must be given 'which are supported by an evidence, however weak,
> insufficient, or doubtful in credibility.' *Chavers v. State*, 361 So.2d 1106, 1107 (Ala.
> 1987)." *Coon v. State*, 494 So.2d 184, 186 (Ala.Cr.App. 1986).

> "'[An intoxication] charge may...be warranted if the record contains evidence of
> the recent use of intoxicants of such nature or quantity to support the inference that their
> ingestion was sufficient to affect Defendant's ability to form the necessary criminal
> intent'". *Fletcher v. State*, 621 So.2d at 1020-21 (emphasis omitted).

The problem with our case at bar is that this line of defense was never developed by trial

counsel. It should have been the failure to develop amounts to ineffective assistance of counsel.

While petitioner does have a first Rule 32 Option, we stress the items and ask the Court to allow

36

the higher standard of review and we ask for the Court to consider these issues in pointing out the necessity and abuse of discretion in denying a hearing on the motion for new trial.

9.   Trial counsel was ineffective for failing to get certified by a psychologist that Holloman needed a C.T. scan examination for his defense of insanity after the trial court denied the *Ex parte* motion for C.T. Scan examination.

Counsel Branley filed an ex parte motion for C.T. Scan examination (C.R. 325-329). The trial court conditionally denied the emotion, to wit: This motion is denied. Defendant has had psychological evaluation by a doctor of his choosing and paid for by his family. If there is serious contention that this procedure is needed for his defense of insanity then his psychologist must go certify to the Court (C.R. 326).

Holloman wants a new trial because counsel failed to pursue a psychologist to certify to the Court he needed a C.T. Scan examination after the court denied counsels' motion for not showing any reasons why Holloman needed the medical attention for his defense of insanity.

Counsel was ineffective for failing to pursue a psychologist to certify to the Court Holloman needed a C.T. Scan for his insanity defense when the Court informed counsel upon denial of the motion it would reconsider upon this condition. Counsel prejudiced Holloman's defense because they each were aware Holloman had a history of head injuries and upon his knowledge counsel initially filed the motion.   The information found by the C.T. Scan examination would provide a determination of whether Holloman's head injuries along with the medication he was on further contributed to an abnormal mental state during the time of the incident or transaction of crime he was being tried for.   The C.T. examination would determine or rule out any brain damage.   For these reasons, counsel should have pursued a psychologist to certify to the court Holloman needed the medical attention to aid in his defense of insanity.

37

Wherefore, counsel was ineffective for not pursuing a psychologist to persuade the Court to order a C.T. medical examination for Holloman's head injuries that could have affected his mental state during the time of the incident.  This motion was material to the defense and deserved attention.

## CONCLUSION

WHEREFORE, based on all the above, the trial court's stated reason is incorrect and there is no unstated reason for this appellate Court not to reverse the trial court's judgment. Therefore, this cause of action is due to be remanded for the trial court to address each material issue of fact raised and grant him due relief sought.

Holloman is due a new trial based upon each of his jurisdictional and/or ineffective assistance of counsels claims because his Rule 32 Petition is meritorious on its face.

<u>CERTIFICATE OF SERVICE</u>

I , James Hickman Holloman do hereby certify that I have served two copies of the foregoing documents upon the Appellate Clerk for him/her to place a copy of same in the Attorney General's mailbox, on this the 5th day of December, 2005,

Respectfully submitted,

James Hickman Holloman

No. CR-05-0245

*In the COURT of CRIMINAL APPEALS*
*of ALABAMA*

◆

JAMES HICKMAN HOLLOMAN,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

◆

*On Appeal From the Circuit Court*
*of Houston County (CC-00-755 - CC-00-758.60)*

**BRIEF OF APPELLANT**

Troy King
*Attorney General*

Andy S. Poole
*Assistant Attorney General*

Cecil G. Brendle Jr.
*Assistant Attorney General*
Counsel of Record*

State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, Alabama  36130-0152
January 4, 2006          (334) 242-7401, 242-7300*



EXHIBIT
H

## STATEMENT REGARDING ORAL ARGUMENT

The issues raised in the present appeal are adequately addressed in the State's brief and therefore oral argument is not necessary or requested.

## **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS....................................... ii

TABLE OF AUTHORITIES.................................... iii

STATEMENT OF THE CASE AND FACTS........................... 1

ISSUE PRESENTED FOR REVIEW............................... 3

STANDARD OF REVIEW...................................... 3

SUMMARY OF THE ARGUMENT.................................. 3

ARGUMENT................................................ 4

    The Circuit Court Properly Denied Holloman's Rule 32
    Petition. .............................................. 4

CONCLUSION.............................................. 6

CERTIFICATE OF SERVICE.................................. 7

## TABLE OF AUTHORITIES

**Cases**

Boyd v. State, 746 So. 2d 364 (Ala. Crim. App. 1999)...... 5

Holladay v. State, 629 So. 2d 673 (Ala. Crim. App. 1992).. 5

Jones v. Barnes, 463 U.S. 745 (1983)..................... 5


**Rules**

Alabama Rules of Criminal Procedure,

    Rule 32.2(a)(3) ........................................ 4

    Rule 32.2(a)(3) and (5) ............................... 4

## STATEMENT OF THE CASE AND FACTS

This is an appeal from the summary dismissal of a Rule 32 petition filed by Appellant, James Hickman Holloman, in the Circuit Court of Houston County. On September 29, 2005, Holloman filed a Rule 32 petition attacking his June 18, 2003 conviction for two counts of capital murder and two counts of attempted murder. (C. 3-56) These convictions were affirmed on appeal by this Court on August 20, 2004. Holloman v. State, [CR-02-1958, Aug. 20, 2004] _____ So. 2d _____ (Ala. Crim. App. 2004).

Grounds raised in the Rule 32 petition were: 1) The court was without jurisdiction to render judgment or to impose sentence because Holloman was deprived of the right to be present during the giving of additional jury instruction; 2) ineffective assistance of trial and appellate counsel for not objecting to the trial court's giving of additional instructions; 3) the trial court was without jurisdiction because Holloman was deprived of his right to be present and heard during a bench conference; 4) ineffective assistance of counsel because counsel did not consult with him about agreement on consolidation; 5) the trial court was without jurisdiction because the indictment

failed to charge he acted intentionally; 6) ineffective
assistance of counsel because counsel did not object to
trial court's instruction concerning an insanity defense
and did not call Sherrie Holloman as a witness; 7)
Holloman was deprived of his right to testify and counsel
coerced him into not testifying; 8) counsel failed to
develop a defense based upon the medication Holloman was
taking; and, 9) the cumulative effect of ineffective
assistance of counsel. (C. 14-55)

On October 13, 2005, the State filed a motion for
summary judgment pointing out that the present issues could
have been raised on appeal; the claim of Holloman being
present during jury instruction was addressed on appeal;
Holloman was present during the consolidation conference;
the indictment was in proper form; the jury instruction
regarding the issue of mental disease was proper; and,
Holloman was not denied his right to testify. (C. 61-62)
On October 18, 2005, the circuit court granted the State's
motion for summary disposition because the issues raised by
Holloman in his Rule 32 petition were or could have been
raised on appeal. (C. 63)

## ISSUE PRESENTED FOR REVIEW

Did the circuit court properly deny Holloman's Rule 32
petition?

## STANDARD OF REVIEW

The standard of review of a trial court's denial of a
Rule 32 petition is abuse of discretion.  Reed v. State,
748 So. 2d 231, 233 (Ala. Crim. App. 1999).

## SUMMARY OF THE ARGUMENT

All of the claims Holloman presented to this Court were
either raised on direct appeal or could have been raised on
direct appeal.  Thus, they are precluded from Rule 32
review.

The one exception is Holloman's claim of ineffective
assistance of appellate counsel.  Counsel's failure to
raise every conceivable issue on appeal did not render his
representation deficient.  Holloman failed to show counsel
was ineffective on appeal.

3

## ARGUMENT

**The Circuit Court Properly Denied Holloman's Rule 32 Petition.**

The first issue Holloman raises on appeal is a claim that he was deprived of his right to be present during the court's giving of additional jury instructions. This issue was addressed on appeal and this Court found that defense counsel stipulated to the trial court actions in this regard. Holloman, id.

The next claim is that he was denied his right to be present during a bench conference concerning consolidation. The record reflects Holloman was present; moreover, this issue could have been raised on appeal. (C. 61) Rule 32.2(a)(3), Ala.R.Crim.P.

Holloman next makes numerous allegations of ineffective assistance of trial counsel. Holloman had new counsel on appeal that raised claims of ineffective assistance of trial counsel in Holloman's appeal. Because all of these claims were, or could have been, raised on appeal, they are now precluded from Rule 32 review. Rule 32.2(a)(3) and (5), Ala.R.Crim.P.

Holloman makes a claim of ineffective assistance of appellate counsel with regard to numerous claims Holloman alleges appellate counsel should have raised on appeal. To render effective assistance, an attorney is not required to raise every conceivable constitutional claim available on appeal. Holladay v. State, 629 So. 2d 673 (Ala. Crim. App. 1992). The courts have recognized the importance of winnowing out weaker arguments on appeal. Jones v. Barnes, 463 U.S. 745, 746 (1983); Boyd v. State, 746 So. 2d 364, 403 (Ala. Crim. App. 1999).

Based upon the reasons stated herein, the trial court did not abuse its discretion in dismissing and denying Holloman's Rule 32 petition.

## CONCLUSION

The State asserts that the Circuit Court of Houston County properly denied Holloman's Rule 32 petition and therefore its judgment is due to be affirmed.

Respectfully submitted,

Troy King
*Attorney General*

Andy S. Poole
*Assistant Attorney General*

Cecil G. Brendle, Jr.
*Assistant Attorney General*
Counsel of Record *

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2006,

I served a copy of the foregoing on Holloman, by placing

the same in the United States Mail, first class, postage

prepaid and addressed as follows:

        James Hickman Holloman
        AIS #229746 (G4A-106)
        1000 St. Clair Road
        Springville, AL  35146-5582


                                    Cecil G. Brendle, Jr.
                                    *Assistant Attorney General*
                                    Counsel of Record *


State of Alabama
Office of the Attorney General
11 South Union Street
Montgomery, AL  36130-0152
(334) 242-7401, 242-7357 *


87990/87415-001

ABC Amber WordPerfect Converter Trial version, http://www.processtext.com/abcwordperfect.h

Rel\04\21\2006\Holloman

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

**Montgomery, AL 36130-1555**

| | |
|---|---|
| H.W."BUCKY" McMILLAN<br>**Presiding Judge**<br>**SUE BELL COBB**<br>**PAMELA W. BASCHAB**<br>**GREG SHAW**<br>**A. KELLI WISE**<br>**Judges** | Lane W. Mann<br>**Clerk**<br>**Gerri Robinson**<br>**Assistant Clerk**<br>**(334) 242-4590**<br>**Fax (334) 242-4689** |

## MEMORANDUM

CR-05-0245                    Houston Circuit Court CC-00-755.60

James Hickman Holloman v. State

McMILLAN, Judge.

The appellant appeals from the trial court's summary dismissal of his Rule 32 petition for post-conviction relief, attacking his June 2005 convictions on two counts of capital murder and two counts of attempted murder. His convictions were affirmed on direct appeal. See Holloman v. State, [Ms. CR-02-1958, August 20, 2004] (Ala. Crim. App. 2004).

In his petition, the appellant raises the following claims as grounds for post-conviction relief:

**EXHIBIT**

I

PENGAD 800 631-6989

ABC Amber WordPerfect Converter Trial version, http://www.processtext.com/abcwordperfect.h

1. The trial court was without jurisdiction to render judgment or to impose sentence because he was deprived of the right to be present during the giving of additional jury instructions;

2. He received ineffective assistance of trial and appellate counsel for failing to object to the trial court's giving of additional instructions;

3. The trial court was without jurisdiction because he was deprived of his right to be present and heard during a bench conference;

4. He received ineffective assistance of counsel because counsel did not consult with him about agreement on consolidation;

5. The trial court was without jurisdiction because the indictment failed to charge he acted intentionally;

6. He received ineffective assistance of counsel because counsel did not object to the trial court's instruction concerning an insanity defense and did not call Sherrie Holloman as a witness;

7. He was deprived of his right to testify and counsel coerced him into not testifying;

8. Trial counsel failed to develop a defense based upon the medication Holloman was taking; and

9. The cumulative effect of ineffective assistance of counsel prejudiced his defense.

The record indicates that the trial court granted the State's motion for summary disposition, citing as grounds that the claims raised in the appellant's petition were, or could have been raised on appeal. See Rule 32.2 (a)(4)and (5), Ala. R. Crim. P. We agree with the State that the appellant has failed to meet his burden of proof entitling him to relief on the grounds alleging ineffective assistance of appellate

ABC Amber WordPerfect Converter Trial version, http://www.processtext.com/abcwordperfect.h

counsel. Rule 32.2, Ala. R. Crim. P.

The judgment of the trial court is affirmed.

AFFIRMED.

Cobb and Wise, JJ., concur.  Baschab and Shaw, JJ., concur in the result.



ABC Amber WordPerfect Converter Trial version

http://www.processtext.com/abcwordperfect.html

# COURT OF CRIMINAL APPEALS
# STATE OF ALABAMA

**Lane W. Mann**
Clerk
**Gerri Robinson**
Assistant Clerk



**P. O. Box 301555**
**Montgomery, AL 36130-1555**
**(334) 242-4590**
**Fax (334) 242-4689**

May 12, 2006

**CR-05-0245**

James Hickman Holloman v. State of Alabama  (Appeal from Houston  Circuit Court: CC00-755.60)

## <u>NOTICE</u>

You are hereby notified that on May 12, 2006 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Judy Byrd, Circuit Clerk
James Hickman Holloman, Pro Se
Cecil G. Brendle, Jr., Asst. Atty. Gen.



EXHIBIT

J

# IN THE SUPREME COURT OF ALABAMA



June 9, 2006

**1051166**

Ex parte James Hickman Holloman.  PETITION FOR WRIT OF CERTIORARI TO
THE COURT OF CRIMINAL APPEALS  (In re: James Hickman Holloman v. State of
Alabama)   (Houston Circuit Court: CC00-755.60; Criminal Appeals : CR-05-0245).

## CERTIFICATE OF JUDGMENT

## Writ Denied

The above cause having been duly submitted, IT IS CONSIDERED AND
ORDERED that the petition for writ of certiorari is denied.

STUART, J. -  Nabers, C.J., and See, Harwood, and Bolin, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.

Witness my hand this _9th_ day of _June,_  _2006_

Clerk, Supreme Court of Alabama



EXHIBIT

_K_

/bb